# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| CITY OF MIAMI FIRE FIGHTERS' AND POLICE OFFICERS' RETIREMENT TRUST, individually and on behalf of all others similarly situated, | CASE NO: <br><br> <u>CLASS ACTION</u> <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
|         Plaintiff, <br><br>   vs. | |
| PRIMO BRANDS CORPORATION, ROBBERT RIETBROEK, DAVID HASS, JASON AUSHER, C. DEAN METROPOULOS, KURTIS BARKER, BRITTA BOMHARD, SUSAN E. CATES, MICHAEL J. CRAMER, ERIC J. FOSS, JERRY FOWDEN, TONY W. LEE, BILLY D. PRIM, KIMBERLY REED, JOSEPH ROSENBERG, ALLISON SPECTOR, STEVEN P. STANBROOK, MORGAN STANLEY & CO. LLC, BOFA SECURITIES, INC., J.P. MORGAN SECURITIES LLC, RBC CAPITAL MARKETS, LLC, BARCLAYS CAPITAL INC., BMO CAPITAL MARKETS CORP., DEUTSCHE BANK SECURITIES INC., JEFFERIES LLC, GOLDMAN SACHS & CO. LLC, MIZUHO SECURITIES USA LLC, TD SECURITIES (USA) LLC, TRUIST SECURITIES, INC., WILLIAM BLAIR & COMPANY, L.L.C., DREXEL HAMILTON, LLC, LOOP CAPITAL MARKETS LLC, and TRITON WATER PARENT HOLDINGS, LP | DEMAND FOR A JURY TRIAL |
|         Defendants. | |

## I.    INTRODUCTION

Plaintiff City of Miami Fire Fighters' and Police Officers' Retirement Trust ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief are based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by Primo Brands Corporation ("Primo Brands" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, conference calls, and postings on the Primo Brands website concerning the Company's public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants.  Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein, which evidence will be developed after a reasonable opportunity for discovery.

## II.    SUMMARY OF THE ACTION

1.    This federal securities class action asserts both strict liability claims under the Securities Act of 1933 (the "Securities Act") and fraud-based claims under the Securities Exchange Act of 1934 (the "Exchange Act").  These claims arise from

Defendants' material misrepresentations made in the lead up to the Merger (as defined herein) between Primo Water Corporation ("Primo Water") and an affiliate of BlueTriton Brands, Inc. ("BlueTriton"), as well as the subsequent material misrepresentations made regarding the integration of these two companies to form Primo Brands.

2.      This federal securities class action is brought on behalf of a "Class" of:

(a)      All persons and entities that purchased Primo Brands common stock pursuant, or traceable, or both, to the SPO Materials (as defined herein) issued in connection with Primo Brands' March 2025 secondary public offering (the "SPO") against Primo Brands and the Securities Act Defendants (as defined herein) for violations of Sections 11, 12(a)(2), and 15 of the Securities Act; and

(b)      All persons who purchased or otherwise acquired: (i) the common stock of Primo Water between June 17, 2024 through November 8, 2024, inclusive, and/or (ii) the common stock of Primo Brands between November 11, 2024 through November 6, 2025, inclusive (the "Class Period"), against Primo Brands and the Exchange Act Individual Defendants (as defined herein) for violations of Sections 10(b) and 20(a) of the Exchange Act and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

3.      Under Sections 11, 12(a)(2), and 15 of the Securities Act, the Securities Act Defendants are liable for materially false and misleading statements contained

2

in the SPO Materials.  Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct as to the Securities Act claims.

4.    Primo Brands is a branded beverage distribution company, with a portfolio of brands like Poland Spring, Pure Life, Saratoga, and Mountain Valley.

5.    Before the Merger in 2021, private equity firm One Rock Capital Partners, LLC ("One Rock Capital") acquired Nestlé Waters North America, which was later rebranded as BlueTriton. During this time, Primo Water was a "water solutions company," and BlueTriton possessed a portfolio of national and regional water brands, in addition to operating a direct delivery business known as "ReadyRefresh."

6.    The first day of the Class Period, before markets opened on June 17, 2024, Primo Water issued a press release to announced that it had agreed to merge with BlueTriton in an all-stock transaction to create Primo Brands (the "Merger"), which was purported to be "a leading North American pure-play healthy hydration company." In the press release announcing the Merger, Primo Water touted that "[i]ncreased presence, [a] leading portfolio of iconic brands, diversified product offerings and enhanced distribution capabilities position the combined company for sustained long-term growth."

7.      During the M&A call held that day, Chairman of the Board of BlueTriton C. Dean Metropoulos ("Metropoulos") touted that the merging companies had "completed the proper due diligence necessary for a deal of this magnitude[,]" while also emphasizing that "[b]oth companies come to this transaction from a position of financial strength."

8.      On November 8, 2024, after markets closed, Primo Water issued a press release announcing that the Merger had closed. In the press release, Metropoulos claimed that Primo Brands had "a clear strategy to accelerate growth driven by the strong demand for branded beverages and healthy hydration that continues to expand across all high-growth channels[.]"

9.      During the Class Period and in the SPO Materials, Primo Brands assured investors that the integration of the merged companies was progressing well and would result in the Merger providing financial growth, meaningful synergies, and significant operational efficiencies. For example, on February 20, 2025, the Company's former Chief Executive Officer ("CEO") Robbert Rietbroek ("Rietbroek") claimed that "[w]e're really looking at the business as, one, go-to-market system now."

10.      Throughout the Class Period and in the SPO Materials, Defendants misled investors about Primo Brands' prospects as a combined company and the Company's integration progress, by failing to disclose that: (1) from the outset of

4

the Merger, Primo Brands' direct delivery business, including ReadyRefresh, experienced serious operational disruptions that prevented the Company from executing the most basic operational tasks; (2) Primo Brands experienced significant, ongoing, self-inflicted execution challenges integrating Primo Water and BlueTriton; (3) the disruptions in the direct delivery business and execution challenges imperiled Primo Brands' integration plan; (4) in turn, Primo Brands was unable to effectively serve its customers, particularly in its direct delivery business; (5) due to the foregoing, Primo Brands' business and operations were negatively impacted; and (6) as a result of the above, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

11.    The truth began to emerge before markets opened on August 7, 2025, when Primo Brands reported revenue of $1.730 billion and adjusted diluted earnings per share ("EPS") of $0.36 for the second quarter of 2025, both of which fell short of analysts' estimates. Primo Brands also reduced both its full year 2025 net sales growth guidance to 0% to 1% (from 3% to 5%) and full year 2025 adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") guidance to $1.485 billion to $1.515 billion (from $1.6 billion to $1.628).

12.    Rietbroek attributed the poor second quarter results to, among other factors, "service issues during the accelerated integration process" and disclosed that

the guidance reductions were "[d]ue to these integration disruptions during the later part of Q2, and our reinvestment to correct the issues."

13.    On this news, Primo Brands stock fell $2.41 per share, or about 9%, to close at $24.00 per share on August 7, 2025.

14.    The truth fully emerged before markets opened on November 6, 2025. That day, Primo Brands disclosed that it was again reducing its full year 2025 sales growth and adjusted EBITDA guidance, as the Company now expected a "net sales decline in the low single digits versus the prior year" and adjusted EBITDA of "approximately $1.45 billion" at the midpoint. On the same day, Primo Brands revealed that Rietbroek had been replaced as Primo Brands CEO by Eric Foss ("Foss"). During the corresponding earnings call, Foss described the direct delivery disruptions to be "self-inflicted," with "the ultimate output" being "customer service issues."

15.    On this news, Primo Brands stock fell $4.96 per share, or more than 21%, to close at $17.70 per share on November 6, 2025.

16.    Analysts swiftly reacted. For example, J.P. Morgan analysts noted that the "3Q25 print was another in a series of disappointments since the merger between Primo Water and BlueTriton with another significant guidance cut and now CEO change." Barclays analysts also explained that "PRMB cut its comparable net sales growth guidance by ~200 bps at the midpoint and lowered its adj. EBITDA range an

incremental ~3%[,] and the market (ourselves included) struggled to wrap its head around the sequential deceleration that is required to bridge to this updated outlook."

17.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in market value of the Company's common stock when the truth was disclosed, Plaintiff and other Class members have suffered significant losses and damages.

## III.    JURISDICTION AND VENUE

18.    The claims asserted herein arise under Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77*l*, and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.    Personal jurisdiction and venue are proper in this Judicial District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v(c)), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public,

and the omission of material information, occurred in substantial part in this Judicial District, as Primo Brands is headquartered in this Judicial District.

21.    Because the Underwriter Defendants (as defined herein) were counterparties to the Underwriting Agreement and each of the Securities Act Individual Defendants (as defined herein) authorized the execution of the Underwriting Agreement by Primo Brands, each of them also submitted to the jurisdiction of this Court by directing acts within this Judicial District out of which this action arises.

22.    In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## IV.    COMPANY BACKGROUND

23.    Primo Brands is a North American branded beverage distribution company that focuses on healthy hydration, with a portfolio of brands like Poland Spring, Pure Life, Saratoga, and Mountain Valley.

24.    In 2021, before the formation of Primo Brands, One Rock Capital acquired Nestlé Waters North America and rebranded the company as BlueTriton. At this time, Primo Water described itself as a "water solutions company," while BlueTriton purported to possess a portfolio of national and regional water brands.

8

BlueTriton also operated its ReadyRefresh direct delivery business.

25.     On June 17, 2024, Primo Water issued a press release announcing the Merger between itself and BlueTriton to form Primo Brands in an all-stock transaction, purportedly creating "a leading North American pure-play healthy hydration company[.]" In the press release, Primo Water touted that "[i]ncreased presence, [a] leading portfolio of iconic brands, diversified product offerings and enhanced distribution capabilities position the combined company for sustained long-term growth."

26.     At the closing of the Merger, Primo Water and BlueTriton shareholders would exchange their shares for shares of the new U.S. holding company, Primo Brands. After the exchange, Primo Water shareholders (including incentive equity holders) would own 43% of the fully diluted Primo Brands shares, and BlueTriton shareholders would own the remaining 57%.

27.     The Merger closed on November 8, 2024, and Primo Brands began trading on the New York Stock Exchange under the ticker symbol "PRMB" on November 11, 2024.

## V.    SUBSTANTIVE ALLEGATIONS – SECURITIES ACT CLAIMS

28.     The claims set forth herein pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act are brought on behalf of persons or entities who purchased Primo Brands common stock in the SPO on March 10, 2025.  The Securities Act claims are

based solely on strict liability and negligence and are not based on any knowing or reckless conduct by or on behalf of any Defendant—*i.e.*, they do not allege, and do not sound in, fraud—and Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in these non-fraud claims.

### A.    Securities Act Parties

#### 1.    Plaintiff

29.    Based in Miami, Florida, Plaintiff City of Miami Fire Fighters' and Police Officers' Retirement Trust provides retirement and related benefits for qualified fire fighters, police officers, and their beneficiaries in the City of Miami. Plaintiff manages over $1.6 billion  in assets for the benefit of more than 4,100 participants.  As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased Primo Brands common stock in the SPO and suffered damages as a result of the violations of the federal securities laws alleged herein.

#### 2.    Defendants

##### a.    Corporate Defendant

30.    Defendant Primo Brands is incorporated under the laws of Delaware, with its principal executive offices located in Tampa, Florida and Stamford, Connecticut. The Company's common stock trades on the New York Stock

Exchange (the "NYSE") under the ticker symbol "PRMB." Primo Brands offered and sold 51,750,000 shares of Primo Brands common stock in the SPO.

### b.    The Securities Act Individual Defendants

31.    Defendant Robbert Rietbroek served as CEO of Primo Water from January 1, 2024 until November 8, 2024. Following the Merger, Rietbroek was CEO of Primo Brands, from its formation through November 6, 2025. Defendant Rietbroek signed the Registration Statement (as defined herein) in connection with the SPO, which was filed with the SEC.

32.    Defendant David Hass ("Hass") served as the Company's Chief Financial Officer ("CFO") at all relevant times and previously served as the CFO of Primo Water. Defendant Hass signed the Registration Statement in connection with the SPO, which was filed with the SEC.

33.    Defendant Jason Ausher ("Ausher") served as the Company's Chief Accounting Officer ("CAO") at all relevant times and previously served as CAO of Primo Water. Defendant Ausher signed the Registration Statement in connection with the SPO, which was filed with the SEC.

34.    Defendant C. Dean Metropoulos served as Chairman of the Board of BlueTriton from March 31, 2021 until November 8, 2024 and as Non-Executive Chairman of Primo Brands' Board of Directors (the "Board") from November 11, 2024 until November 6, 2025. Metropoulos remains a member of the Board.

Defendant Metropoulos signed the Registration Statement in connection with the SPO, which was filed with the SEC.

35.     Defendant Kurtis Barker ("Barker") served as a member of the Board, from the formation of Primo Brands, until May 21, 2025. Defendant Barker signed the Registration Statement in connection with the SPO, which was filed with the SEC.

36.     Defendant Britta Bomhard ("Bomhard") served as a member of the Board at all relevant times. Defendant Bomhard signed the Registration Statement in connection with the SPO, which was filed with the SEC.

37.     Defendant Susan E. Cates ("Cates") served as a member of the Board at all relevant times. Defendant Cates signed the Registration Statement in connection with the SPO, which was filed with the SEC.

38.     Defendant Michael J. Cramer ("Cramer") served as a member of the Board at all relevant times. Defendant Cramer signed the Registration Statement in connection with the SPO, which was filed with the SEC.

39.     Defendant Eric J. Foss was appointed CEO and Chairman of the Board effective November 6, 2025 and previously served as a member of the Board. Defendant Foss signed the Registration Statement in connection with the SPO, which was filed with the SEC.

40.    Defendant Jerry Fowden ("Fowden") served as a member of the Board at all relevant times. Defendant Fowden signed the Registration Statement in connection with the SPO, which was filed with the SEC.

41.    Defendant Tony W. Lee ("Lee") served as a member of the Board at all relevant times. Defendant Lee signed the Registration Statement in connection with the SPO, which was filed with the SEC.

42.    Defendant Billy D. Prim ("Prim") served as a member of the Board at all relevant times. Defendant Prim signed the Registration Statement in connection with the SPO, which was filed with the SEC.

43.    Defendant Kimberly Reed ("Reed") served as a member of the Board at all relevant times. Defendant Reed signed the Registration Statement in connection with the SPO, which was filed with the SEC.

44.    Defendant Joseph Rosenberg ("Rosenberg") served as a member of the Board, from the formation of Primo Brands, until his resignation on March 20, 2025. Defendant Rosenberg signed the Registration Statement in connection with the SPO, which was filed with the SEC.

45.    Defendant Allison Spector ("Spector") served as a member of the Board, from the formation of Primo Brands, until her resignation May 21, 2025. Defendant Spector signed the Registration Statement in connection with the SPO, which was filed with the SEC.

46.    Defendant Steven P. Stanbrook ("Stanbrook") served as a member of the Board at all relevant times. Defendant Stanbrook signed the Registration Statement in connection with the SPO, which was filed with the SEC.

47.    Defendants Rietbroek, Hass, Ausher, Metropoulos, Barker, Bomhard, Cates, Cramer, Foss, Fowden, Lee, Prim, Reed, Rosenberg, Spector, and Stanbrook are collectively referred to herein as the "Securities Act Individual Defendants."

48.    Each of the Securities Act Individual Defendants participated in the preparation of the SPO Materials and in the making of the materially inaccurate, misleading, and incomplete statements alleged herein. In particular, the Securities Act Individual Defendants reviewed, edited, and approved the Primo Brands SPO Materials, participated in the SPO, and solicited the purchase of Primo Brands common stock in the SPO to serve their financial interests and those of Primo Brands.

### c.    The Underwriter Defendants

49.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter for the SPO.

50.    Defendant BofA Securities, Inc. ("BofA") served as an underwriter for the SPO.

51.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the SPO.

52.    Defendant RBC Capital Markets, LLC ("RBC") served as an underwriter for the SPO.

53.    Defendant Barclays Capital Inc. ("Barclays") served as an underwriter for the SPO.

54.    Defendant BMO Capital Markets Corp. ("BMO") served as an underwriter for the SPO.

55.    Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") served as an underwriter for the SPO.

56.    Defendant Jefferies LLC ("Jefferies") served as an underwriter for the SPO.

57.    Defendant Goldman Sachs & Co. LLC ("GS") served as an underwriter for the SPO.

58.    Defendant Mizuho Securities USA LLC ("Mizuho") served as an underwriter for the SPO.

59.    Defendant TD Securities (USA) LLC ("TD") served as an underwriter for the SPO.

60.    Defendant Truist Securities, Inc. ("Truist") served as an underwriter for the SPO.

61.    Defendant William Blair & Company, L.L.C. ("William Blair") served as an underwriter for the SPO.

62.    Defendant Drexel Hamilton, LLC ("Drexel") served as an underwriter for the SPO.

63.    Defendant Loop Capital Markets LLC ("Loop Capital") served as an underwriter for the SPO.

64.    The Defendants listed in ¶¶ 49-63 are referred to herein as the "Underwriter Defendants." The Underwriter Defendants sold 51,750,000 shares of Primo Brands common stock in the SPO—including the Underwriter Defendants' firm commitment to purchase and offer 45,000,000 shares of Primo Brands common stock and the full exercise of the Underwriter Defendants' option to purchase and offer up to 6,750,000 additional shares of Primo Brands common stock—at $29.50 per share and shared $46,949,471 in underwriting discounts and commissions. The Underwriter Defendants' failure to conduct adequate due diligence in connection with the SPO and the preparation of the SPO Materials was a substantial factor leading to the harm complained of herein.

### d.    The Selling Stockholder Defendant

65.    Defendant Triton Water Parent Holdings, LP ("Triton Water Parent Holdings"), an affiliate of One Rock Capital, owned 160,618,368 shares of Primo Brands common stock prior to the SPO—and following the full exercise of the underwriters' option purchase up to an additional 6,750,000 shares of Primo Brands

common stock from Triton Water Parent Holdings—owned 166,868,368 shares of Primo Brands common stock.

66.    Defendant Triton Water Holdings is referred to herein as the "Selling Stockholder Defendant."

67.    For the purposes of the Securities Act claims alleged herein, Defendant Primo Brands, the Securities Act Individual Defendants, the Underwriter Defendants, and the Selling Stockholder Defendant are collectively referred to herein as the "Securities Act Defendants."

**B.    Material Misrepresentations and Omissions in the SPO Materials**

68.    On or about March 10, 2025, Primo Brands conducted the SPO, in which the Selling Stockholder Defendant sold 51,750,000 shares of Primo Brands common stock to the public at $29.50 per share for gross proceeds of $1,522,692,060 (including the Underwriter Defendants' option to purchase and offer an additional 6,750,000 shares of Primo Brands common stock).

69.    The SPO was conducted pursuant to, and the sale of common stock was solicited by, several documents that were filed by Primo Brands and the Underwriter Defendants with the SEC and disseminated to the investing public, including (i) a March 5, 2025 registration statement on Form S-1/A, which was declared effective by the SEC on March 10, 2025 (the "Registration Statement"), and (ii) a March 10, 2025 preliminary prospectus supplement and a March 11, 2025 final prospectus

supplement filed pursuant to Rule 424(b)(3), which forms part of the Registration Statement (the "Prospectus" and, together with the Registration Statement and attendant materials filed or published with these forms, the "SPO Materials").

70.    The SPO Materials explained that Primo Brands' "combined platform brings together BlueTriton's iconic portfolio of brands and retail distribution strength with Primo Water's complementary branded large format and direct-to-consumer offering." The SPO Materials further claimed that "[t]he increased scale and reach of our North American platform make the Company well positioned to take share of and sustainably grow in the large U.S. beverage category." Additionally, the SPO Materials claimed that Primo Brands had identified an "estimated $300 million run-rate cost synergies opportunity[,]" and that the synergies were "designed to streamline our cost structure and optimize our operations, procurement, IT/ERP, call center and SG&A functions."

71.    The statements referenced above in ¶ 70 were each inaccurate statements of material fact because the SPO Materials failed to disclose the following significant, then-existing material events, trends, and uncertainties that Primo Brands had already been facing at the time of the SPO: (1) from the outset of the Merger, Primo Brands' direct delivery business, including ReadyRefresh, experienced serious operational disruptions that the prevented the Company from executing the most basic operational tasks; (2) Primo Brands experienced

significant, ongoing, self-inflicted execution challenges integrating Primo Water and BlueTriton; (3) the disruptions in the direct delivery business and execution challenges imperiled Primo Brands' integration plan; (4) in turn, Primo Brands was unable to effectively serve its customers, particularly in its direct delivery business; and (5) due to the foregoing, Primo Brands' business and operations were negatively impacted.

### C. Post-Offering Events

72.    August 7, 2025, the Company issued a press release announcing its second quarter 2025 financial results and held an accompanying earnings call, revealing the severity of the challenges with the integration of Primo Water and Triton Water. Specifically, Primo Brands disclosed second quarter revenue and adjusted diluted EPS that fell short of analysts' estimates. Primo Brands also slashed its full year 2025 net sales growth guidance to 0% to 1% (from 3% to 5%) and full year 2025 adjusted EBITDA guidance to $1.485 billion to $1.515 billion (from $1.6 billion to $1.628).

73.    In the press release, Rietbroek informed investors that the second quarter results were impacted by, among other factors, "service issues during the accelerated integration process[.]" He further explained that the guidance cuts were "[d]ue to these integration disruptions during the later part of Q2, and our reinvestment to correct the issues."

74.    During the earnings call, Rietbroek further admitted that "In the second quarter, we have significant disruptions in our direct delivery business, resulting from the combining, upgrading and rationalizing of our operations."

75.    Then, on November 6, 2025, Primo Brands issued a press release reporting its third quarter 2025 financial results and held an accompanying earnings call in which the Company revealed that Foss had replaced Rietbroek as Primo Brands CEO. During the earnings call, Hass disclosed that the Company again lowered its full year 2025 guidance expecting a "net sales decline in the low single digits versus the prior year" and adjusted EBITDA of "approximately $1.45 billion" at the midpoint.

76.    During that same call, in response to a CJS Securities analyst asking about the integration's challenges, Foss conceded that "most of the direct delivery disruption has been self-inflicted." He further explained that Primo Brands "probably moved too far too fast on some of the various integration work streams." He also admitted that "[t]here's no doubt that, that speed impacted product supply[]" and the Company's "ability to get through a lot of the warehouse closures and route realignment without disruption."

77.    Analysts swiftly reacted to these revelations. For example, J.P. Morgan analysts explained that the "3Q25 print was another in a series of disappointments

since the merger between Primo Water and BlueTriton with another significant guidance cut and now CEO change."

78.    Since the SPO, the value of Primo Brands common stock shares has declined substantially from the SPO price of $29.50 per share to $16.24 per share on December 4, 2025 (a 44.95% decline from the SPO price), the day before this Action was filed.

79.    As a result of the Securities Act Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Class members have suffered significant losses and damages.

## COUNT I

### For Violation of Section 11 of the Securities Act
### Against Primo Brands, the Securities Act Individual Defendants, and the Underwriter Defendants

80.    Plaintiff repeats, incorporates, and realleges each and every allegation above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

81.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendant Primo Brands, each of the Securities Act Individual Defendants, and each of the Underwriter Defendants. This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which

is not a required element of Section 11, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

82.   The SPO Materials issued in connection with the SPO were inaccurate and misleading, contained inaccurate and misleading statements of material facts, omitted to state material facts necessary to render the statements therein not misleading, and omitted to state material facts required to be stated therein.

83.   Primo Brands is the registrant and issuer of the common stock sold pursuant to the SPO Materials. The Securities Act Defendants named herein were responsible for the contents and dissemination of the SPO Materials. Each of the Securities Act Individual Defendants signed or authorized the signing of the SPO Materials on their own behalf. The Underwriter Defendants marketed and underwrote the SPO and sold the Primo Brands common stock issued in the SPO to the Class.

84.   As the issuer of the shares of Primo Brands common stock sold pursuant to the SPO Materials, Primo Brands is strictly liable to the Class for the SPO Materials' material misstatements and omissions. Signatories of the SPO Materials, and possibly other Securities Act Defendants, may also be strictly liable to the Class for such material misstatements and omissions.

85.   None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds to believe that the statements in the

SPO Materials were true, complete, accurate, without omissions of any materials facts, or not misleading.

86.     By reasons of the conduct alleged herein, each of the Securities Act Defendants named herein violated and/or controlled a person who violated Section 11 of the Securities Act.

87.     None of the untrue statements or omissions of material fact in the SPO Materials alleged herein was a forward-looking statement.   Rather, each such statement concerned existing facts. Moreover, the SPO Materials did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

88.     Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which these claims are based to the time that Plaintiff filed this action. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this action.

89.     Plaintiff and the Class have sustained damages. The value of Primo Brands common stock has declined substantially subsequent to and due to violations by the Securities Act Defendants named in this Count.

90.     At the time of their purchases of Primo Brands common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the

wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures alleged herein.

## COUNT II

### For Violation of Section 12(a)(2) of the Securities Act
### Against the Securities Act Defendants

91.    Plaintiff repeats, incorporates, and realleges each and every allegation above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

92.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), on behalf of the Class, against Defendant Primo Brands, the Securities Act Individual Defendants, the Underwriter Defendants, and the Selling Stockholder Defendant. This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 12(a)(2), and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

93.    Each of the Defendants named in this Count were sellers, offerors, or solicitors of purchases of the Company's common stock pursuant to the defective Prospectus that respectively formed in relevant part the SPO Materials. The actions of solicitation by these Securities Act Defendants include participating in the

preparation of the false and misleading Prospectus and marketing the common stock to investors, including members of the Class.

94.    The Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make statements made therein not misleading, and omitted to state material facts required to be stated therein.

95.    Each of the Securities Act Defendants named in this Count owed Plaintiff and other members of the Class that purchased Primo Brands common stock pursuant to the Prospectus a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. By virtue of each of the Securities Act Defendants' failure to exercise reasonable care, the Prospectus contained misrepresentations of material fact and omissions of material fact necessary to make the statements therein not misleading.

96.    Plaintiff and the members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus issued in connection with the SPO at the time they purchased Primo Brands common stock.

97.    By reason of the conduct alleged herein, the Securities Act Defendants violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of

such violations, Plaintiff and the other members of the Class that purchased Primo Brands common stock pursuant to SPO sustained substantial damages in connection therewith. Accordingly, Plaintiff and the other members of the Class that hold the common stock issued pursuant to SPO have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity. Class members that have sold their Primo Brands common stock seek damages to the extent permitted by law.

98.    Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which these claims are based to the time that Plaintiff filed this action. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this action.

**COUNT III**

**For Violation of Section 15 of the Securities Act**
**<u>Against the Securities Act Individual Defendants and the Selling Stockholder</u>**
**<u>Defendant</u>**

99.    Plaintiff repeats, incorporates, and realleges each and every allegation above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

100.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class, against each of the Securities Act Individual

26

Defendants and the Selling Stockholder Defendant. This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 15, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

101.    As detailed above, the Securities Act Individual Defendants named herein committed primary violations of the Securities Act by engaging in conduct in contravention of Section 11 of the Securities Act.

102.    The Securities Act Individual Defendants and the Selling Stockholder Defendant each were control persons of Primo Brands by virtue of their positions as directors, senior officers, and/or significant shareholders of Primo Brands. The Securities Act Individual Defendants and the Selling Stockholder Defendant each had a series of direct and/or indirect business and/or personal relationships with other directors, officers, and/or significant shareholders of Primo Brands. Primo Brands also controlled the Securities Act Individual Defendants, given the influence and control the Company possessed and exerted over the Securities Act Individual Defendants and all its employees. The Selling Stockholder Defendant was a control person of Primo Brands by virtue of its significant influence over the Company's management and Board and its significant ownership of Primo Brands common stock.

103.   By reason of the conduct alleged herein, the Securities Act Individual Defendants and the Selling Stockholder Defendant violated Section 15 of the Securities Act, and Plaintiff and other members of the Class have suffered harm as a result.

## VI.   SUBSTANTIVE ALLEGATIONS – EXCHANGE ACT CLAIMS

### A.   Exchange Act Parties

104.   Based in Miami, Florida, Plaintiff City of Miami Fire Fighters' and Police Officers' Retirement Trust provides retirement and related benefits for qualified fire fighters, police officers, and their beneficiaries in the City of Miami. Plaintiff manages over $1.6 billion in assets for the benefit of more than 4,100 participants.   As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased Primo Brands common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

105.   Defendant Primo Brands is incorporated under the laws of Delaware, with its principal executive offices located in Tampa, Florida and Stamford, Connecticut.   The Company's common stock trades on the NYSE under the ticker symbol "PRMB."

106.   Defendant David Hass served, at all relevant times, as the Company's Chief Financial Officer, and previously served as the CFO of Primo Water.

28

107.   Defendant C. Dean Metropoulos served as Chairman of the Board of BlueTriton Brands from June 17, 2024 through November 8, 2024 and as Non-Executive Chairman of the Board of Primo Brands from November 11, 2024 until November 6, 2025 when he was succeeded by Foss. Metropoulos remains a member of the Board.

108.   Defendant Robbert Rietbroek served as CEO of Primo Water from January 1, 2024 until the Merger on November 8, 2024. Following the Merger, Rietbroek was CEO of Primo Brands, from its formation through November 6, 2025.

109.   Defendants Hass, Metropoulos, and Rietbroek are collectively referred to herein as the "Exchange Act Individual Defendants." The Exchange Act Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, shareholder letters, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Exchange Act Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the

public, and that the positive representations that were being made were then materially false and/or misleading. The Exchange Act Individual Defendants are liable for the false statements pleaded herein.

110.    For the purposes of the Exchange Act claims alleged herein, Defendant Primo Brands and the Exchange Act Individual Defendants are collectively referred to herein as the "Exchange Act Defendants." The Securities Act Defendants and the Exchange Act Defendants are collectively referred to herein as "Defendants."

**B.    Materially False and Misleading Statements Issued During the Class Period**

111.    Plaintiff's Exchange Act claims are brough on behalf of all persons who purchased or otherwise acquired: (i) the common stock of Primo Water Corporation between June 17, 2024 through November 8, 2024, inclusive, and/or (ii) the common stock of Primo Brands between November 11, 2024 through November 6, 2025, inclusive.

112.    On June 17, 2024, before markets opened, Primo Water and BlueTriton announced that the two companies had agreed to merge to create Primo Brands, "a leading North American pure-play healthy hydration company in an all-stock transaction." In the press release, Primo Water touted that "[i]ncreased presence, [a] leading portfolio of iconic brands, diversified product offerings and enhanced distribution capabilities position the combined company for sustained long-term growth."

30

113.    During the associated M&A call held that day, Metropoulos stated, "I would like to thank the Primo Water and BlueTriton teams and our advisers for their hard work as we completed the proper due diligence necessary for a deal of this magnitude. Both companies come to this transaction from a position of financial strength." He later claimed, "[b]y combining BlueTriton and Primo Water, we will create a leading North American platform, which combines complementary businesses across various channels, formats, geographies and usage occasions."

114.    During that same call, Rietbroek emphasized that Primo Brands was "positioned to generate meaningful cost synergies and value creation opportunities." Hass also explained:

> In IT and ERP, we plan to optimize our functional software and expand the use of successful systems implementation further into the organization. We also plan to benefit from a recently implemented ERP by BlueTriton, which we expect to accelerate the modernization of our combined financial systems. Within our call center, we have an opportunity to better align our activities to deliver superior service at a lower cost. And within the broader SG&A category, we will seek to optimize systems and processes across key functional areas.

115.    On August 8, 2024, during Primo Water held its second quarter 2024 earnings call, during which Rietbroek stated, "From our production and distribution footprint to our ability as a combined company to elevate the customer experience, we're excited to provide a diverse array of water solutions for the residential, the commercial, and the retail customers."

116.    On November 7, 2024, Primo Water held its third quarter 2024 earnings call, during which Hass stated that "our improved financial profile and flexibility along with a compelling long-term growth outlook and the growth potential from our transaction with BlueTriton are a solid foundation for the future success of the new combined company, Primo Brands."

117.    During that same call, Rietbroek touted the prospects of the Merger, stating that, "[a]s demonstrated by the respective Q3 financial results, both companies enter this transaction from a position of strength." He further boasted about the integration "planning efforts," stating:

> I am pleased that as the progress in defining the new Primo Brands organization has taken place, *teams have been diligent in their integration planning efforts to hit the ground running upon closing. After the transaction was announced, we created working teams from both organizations that were tasked with identifying opportunities and planning to create an optimized structure to capture value across the organization once we close.* We believe Primo Brands is positioned for success as a leading branded beverage company in North America with a leadership position in retail, residential, commercial, and away-from-home. We believe the combined company is positioned to deliver long-term growth, transform efficiencies and generate superior financial returns with premier brands, a unique platform, diversified assets and operations, an experienced executive team with representatives from both companies.

118.    Rietbroek further touted the direct-to-consumer business, stating:

> We also have a strong direct-to-customer platform, which includes the sale and rent of dispensers, commercial, residential and away-from-home beverage delivery services; Water Exchange, a program where consumers can purchase and return their multi-use bottles directly; our in-store Water Refill selfserve business, where

consumers can fill their own bottles using our dispensers inside and outside stores; and Water Filtration, where consumers can have a unit installed at their residential or commercial location. As a combined company, we will be able to provide even more branded beverage solutions any time, any place, anywhere. We will be positioned to benefit from highly attractive market dynamics in U.S. bottled water. Our scale will allow us to become a stronger strategic partner with our retailers, helping them manage the bottled water category for growth.

119.    The next day, on November 8, 2024, the closing of the Merger was announced in a press release after issued markets closed. Primo Brands informed investors that the Company will begin trading on the New York Stock Exchange under the ticker symbol "PRMB" on November 11, 2024. In the press release, Metropoulos claimed that Primo Brands had "a clear strategy to accelerate growth driven by the strong demand for branded beverages and healthy hydration that continues to expand across all high-growth channels," which included "retail, clubs, restaurants, hospitality, convenience stores, hospitals, schools, offices and more."

120.    On February 20, 2025, Primo Brands issued a press release to announce its financial results for the fourth quarter and full year of 2024. In the press release, Rietbroek stated, "I am pleased with the progress of our integration[]" as Primo Brands had "accelerated the size and speed of cost synergy capture." He further stated that "[i]t is now forecasted to be $100 million higher and one year sooner, with $300 million in total expected by year end 2026. First-year 2025 synergies are estimated to be $200 million, with the balance occurring in 2026[,] and that "[t]he synergy capture is reflected in our 2025 outlook[.]"

121.   During the associated earnings call, Rietbroek stated, "We believe all aspects of our business are aligning for flawless integration execution, where we build a foundation for long-term growth by unifying the people, processes, policies and platforms to maximize timely cost synergy capture as well as to capture revenue synergies." Later during that call Hass also spoke about the integration, stating:

> Integration CapEx is expected to be approximately $200 million in 2025 and $50 million in 2026. Due to the strength at BlueTriton across our enterprise reporting platform, production and vertically integrated large-format bottle production, we are able to integrate these aspects of legacy Primo Water business into the asset base. The significant integration and volume shifts of the business into a single network and operating system will require some spend in key categories. These include onetime integration CapEx within IT to assist the transition of Primo Water ERP into the legacy BlueTriton systems, water production and capacity expansion, geographic location of our equipment, additional large-format blow molding equipment as well as other fleet and cooler asset standardization. We believe this will also allow future year growth to efficiently move through our vertically integrated and scaled production and distribution system. Combining these factors along with the core health and cash generation capacity of our business model, we are forecasting adjusted free cash flow of between $790 million and $810 million for 2025. This forecast assumes adding back acquisition and integration costs, in-year integration only CapEx as well as benefit of after-tax in-year synergy capture.

122.   During the question-and-answer portion of the call, a J.P. Morgan analyst asked about Primo Brands' revenue growth. In response, Rietbroek stated that "[w]e're really looking at the business as, one, go-to-market system now[,]" with "one network, coast-to-coast network vertically integrated that serves both commercial and residential customers as well as retail customers and foodservice customers as well as small format." He further added that "the strength of this unique

go-to-market system is that unique distribution model that we can fully leverage and

gives us scale and allows us to grow accretively as one end-to-end business model."

123.    On May 8, 2025, Primo Brands held its first quarter 2025 earnings call.

During the call Rietbroek reiterated:

> We believe all aspects of our business are aligning for flawless
> integration execution, where we build the foundation for long-term
> growth by unifying the people, processes, policies and platforms to
> maximize timely cost synergy capture as well as to capture revenue
> synergies.

124.    On that same call, Hass again touted the integration, boasting:

> While many companies in today's environment are stepping back to
> review and adjust their cost structures and drive efficiencies, ***Primo
> Brands remains in a strong position to quickly extract and
> leverage the benefits of our merger***. We began to immediately
> deploy our integration playbook at the time of our merger to remove
> duplicative costs and seek a leaner cost structure. ***This also allows
> us to review all aspects of the businesses we are combining without
> a lot of risks to our offerings as we're largely driving efficiencies
> and streamlining into a single-company operating structure***. We
> will continue to prioritize executing our cost synergy capture in
> 2025 to drive our profitability and leverage a single production and
> operations footprint.

125.    On May 14, 2025, Primo Brands presented at the 2025 BMO Farm to

Market Chemicals Conference. During the presentation, a BMO Capital Markets

analyst asked about the progress of the integration, and in response, Rietbroek stated,

in relevant part:

> Obviously, integrations are tough, right? Nothing is perfect. I mean
> it's full of learning. So that's why we have phases, and we call them
> R1, R2, R3, R4 and R5. So we are going through a third phase now
> of branch integrations. The first one was small. We tested the
> system, we learned how to improve, then we did a slightly bigger
> one. And we do it city by city. So we'll do Dallas, we'll do Los
> Angeles, we'll do Colorado. And we're learning and it's not perfect,

and we're fixing on the fly. ***That's why the focus for this year is truly primarily the integration and getting to a flawless integration, so that by the time we get into 2026, you all see a true picture of this business. It's far from perfect, but it is working well. We've not had major hiccups.*** But think about things like data integrity when you're transferring a database from one system to another. Enterprise software, so migrating our facilities into SAP. Those are all single individual projects that go side by side that need entire multifunctional teams to execute with excellence.

126.    The above statements identified in ¶¶ 112-125 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading. Specifically, Defendants failed to disclose to investors that: (1) from the outset of the Merger, Primo Brands' direct delivery business, including ReadyRefresh, experienced serious operational disruptions that the prevented the Company from executing the most basic operational tasks; (2) Primo Brands experienced significant, ongoing, self-inflicted execution challenges integrating Primo Water and BlueTriton; (3) the disruptions in the direct delivery business and execution challenges imperiled Primo Brands' integration plan; (4) in turn, Primo Brands was unable to effectively serve its customers, particularly in its direct delivery business; (5) due to the foregoing, Primo Brands' business and operations were negatively impacted; and (6) as a result of the above, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

36

**C.     The Truth Begins to Emerge**

127.    The truth began to emerge before markets opened on August 7, 2025, when Primo Brands issued a press release announcing its financial results for the second quarter of 2025. In the press release, the Company reported revenue of $1.730 billion and adjusted diluted EPS of $0.36 for the second quarter, both of which missed analysts' estimates of $1.806 billion and $0.41 per share, respectively. Primo Brands also reduced both its full year 2025 net sales growth guidance to 0% to 1% (from 3% to 5%) and full year 2025 adjusted EBITDA guidance to $1.485 billion to $1.515 billion (from $1.6 billion to $1.628).

128.    Additionally, in the press release, Rietbroek stated, "Our Q2 results were impacted by previously reported tornado damage to our Hawkins, Texas facility, and ***service issues during the accelerated integration process***[,]" while also explaining that the guidance reductions were "[d]ue to these integration disruptions during the later part of Q2, and our reinvestment to correct the issues." Nonetheless, he reassured investors about the promising prospects and status of the merger's integration, stating:

> Despite these Q2 challenges, we continue to see strong consumer demand for healthy hydration, and are encouraged by our retail share growth in July. We believe we are taking the right steps to resolve the service issues, which we expect to be back to normal by the end of September. Our business model is resilient and is well positioned to deliver growth, improve margins, and generate strong cash flow going forward, which will enable us to opportunistically return value to shareholders with the new $250 million share repurchase program[.]

129.    During the corresponding earnings call, Rietbroek explained that the integration process was one of "the 2 key disruptions that impacted our top line in the second quarter," and claimed "both of which are largely resolved[.]" He elaborated further, in relevant part, stating:

> *In the second quarter, we have significant disruptions in our direct delivery business, resulting from the combining, upgrading and rationalizing of our operations.* During the quarter, we closed 40 facilities, bringing the total number of facilities closed since the merger to 48 facilities or 15% of our total network, and we reduced headcount by 1,100 full-time equivalent roles in the quarter. In total, since the merger, we have reduced headcount by more than 1,600 roles, representing an 11% reduction across our organization. Additionally, in the past few months, we have been integrating facilities, merging routes and rationalizing technology, which included transitioning our legacy Primo branches to SAP and introducing new handheld devices to a large portion of our workforce.
>
> While the vast majority of our customers continued to receive the great service they expect from us, *in some markets, the high demand, standardization initiatives and challenges from an accelerated integration collectively affected our inventory levels and fill rates. We prioritized speed and cost reductions, resulting in some customers experiencing rescheduled or canceled deliveries on a recurring basis, product substitutions and extended customer service wait times.* These disruptions began in late May, and we have been working tirelessly to address the underlying operational issues, stabilizing service levels and optimizing our factory-to-branch transport and delivery routes. . . .

130.    During the same call, Hass also stated, in relevant part:

> Shifting to the direct delivery business. As Robbert mentioned, *we experienced some disruptions as the first wave of integration impacts caused product supply and delivery service in late May, and we're unable to fulfill strong demand from our customers. These friction points in our integration were not anticipated, but we believe that as our product supply stabilizes, this business will resume accretive performance to our long-term algorithm.* We believe this portion of business will stabilize in late Q3, and we'll discuss more about how this impacts our revised financial guidance

in a moment. Integrations can be challenging, particularly when merging 2 established leaders, ***but we have moved quickly to address the product supply issues and expect to return to growth as we exit the year***.

131.    Nonetheless, despite the poor second quarter results, Hass downplayed the issues surrounding the merger's integration and its negative impact on the direct delivery business, claiming, "The challenges in volume were directly related to the items previously discussed including our temporary inability to fulfill strong customer demand in our direct delivery business[,]" and that "We believe our shortfall was largely driven by correctable product supply issues."

132.    During the question-and-answer portion of the call, a TD Cowen analyst asked about the issues pertaining to service levels. In response, Rietbroek stated:

> I think we temporarily dropped below 80% in the first weeks of May. So through April when we started the conversion of the branches, rolled out new handhelds, consolidated branches, ***we saw a significant disruption there for a short period***. We then started adding modular racks and bottles. ***We had a compatibility issue. We were running the legacy Primo bottles through the ReadyRefresh network and discovered that we had an issue of decapping and capping the bottles***. We also learned about a compatibility issue with the racks, where we put in optical eyes to be able to identify

the racks.

133.   On this news, Primo Brands stock fell $2.41 per share, or about 9%, from a closing price of $26.41 per share on August 6, 2025, to a closing price of $24.00 per share on August 7, 2025.

134.   The above statements identified in ¶¶ 128-132 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading.  Specifically, Defendants failed to disclose to investors that: (1) from the outset of the Merger, Primo Brands' direct delivery business, including ReadyRefresh, experienced serious operational disruptions that the prevented the Company from executing the most basic operational tasks; (2) Primo Brands experienced significant, ongoing, self-inflicted execution challenges integrating Primo Water and BlueTriton; (3) the disruptions in the direct delivery business and execution challenges imperiled Primo Brands' integration plan; (4) in turn, Primo Brands was unable to effectively serve its customers, particularly in its direct delivery business; (5) due to the foregoing, Primo Brands' business and operations were negatively impacted; and (6) as a result of the above, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### D.   The Truth Fully Emerges

135.   The truth fully emerged before markets opened on November 6, 2025. That day, Primo Brands disclosed that it was reducing its full year 2025 sales growth and adjusted EBITDA guidance for the second time, while also announcing that Rietbroek had been replaced as Primo Brands CEO by Eric Foss. During the associated earnings call, Hass stated that the Company now expected a "net sales decline in the low single digits versus the prior year[,]" and that Primo Brands was lowering its full year 2025 adjusted EBITA guidance to "approximately $1.45 billion" at the midpoint.

136.   During the question-and-answer portion of that same call, in response to a CJS Securities analyst asking about challenges relating to the integration, Foss admitted that "I think most of the direct delivery disruption has been self-inflicted. And sometimes mergers can be complicated and more complex than maybe even anticipated going into them[,]" while highlighting that Primo Brands "probably moved too far too fast on some of the various integration work streams." He also admitted that "[t]here's no doubt that, that speed impacted product supply[]" and the Company's "ability to get through a lot of the warehouse closures and route realignment without disruption." Foss further explained, "the ultimate output of that was the customer service issues that we've highlighted."

137.   In responding to that same question, Foss also stated:

There are also where, I believe, some just integration issues related to the technology move over. But at the end of the day, as David said, the team has really been and continues to work hard to address those and correct those. I think in the quarter, David highlighted this, we saw continued improvement on multiple fronts. I think on the product supply front, we're pretty much corrected on that relative to instock conditions. But we still have work to do at the moment of truth around making sure our deliveries are on time with the right product. We did see each of the kind of process metrics around customer call volume and did see both improvements in the quarter on customer sat scores. But again, there is more work to do on this front to completely get the issues solved and corrected.

138.   On this news, Primo Brands stock fell $4.96, or more than 21%, from a closing price of $22.66 per share on November 5, 2025, to a closing price of $17.70 per share on November 6, 2025.

139.   Analysts immediately reacted. For example, J.P. Morgan analysts cut their price target and issued a report, noting that the "3Q25 print was another in a series of disappointments since the merger between Primo Water and BlueTriton with another significant guidance cut and now CEO change." Additionally, Barclays analysts slashed their price target and issued a report, highlighting, "PRMB cut its comparable net sales growth guidance by ~200 bps at the midpoint and lowered its adj. EBITDA range an incremental ~3%[,] and the market (ourselves included) struggled to wrap its head around the sequential deceleration that is required to bridge to this updated outlook."

**E.    Undisclosed Adverse Information**

140.   The market for Primo Brands common stock was an open, well-developed, and efficient market at all relevant times. As a result of the materially

false and/or misleading statements and/or omissions particularized in this Complaint, the Company's common stock traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased the Company's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Primo Brands and have been damaged thereby.

141.  During the Class Period, Defendants materially misled the investing public, thereby inflating the price of the Company's common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about the Company's business, operations, and prospects as alleged herein. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's common stock to be overvalued and artificially inflated or maintained at all relevant times. Defendants' materially false and/or misleading statements during the Class Period directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other

members of the Class who purchased the Company's common stock at artificially inflated prices and were harmed when the truth was revealed.

**F.    Scienter Allegations**

142.   As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

143.   As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Primo Brands, their control over, receipt, and/or modification of the Company's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Primo Brands, participated in the fraudulent scheme alleged herein.

**G.    Inapplicability of Statutory Safe Harbor**

144.   The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and

misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

145. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Primo Brands who knew that the statement was false when made.

### H.    Loss Causation

146. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

147. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market. This artificially inflated the prices of the Company's common

stock and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of the Company's stock fell precipitously, as the prior artificial inflation came out of the price.

## I.    Applicability of Presumption of Reliance (Fraud-on-the-Market Doctrine)

148.    The market for Primo Brands common stock was open, well-developed, and efficient at all relevant times.   As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Primo Brands common stock traded at artificially inflated and/or maintained prices during the Class Period. Plaintiff and other members of the Class purchased the Company's common stock relying upon the integrity of the market price of Primo Brands common stock and market information relating to Primo Brands and have been damaged thereby.

149.    At all times relevant, the market for Primo Brands common stock was an efficient market for the following reasons, among others:

(a)    Primo Brands was listed and actively traded on NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Primo Brands filed periodic public reports with the SEC and/or NYSE;

(c)    Primo Brands regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Primo Brands was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

150.    As a result of the foregoing, the market for Primo Brands common stock promptly digested current information regarding Primo Brands from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of Primo Brands common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

151.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions. Because this action

47

involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## **COUNT IV**

### **For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against Primo Brands and the Exchange Act Individual Defendants**

152.   Plaintiff repeats, incorporates, and realleges each and every allegation above as if fully set forth herein.

153.   During the Class Period, Defendant Primo Brands and the Exchange Act Individual Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Primo Brands common stock; and (iii) cause Plaintiff and other members of the Class to purchase Primo Brands common stock

at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Exchange Act Defendants took the actions set forth herein.

154.   Defendant Primo Brands and the Exchange Act Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Primo Brands common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The Exchange Act Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

155.   Defendant Primo Brands and the Exchange Act Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's business, operations, and prospects, as specified herein. The Exchange Act Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors

49

of the Company's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Primo Brands and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

156. Each of the Exchange Act Individual Defendants' primary liability and controlling-person liability, arises from the following facts: (i) each of the Exchange Act Individual Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) each of the Exchange Act Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Exchange Act Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and

(iv) each of the Exchange Act Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

157.   Defendant Primo Brands and the Exchange Act Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The Exchange Act Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock. As demonstrated by the Exchange Act Defendants' overstatements and misstatements of the Company's business, operations, and prospects throughout the Class Period, the Exchange Act Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

158.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Primo Brands common stock was artificially inflated, and relying

directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the shares and stock traded or trades, and/or in the absence of material adverse information that was known or recklessly disregarded by the Exchange Act Defendants, but not disclosed in public statements by the Exchange Act Defendants during the Class Period, Plaintiff and the other members of the Class purchased Primo Brands common stock during the Class Period at artificially inflated prices and were damaged thereby.

159.   At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff, the other members of the Class, and the marketplace known of the truth regarding the problems that Primo Brands was experiencing, which were not disclosed by the Exchange Act Defendants, Plaintiff and other members of the Class would not have purchased Primo Brands common stock, or, if they had purchased such shares or stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

160.   By virtue of the foregoing, Primo Brands and the Exchange Act Individual Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

161.   As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in

connection with their purchases of the Company's common stock during the Class Period.

## COUNT V

### For Violations of Section 20(a) of the Exchange Act
### Against the Exchange Act Individual Defendants

162.   Plaintiff repeats, incorporates, and realleges each and every allegation above as if fully set forth herein.

163.   The Exchange Act Individual Defendants acted as controlling persons of Primo Brands within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Exchange Act Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Each of the Exchange Act Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the

ability to prevent the issuance of the statements or cause the statements to be corrected.

164.   In particular, the Exchange Act Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

165.   As set forth above, Primo Brands and the Exchange Act Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Exchange Act Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## VII.   CLASS ACTION ALLEGATIONS

166.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of:

(a)   All persons and entities that purchased Primo Brands common stock pursuant, or traceable, or both, to the SPO Materials issued in connection with Primo Brands' March 2025 SPO, except those who are excluded below, against Primo Brands and the Securities Act Defendants for violations of Sections 11,

12(a)(2), and 15 of the Securities Act; and

(b)    All persons and entities that purchased (i) the common stock of Primo Water Corporation between June 17, 2024 through November 8, 2024, inclusive, and/or (ii) the common stock of Primo Brands between November 11, 2024 through November 6, 2025, inclusive, except those who are excluded below, against Primo Brands and the Exchange Act Individual Defendants for violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

167.   The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Throughout the Class Period, common stock of Primo Brands actively traded on the NYSE (an open and efficient market) under the ticker symbol "PRMB." Millions of Primo Brands shares were traded publicly during the Class Period on the NYSE. As of November 3, 2025, Primo Brands had more than 370,000,000 million shares of Class A common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Primo Brands or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

168.   Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

169.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that conflict with those of the Class.

170.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether Defendants violated the Securities Act or Exchange Act, or both, by the acts and omissions as alleged herein;

(b)     Whether Defendants omitted or misrepresented material facts, including whether the SPO Materials misrepresented and/or omitted material information in violation of the Securities Act;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether, with respect to the Exchange Act claims only, the Exchange Act Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

56

(e)    Whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of Primo Brands;

(f)    Whether the market price of Primo Brands common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(g)    The extent to which the members of the Class have sustained damages and the proper measure of damages.

171.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## **PRAYER FOR RELIEF**

172.    WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

(a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)    Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

(c)    Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

(d)    Awarding such other relief as this Court deems appropriate.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

Dated: December 5, 2025                Respectfully submitted,

**SAXENA WHITE P.A.**

By: */s/ Lester R. Hooker*
Maya Saxena
Lester R. Hooker
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
lhooker@saxenawhite.com

Marco A. Dueñas (*pro hac vice*
forthcoming)
10 Bank Street, Suite 882
White Plains, NY 10606

58

Tel.: (914) 437-8551
Fax: (888) 216-2220
mduenas@saxenawhite.com

*Counsel for Plaintiff City of Miami Fire
Fighters' and Police Officers' Retirement
Trust*

**KLAUSNER KAUFMAN JENSEN &
LEVINSON**
Robert D. Klausner (*pro hac vice*
forthcoming)
7080 NW 4th Street
Plantation, FL 33317
Tel.: (954) 916-1202
Fax: (954) 916-1232
Email: bob@robertdklausner.com

*Additional Counsel for Plaintiff City of
Miami Fire Fighters' and Police Officers'
Retirement Trust*

59

## CERTIFICATION AND AUTHORIZATION

I, Dania Orta, on behalf of City of Miami Fire Fighters' and Police Officers' Retirement Trust ("Miami FIPO"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I have reviewed a complaint prepared against Primo Brands Corporation ("Primo Brands"), arising from materially false and misleading statements made to investors concerning the merger of Primo Water Corporation ("Primo Water") and an affiliate of BlueTriton Brands, Inc., that alleges violations of the federal securities laws, and authorize its filing. I am authorized in my capacity as Administrator of Miami FIPO to initiate litigation and to execute this Certification on behalf of Miami FIPO.

2.  Miami FIPO did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.  Miami FIPO is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  Miami FIPO's transactions in Primo Water and/or Primo Brands common stock during the Class Period are set forth in the attached Schedule A.

5.  Miami FIPO has sought to serve and was appointed as lead plaintiff and/or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

    *Operating Eng'rs Constr. Indus. & Misc. Pension Fund v. Neogen Corp.*, No. 1:25-cv-0802 (W.D. Mich.);

    *Nixon v. CVS Health Corp.*, No. 1:24-cv-5303 (S.D.N.Y.); and

    *Oakland Cnty. Voluntary Emps' Beneficiary Assoc. v. Generac Holdings Inc.*, No. 2:22-cv-1436 (E.D. Wis.) (named plaintiff).

6.  Miami FIPO has sought to serve as a lead plaintiff or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff appointment, was not appointed lead plaintiff, or the lead plaintiff decision is still pending:

    *Baxter v. MongoDB, Inc.*, No. 1:24-cv-5191 (S.D.N.Y.); and

    *West Palm Beach Police Pension Fund v. Leslie's Inc.*, No. 2:23-cv-1887 (D. Ariz).

7.  Miami FIPO will not accept any payment for serving as a representative party on behalf of the Class beyond Miami FIPO's pro rata share of any recovery, except

1

such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of December, 2025.

*City of Miami Fire Fighters' and Police Officers' Retirement Trust*

Dania Orta, Administrator

2

| | SCHEDULE A | |
|---|---|---|
| | **City of Miami Fire Fighters' and Police Officers' Retirement Trust** | |
| | **Transactions in Primo Brands Corporation** | |

| Common Stock Purchases | | |
|---|---|---|
| Date | Shares | Price |
| 11/26/24 | 267 | $28.3056 |
| 11/27/24 | 99 | $28.4150 |
| 11/27/24 | 172 | $28.6207 |
| 11/27/24 | 88 | $28.6300 |
| 11/29/24 | 53 | $28.5244 |
| 11/29/24 | 294 | $28.5441 |
| 12/02/24 | 421 | $29.3612 |
| 12/02/24 | 580 | $29.5390 |
| 12/03/24 | 983 | $29.3007 |
| 12/03/24 | 57 | $29.0200 |
| 12/04/24 | 663 | $29.6732 |
| 12/05/24 | 501 | $29.6020 |
| 12/06/24 | 480 | $29.9441 |
| 12/09/24 | 1,034 | $31.4681 |
| 12/10/24 | 667 | $30.9968 |
| 12/10/24 | 262 | $31.1891 |
| 12/11/24 | 439 | $31.5802 |
| 12/12/24 | 416 | $31.7972 |
| 02/03/25 | 67 | $33.2287 |
| 02/28/25 | 706 | $33.2437 |
| 02/28/25 | 32 | $33.1750 |
| 02/28/25 | 46 | $33.2850 |
| 03/03/25 | 72 | $33.1224 |
| 03/03/25 | 1,051 | $33.1224 |
| 03/04/25 | 49 | $32.7160 |
| 03/04/25 | 22 | $32.7160 |
| 03/11/25* | 4,780 | $29.5000 |
| 03/11/25 | 21 | $30.5400 |
| 04/04/25 | 12 | $33.5519 |
| 05/07/25 | 33 | $32.9856 |
| 06/13/25 | 2,308 | $29.5609 |
| 09/04/25 | 102 | $25.1998 |

| Common Stock Sales | | |
|---|---|---|
| Date | Shares | Price |
| 08/07/25 | 2,814 | $23.5434 |
| 08/07/25 | 112 | $24.3850 |
| 09/15/25 | 265 | $23.2137 |
| 09/15/25 | 1,219 | $22.8735 |
| 09/15/25 | 1,682 | $22.8735 |

* Shares purchased in secondary public offering

3