UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

| | |
|---|---|
| CITY OF MIAMI FIRE FIGHTERS' AND POLICE OFFICERS' RETIREMENT TRUST, Individually and on Behalf of All Others Similarly Situated,<br><br>           Plaintiff,<br><br>     vs.<br><br>PRIMO BRANDS CORPORATION, et al.,<br><br>           Defendants. | No. 8:25-cv-03328-JLB-AAS<br><br><u>CLASS ACTION</u> |
| _____ / | <u>DEMAND FOR JURY TRIAL</u> |

**LEAD PLAINTIFFS' COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................1

II.     SUMMARY OF THE ACTION ...................................................3

III.    JURISDICTION AND VENUE ..................................................10

IV.     FRAUD-BASED EXCHANGE ACT CLAIMS ...........................................11

        A.      Parties to Fraud-Based Claims ...............................11

                1.      Exchange Act Plaintiffs ............................11

                2.      The Exchange Act Defendants.........................12

        B.      Substantive Allegations......................................16

                1.      Background of the Company .........................16

                2.      The Merger Between Competitors BlueTriton and
                        Primo Water .......................................18

                3.      The Company's Merger Integration Efforts Shed
                        Further Light on the Incompatibilities Between Primo
                        Water and BlueTriton...............................20

                4.      The Merger Closes and Rushed Integration Efforts
                        Exacerbate Known Incompatibilities Causing Major
                        Operational Issues.................................26

                5.      Exchange Act Defendants Accelerate the Integration
                        Plan Despite Known Problems and Build the Plane as
                        They Fly It........................................29

                6.      Exchange Act Defendants Conceal Massive
                        Operational Issues and Resulting Costs While Touting
                        "Flawless Integration" ............................32

                7.      Defendants Formed a War Room and Crisis Response
                        Team to Address the Merger Integration Problems....35

- i -

**Page**

8.   The Merger Integration Problems Became so Pervasive that Exchange Act Defendants Could No Longer Conceal Them from the Public ..................................38

C.   Post-Class Period Developments ..........................................41

D.   Exchange Act Defendants' Scienter.......................................43

1.   Exchange Act Defendants' Admitted Involvement in Merger Due Diligence and the Merger Integration Process Confirms Their Knowledge .........................................43

2.   The Exchange Act Defendants' Knowledge of Merger Integration and Operational Problems Is Further Established by Their Admitted Tracking of the Company's Key Performance Metrics......................................47

3.   Exchange Act Defendants' Knowledge of the Company's Operational Issues Is Evidenced by Their Creation and Involvement in the War Room/Crisis Response Team ........................................................................49

4.   Exchange Act Defendants' Admissions Affirm Their Contemporaneous Knowledge of Information Undermining Their Public Statements......................................50

5.   Exchange Act Defendants' Substantial Merger-Related Payments and Compensation Tied to Financial and Stock Price Performance ..................................52

6.   Suspiciously-Timed Executive Departures Support Scienter...................................................................................58

E.   Exchange Act Defendants' Materially Misleading Statements and Omissions................................................................59

1.   June 17, 2024 Merger Announcement ....................................59

**Page**

2.     November 7, 2024 Primo Water Press Release (3Q24 Results) ................................................................................64

3.     November 8, 2024 Primo Brands Press Release Announcing the Closing of the Merger ....................................67

4.     November 14, 2024 JPMorgan Equity Opportunities Forum .................................................................................69

5.     February 20, 2025: Fourth Quarter and Fiscal Year 2024 Financial Results ............................................................71

6.     February 27, 2025 – Primo Brands Inaugural Investor Day .....................................................................................77

7.     February 27, 2025 – Issuance of the Form 10-K for FY24 ......................................................................................82

8.     March 2025 – SPO Offering Materials ...................................85

9.     May 8, 2025 – First Quarter 2025 Financial Results ...............89

10.    May 14, 2025 BMO Farm to Markets Chemicals Conference ........................................................................95

11.    August 7, 2025 – Second Quarter 2025 Financial Results ...................................................................................98

12.    August 11, 2025 – Fireside Chat Hosted by RBC Capital Markets .................................................................106

13.    September 4, 2025 – Barclays Global Consumer Staples Conference ...............................................................110

F.    Loss Causation and Economic Loss – Exchange Act Claims Only ...........................................................................113

1.     August 7, 2025 ...............................................................115

**Page**

        2.     November 6, 2025................................................................122

    G.    Presumption of Reliance .....................................................129

    H.    No Safe Harbor....................................................................131

    I.    Class Action Allegations for Exchange Act Claims .........132

COUNT I: For Violations of Section 10(b) of the Exchange Act and Rule
    10b-5 Promulgated Thereunder Against Exchange Act Defendants ..........135

COUNT II: For Violations of Section 20(a) of the Exchange Act Against
    Exchange Act Individual Defendants...........................................................140

V.    STRICT LIABILITY SECURITIES ACT CLAIMS (NON-
    FRAUD).........................................................................................................142

    A.    Parties to Strict Liability Securities Act Claims ..............143

        1.    Securities Act Plaintiff............................................143

        2.    The Securities Act Defendants.................................143

            a.    The Individual Securities Act Defendants.....................143

            b.    The Director Defendants ..............................145

            c.    The Underwriter Defendants .......................149

            d.    The Selling Stockholder Defendant.............153

    B.    Securities Act Defendants File the Offering Materials and
    Conduct the SPO ................................................................154

    C.    The Registration Statements' False and Misleading
    Statements and Omissions..................................................157

    D.    Underwriter Defendants Failed to Exercise Due Diligence..............166

    E.    Class Action Allegations for Securities Act Claims .........166

**Page**

COUNT III: For Violations of Section 11 of the Securities Act Against
Securities Act Defendants ...........................................................................169

COUNT IV: For Violations of Section 12(a)(2) of the Securities Act
Against Securities Act Defendants.............................................................173

COUNT V: For Violations of Section 15 of the Securities Act Against
Individual Securities Act Defendants, Director Defendants, and the
Selling Stockholder Defendant...................................................................175

PRAYER FOR RELIEF .........................................................................................176

JURY TRIAL DEMANDED..................................................................................177

## I.   INTRODUCTION

1.      Lead Plaintiffs Heavy & General Laborers' Locals 472 & 172 Pension & Annuity Funds and Providence Employees Retirement System ("Providence") (collectively, "Lead Plaintiffs") bring this federal class action for violations of the federal securities laws.

2.      Lead Plaintiffs bring this federal class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, on behalf of all persons who purchased or otherwise acquired: (i) the common stock of Primo Water Corporation ("Primo Water") between June 17, 2024 through November 8, 2024, inclusive, and/or (ii) the common stock of Primo Brands Corporation ("Primo Brands" or "Company") between November 11, 2024 through November 6, 2025, inclusive ("Class Period"), and who were damaged thereby.  Lead Plaintiffs bring these Exchange Act claims against Primo Brands, Robbert Rietbroek ("Rietbroek"), David Hass ("Hass"), C. Dean Metropoulos ("Metropoulos"), and Jeffrey Johnson ("Johnson") (collectively, the "Exchange Act Defendants").

3.      Separately, Lead Plaintiff Providence brings this federal class action under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§77k, 77*l*, and 77o, and rules promulgated thereunder, on behalf of all

persons or entities that purchased or acquired the Class A common stock of Primo Brands issued pursuant and/or traceable to the Registration Statement (as defined herein) in connection with the Company's secondary public offering in March 2025 ("SPO") against Primo Brands, Rietbroek, Hass, Jason Ausher ("Ausher"), Director Defendants (as defined herein), Underwriter Defendants (as defined herein), and the Selling Stockholder Defendant (as defined herein) (collectively, "Securities Act Defendants" and, together with Exchange Act Defendants, "Defendants").

4. Lead Plaintiffs make the following allegations upon personal knowledge as to those allegations concerning Lead Plaintiffs and, as to all other matters, upon the investigation of counsel, which included, among other things, a review of certain SEC filings by Primo Brands and Primo Water, Company press releases and earning calls, analyst and media reports about the Company, price and volume data for Primo Brands and Primo Water securities, interviews with factual sources, and other publicly available materials and data. Many of the facts supporting the allegations are known only to Defendants named herein, or are exclusively within their custody and control. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.    SUMMARY OF THE ACTION

5.    Competitors Primo Water and BlueTriton Brands, Inc. ("BlueTriton") explored a Merger that, combined, would make them the "category leader in U.S. bottled water, holding the number one market share in the retail channel."  After months of negotiations, extensive due diligence, and the sharing of a "wealth of information," Exchange Act Defendants announced the Merger to the public on June 17, 2024.

6.    Exchange Act Defendants touted the benefits of the Merger and emphasized that the combined company – Primo Brands – was positioned to achieve "$200 million of run rate cost synergies . . . over the next three years following closing [of the Merger]."  This would purportedly come at a one-time cost of $115 million.

7.    Following the Merger announcement, teams of executives from Primo Water and BlueTriton, including Exchange Act Defendants, formed a "Merger Integration Team" to work on strategic integration plans that would serve as a specific roadmap for how the legacy companies would be combined into a unified structure and achieve synergy capture.  The Merger Integration Team built on the pre-Merger due diligence process by evaluating all aspects of the legacy companies' businesses, and building a plan that would enable them to become – and effectively function as – one company upon the Merger's close.  Through ***both*** of these

- 3 -

processes, Exchange Act Defendants were intimately aware that Primo Water and BlueTriton "were run and operated very differently" as the Company later admitted to investors on January 7, 2026.

8.      The two legacy companies had a host of significant incompatibilities, including, among others, that their core databases (enterprise resource planning "ERP" systems) ran on entirely different operating systems that did not speak to each other and their manufacturing facilities and critical bottle rack systems were designed for their own products and not each other's.  To bring these companies together, processes and procedures would need to be harmonized, data merged and migrated, and manufacturing facilities upgraded and aligned – all of which would be complex, time-consuming, and costly.  On top of this, to capture the promised $200 million in cost synergies that was the essential goal of the Merger, manufacturing facilities and branches would have to be closed, delivery routes realigned, merged, and reduced, and headcount cut, all of which Defendants called "optimization initiatives."

9.      The Merger Integration Team created a comprehensive integration plan ("Integration Plan"), which laid out these incompatibilities, a plan for synergizing the legacy companies' distinct operations, and numerous warnings and red flags if the legacy companies' operational differences were not resolved.

- 4 -

10.    On November 8, 2024, the Merger closed and the new, combined Company, Primo Brands, was born.  Hass and Metropoulos were heftily compensated for their roles in achieving the deal.  Exchange Act Defendants touted Primo Brands' capabilities and the planned synergy capture, stating that the Company was "*strategically positioned to accelerate growth,*" but misleadingly omitted the depth of the compatibility issues between the legacy companies that would need to be bridged for it to function effectively, and achieve synergy capture, and growth.

11.    From the outset, the Company was plagued by the very incompatibilities that were *known* from the extensive due diligence and further analyzed throughout the Merger integration processes.  Merging the legacy companies' operational systems was slow and the Company was forced to operate on two systems that did not communicate with each other, which materially affected the Company's vital operations such as sales, inventory control, delivery routes, human resources, billing, and financial reporting.  The Company grappled with the previously identified but unresolved compatibility issues with its bottles, racks, and manufacturing facilities, which led to supply shortages, production and delivery delays, and increased freight costs.

12.    Despite these unresolved fundamental issues, in January 2025, Exchange Act Defendants decided to accelerate their synergy capture, departing

- 5 -

from the timeframes established in the Merger Integration Plan. While the Merger Integration Team had established an appropriate timeline for integration, taking into account the various incompatibilities of the legacy companies, executive management stated they wanted to move ***even faster*** and implement a more accelerated timeline. They decided to build the plane while we are flying it.

13. In February 2025, Exchange Act Defendants announced their plans to accelerate the size and speed of synergy capture, stating that it would be "$100 million higher and 1 year sooner than previous forecasts provided at the time of the deal announcement" and that they were "decreasing our estimate of anticipated costs necessary to achieve these synergies to approximately $100 million." The Company also issued full year 2025 net sales, adjusted EBITDA, and adjusted free cash flow guidance tied to this synergy capture. But, Exchange Act Defendants continued to conceal the massive integration problems they were already facing, which they knew would be exacerbated by the acceleration, instead stating the "integration [was] ahead of schedule" and "[w]e believe ***all aspects of our business are aligning for flawless integration execution***."

14. On March 11, 2025, Defendants doubled down on the new higher synergy capture, and conducted the SPO wherein 51,750,000 shares of Primo Brands Class A common stock were sold to the public at a price of $29.50 per share for

- 6 -

gross proceeds $1,522,692,060. As part of the SPO, the Underwriter Defendants collectively received $46,949,471 in discounts and commissions.

15. Exchange Act Defendants pursued their unsound accelerated synergy capture by pushing rapid cost-cutting and restructuring measures, including closing numerous manufacturing plants and branch locations, and dramatically reducing headcount, including delivery drivers. Unbeknownst to investors, these rushed initiatives compounded the existing incompatibility issues, causing operations to deteriorate rapidly. This disrupted the Company's crucial direct delivery business, leading to late deliveries or no deliveries at all. The Company received a deluge of customer complaints it was unable to deal with because of reductions in its customer service operations. Customer cancellations rose and sales slowed. Costs exploded due to operational inefficiencies and the Company's massive expenditures to address integration problems.

16. Despite their awareness of the serious Merger integration problems at the Company and their impact on its operations and finances, in May 2025, Exchange Act Defendants reaffirmed the Company's full year guidance, again stating that "*[w]e believe all aspects of our business are aligning for flawless integration execution*," and that "*[W]e are on track to realize our $200 million cost synergies opportunity by 2025, supporting our full-year outlook* . . . ." With respect to customer churn, they assured investors "*[w]e've really not seen any sort of*

- 7 -

*slippage*."  And, when asked about the progress of the Merger integration process, they assured investors that "we're driving synergies," and "[w]e've not had major hiccups."

17.    However, conditions at the Company were so dire that, approximately six months into the Merger, Exchange Act Defendants had to form a Crisis Response Team ("CRT") at headquarters to address escalating freight costs, plant inefficiencies, and other operational issues from the Merger integration that were impacting the Company's performance, even deploying "Tiger Teams" to address major operational challenges.

18.    On August 7, 2025, Exchange Act Defendants finally began to reveal the major Merger integration problems and operational issues that were affecting the Company and its financial performance.  They announced a sales decline for the quarter and that they were significantly reducing the Company's 2025 guidance to reflect lower sales growth, free cash flow, and earnings (EBITDA), admitting that "[t]he speed by which we closed facilities and reduced headcount led to disruptions in product supply, delivery and service."  Investors were shocked by Exchange Act Defendants' disclosures, which starkly contrasted with their prior (false) assurances of "*flawless integration execution*," and their acceleration of synergies and cost reductions.  The stock price plummeted by *9%* and investors suffered substantial losses.

19.     However, Exchange Act Defendants led investors to believe that the problems were behind the Company, and adequately accounted for in their updated and lowered guidance, stating they had "resolved the majority of issues" and that the disruptions occurred in a "one rip the band-aid off quarter."  They continued to conceal the full extent of the integration problems and their ongoing negative impact on the Company's operations and financial results, keeping the price of Primo Brands securities artificially inflated.

20.     But, on November 6, 2025, Exchange Act Defendants revealed the truth – the Company's Merger integration and operational problems and their negative impact on the Company's financial performance were pervasive and ongoing. Exchange Act Defendants surprised the market, by again reducing their 2025 net sales growth and EBITDA guidance and also announced that Rietbroek was "stepping down" as Chief Executive Officer ("CEO") and resigning as a member of the Primo Brands' Board of Directors ("Board").  Metropoulos also stepped down from his Chairman position.  The Company's new CEO, Eric Foss ("Foss"), admitted on behalf of the Company that the problems were "***self-inflicted***." Investors again suffered massive losses when Primo Brands stock price declined ***36%*** over two trading days.

21.     Exchange Act Defendants have admitted that Primo Brands' operational problems were "self-inflicted" and the result of their own intentional

- 9 -

actions to "prioritize[] speed and cost reductions." They failed to resolve incompatibilities known to them from Merger due diligence and integration planning and departed from the timelines outlined in the Company's Merger Integration Plan, aggressively accelerating synergies, despite known red flags. They then misled investors as to the progress of the Merger integration (stating it was "ahead of schedule" and "flawless") and synergy capture, while concealing the massive operational issues the Company was experiencing. Exchange Act Defendants' misstatements and omissions had the intended effect of artificially inflating the Company's stock price during the Class Period.

22. While investors lost millions when the truth was disclosed, Exchange Act Defendants profited handsomely from their conduct, pocketing immense Merger-related bonuses and incentive compensation throughout the fraud.

## III.   JURISDICTION AND VENUE

23. The claims asserted herein arise under Sections 11, 12, and 15 of the Securities Act, 15 U.S.C. §§77k, 77*l*, and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

24. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act, 15 U.S.C. §77v, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

25.    Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v(c), Section 27 of the Exchange Act, 15 U.S.C. §78aa(c), and 28 U.S.C. §1391(b).  A substantial amount of the acts and omissions giving rise to the claims at issue occurred in this District.  Primo Brands is headquartered in this District and Defendants are subject to personal jurisdiction in this District.

26.    Because Underwriter Defendants (as defined herein) were counterparties to the underwriting agreement and each of the Securities Act Individual Defendants (as defined herein) authorized the execution of the underwriting agreement by Primo Brands, each of them also submitted to the jurisdiction of this Court by directing acts within this District out of which this action arises.

27.    In connection with the acts and omissions alleged in this complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## IV.    FRAUD-BASED EXCHANGE ACT CLAIMS

### A.    Parties to Fraud-Based Claims

#### 1.    Exchange Act Plaintiffs

28.    Lead Plaintiffs Heavy & General Laborers' Locals 472 & 172 Pension & Annuity Funds and Providence Employees Retirement System were appointed to serve as Lead Plaintiffs in this action by Order of this Court dated February 4, 2026

- 11 -

[ECF 48]. As shown in their certifications filed in this action [ECF 17-3], which are incorporated herein, Lead Plaintiffs purchased or otherwise acquired Primo Brands common stock at artificially inflated prices during the Class Period. Lead Plaintiffs suffered economic losses when true facts about the Company's operating and financial condition were disclosed and the artificial inflation was removed from the price of Primo Brands common stock.

### 2. The Exchange Act Defendants

29. Defendant Primo Brands is incorporated under the laws of Delaware, with its principal executive offices located in Tampa, Florida and Stamford, Connecticut. During the Class Period, the common stock of Primo Brands and its predecessor-in-interest, Primo Water, traded on the New York Stock Exchange ("NYSE") under the ticker symbols "PRMB" and "PRMW," respectively.

30. Defendant Robbert Rietbroek served as CEO of Primo Water from January 1, 2024 until the Merger closed on November 8, 2024. At the close of the Merger, Rietbroek became CEO of Primo Brands and occupied that position until November 6, 2025, when he was abruptly replaced by Foss. At the time the Merger was announced, Rietbroek's background included more than 25 years of leadership experience at Fortune 200 consumer goods companies, including PepsiCo, Kimberly-Clark, and Procter & Gamble, among other leadership roles. During his tenure as CEO of Primo Brands, Rietbroek appeared on public conference calls

- 12 -

(including quarterly earnings calls) with Hass, Metropoulos, and/or Johnson, wherein he made materially misleading statements and omissions to investors. Rietbroek also signed Primo Brands' February 27, 2025 Form 10-K ("FY24 Form 10-K") and the respective certifications required by the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") included in Primo Water's August 8, 2024 Form 10-Q, Primo Water's November 7, 2024 Form 10-Q, Primo Brands' December 17, 2024 Form 10-Q, Primo Brands' FY24 Form 10-K, Primo Brands' May 8, 2025 Form 10-Q, and Primo Brands' August 7, 2025 Form 10-Q, all filed with the SEC.

31.    Defendant David Hass served as Chief Financial Officer ("CFO") of Primo Water from January 23, 2023 until the Merger closed on November 8, 2024. Prior to that role, Hass served in various other roles at Primo Water from 2011 to 2023, including Chief Strategy Officer; Vice President of Strategy; Vice President of Financial Planning & Analysis ("FP&A"); and General Manager of the Canadian Business Unit and the Water Direct Business Unit.  At the close of the Merger, Hass became CFO of Primo Brands and continues to occupy that position.  Due to his involvement in the Merger, Hass was paid a one-time cash bonus of $300,000 due to his "efforts during the pendency" of the Merger.  As detailed below, Hass appeared on public conference calls (including quarterly earnings calls) with Rietbroek, Metropoulos, and/or Johnson, wherein Hass made materially misleading statements and omissions to investors.  Hass also signed Primo Water's August 8,

- 13 -

2024 Form 10-Q, Primo Water's November 7, 2024 Form 10-Q, Primo Brands' December 17, 2024 Form 10-Q, Primo Brands' FY24 Form 10-K, Primo Brands' May 8, 2025 Form 10-Q, and Primo Brands' August 7, 2025 Form 10-Q and the respective certifications required by Sarbanes-Oxley included therein, all filed with the SEC.

32.     Defendant C. Dean Metropoulos served as Chairman of the Board of Directors of BlueTriton from March 31, 2021 until the Merger closed on November 8, 2024, and as Interim CEO of BlueTriton from March 31, 2021 to November 28, 2023. At the close of the Merger, Metropoulos became non-executive Chairman of the Board and occupied that position until November 6, 2025. Thereafter, Metropoulos remained a member of the Board of Primo Brands, and continues to serve in that role through present. In consideration for the provision of advice and strategic planning to the Company in connection with the Merger, Fairmont Holdings, LLC ("Fairmont"), an affiliate of Metropoulos, received approximately $2,320,303 as a lump sum cash payment. As detailed below, Metropoulos appeared on public conference calls (including quarterly earnings calls) with Rietbroek, Hass, and/or Johnson, wherein Metropoulos made materially misleading statements and omissions to investors. Metropoulos also signed Primo Brands' FY24 Form 10-K.

33.     Defendant Jeffrey Johnson served as Primo Water's Senior Vice President of Process Excellence and Integration Management from August 2024

- 14 -

until the Merger closed on November 8, 2024.  Prior to that role, Johnson served as Primo Water's Senior Vice President of Global Process Excellence from 2022 to 2024 and as Primo Water's Senior Vice President of Global Operational Excellence and Service Optimization from 2021 to 2022.  At the close of the Merger, Johnson became Chief Transformation Officer of Primo Brands and continues to occupy that position.  As detailed below, Johnson appeared on the inaugural Primo Brands Investor Day public conference call on February 27, 2025 with Rietbroek, Hass, and Metropoulos, wherein Johnson made materially misleading statements and omissions to investors.

34.    Rietbroek, Hass, Metropoulos, and Johnson are collectively referred to herein as "Exchange Act Individual Defendants."  Exchange Act Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, shareholder letters, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Exchange Act Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, Exchange Act Individual Defendants knew that the adverse facts specified

- 15 -

herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. Exchange Act Individual Defendants are liable for the false statements pleaded herein. Exchange Act Individual Defendants, together with Primo Brands, are "Exchange Act Defendants."

### B. Substantive Allegations

#### 1. Background of the Company

35. Primo Brands was formed as a result of a November 2024 Merger between Primo Water and BlueTriton, two former competitors in the North American bottled and delivered water industry.

36. Prior to the Merger, Primo Water was headquartered in Tampa, Florida and publicly traded on the NYSE under the ticker symbol "PRMW." Primo Water described itself as a "branded pure-play water solutions company with a broad portfolio of sustainable hydration brands," including several bottled brands sold in retail stores such as Primo Water, Mountain Valley, and Crystal Springs. Primo Water also sold large format bottles (3-gallon and larger) in retail stores and offered direct delivery service to homes and offices across the United States, including reusable 3- and 5- gallon jugs and water dispensers for purchase or rent.

37. BlueTriton was a privately held company headquartered in Stamford, Connecticut, majority owned by private equity firm One Rock Capital Partners, LLC

- 16 -

("One Rock Capital"). BlueTriton possessed a portfolio of national and regional water brands sold in retail stores in single-serve and multi-pack bottles, including Poland Spring, Deer Park, Ozarka, Ice Mountain, Zephyrhills, Arrowhead, Saratoga, and Pure Life. In addition to its retail business, BlueTriton maintained a direct delivery business known as "ReadyRefresh." Through ReadyRefresh, BlueTriton delivered bottled water (including reusable 3- and 5-gallon jugs), other beverages, and other products like water dispensers directly to customers' homes and offices across the United States. Leading up to the Merger, BlueTriton was a much larger business than Primo Water, reporting last twelve month ("LTM") March 31, 2024 revenues of approximately $4.7 billion, compared to Primo Water's LTM March 31, 2024 revenues of approximately $1.8 billion.

38. Post-Merger, the Company touted itself as "the category leader in U.S. bottled water, holding the number one market share in the retail channel, supported by our nationally recognized, fast-growing brands." Primo Brands distributes its products primarily through two channels. It distributes directly to retailers across more than 200,000 retail outlets as well as directly reaching customers and consumers through its direct delivery, exchange, and refill offerings. Through direct delivery, the Company delivers "hydration solutions" such as pre-filled water bottles directly to home and business customers. Through "exchange," consumers visit retail locations and purchase pre-filled, multi-use water bottles that can be

exchanged after use for a discount on the next purchase.  Through "refill", consumers refill empty, multi-use water bottles at self-service refill stations.  The Company also offers water filtration units for home and business consumers.

### 2.    The Merger Between Competitors BlueTriton and Primo Water

39.    Primo Water began exploring potential strategic alternatives in 2022, and in November 2023 began to discuss a potential transaction between BlueTriton and Primo Water.  Thereafter, the two companies conducted extensive due diligence on a potential Merger.  *See* Section D.1 below.  From December 18, 2023 to February 20, 2024, executives from BlueTriton and Primo Water engaged in informal discussions and communications, including establishing a process to evaluate synergies with each party's prospective advisors in an initial phase before moving into a fulsome due diligence review.  Then, from March 2024 to June 2024, representatives of Primo Water and BlueTriton participated in various business and legal due diligence sessions, along with numerous in-person site visits across both companies' various operating locations.  At the conclusion of the due diligence process, on June 16, 2024, representatives from Primo Water and BlueTriton entered into a definitive agreement to combine the two companies.

40.    Before the market opened on June 17, 2024, the first day of the Class Period, Primo Water issued a press release announcing the Merger and touting its purported benefits.  During a conference call that day, Rietbroek, Hass, and

- 18 -

Metropoulos emphasized their involvement in the due diligence process and its comprehensiveness to investors.  Rietbroek stated that he had been "[n]egotiating this transaction over the last several months" with Metropoulos confirming to the market that "we completed the proper due diligence necessary for a deal of this magnitude."  Hass reiterated Metropoulos' sentiment that "[a] wealth of information . . . has enabled us to bring these two great companies together."

41.   Exchange Act Defendants further emphasized the Merger's critical importance, stating it would lead to "a leading North American pure-play healthy hydration company in an all-stock transaction" and emphasized that an "[i]ncreased presence, [a] leading portfolio of iconic brands, diversified product offerings and enhanced distribution capabilities position the combined company for sustained long-term growth."

42.   The strategic rationale of the Merger, as Rietbroek told investors, was to create a combined company "*positioned to generate meaningful cost synergies and value creation opportunities*."  As Hass further explained, the Company's "business optimization initiatives" positioned it to "*realize an estimated $200 million of cost synergies and value-creation opportunities on a run-rate basis*." Rietbroek added that the "$200 million of run rate cost synergies" would be achieved "over the next three years following closing [of the Merger]."  Exchange Act Defendants further expressed "confidence" that Primo Brands would achieve these

- 19 -

synergies, which would supposedly come at a one-time cost of $115 million.  Primo Water's October 2024 Proxy Statement emphasized that a "Reason[] for the Transaction" was "annual run-rate synergies opportunity of approximately $200 million expected to result from the Transaction across functional areas of operations, procurement, information technology and enterprise resource planning, call centers and selling, general and administrative expenses of . . . the combined company, relative to Primo Water on a standalone basis."

### 3. The Company's Merger Integration Efforts Shed Further Light on the Incompatibilities Between Primo Water and BlueTriton

43.    Through the comprehensive due diligence and integration processes begun by Primo Water and BlueTriton months before the Merger closed, it became clear that the two companies had significant operational differences that needed to be bridged for the Company to function efficiently and effectively.  Additionally, process harmonization was identified as a significant challenge.  Standardizing procedures across departments required not only technical adjustments but also the careful management of change among employees accustomed to different ways of working.

44.    To prepare for the Merger, Primo Water and BlueTriton formed an Integration Management Office ("IMO"), to act as a "clearing house" for the data and information that would be received throughout the course of the Merger.  It

consisted of two IMO leads from both companies. Within two weeks of the Merger being announced in June, Primo Water and BlueTriton also established a Merger Integration Team (a.k.a. Kick-Off Team), in conjunction with the IMO. The Merger Integration Team had approximately 35-45 members, and was tasked with developing and formulating the comprehensive Merger Integration Plan. The Merger Integration Team was led by Johnson and Chief Information Technology ("IT") Officer Eric Lord ("Lord") and included working groups consisting of the CEOs from both companies (including Rietbroek), the CFOs from both companies (including Hass), and the Senior Vice Presidents and other counterpart employees from both companies. The Merger Integration Team also included representatives from the consulting firm McKinsey & Company ("McKinsey"), which Rietbroek later acknowledged by stating, "we're working with world-class consulting companies and advisers to ensure we follow best practice."

45.    The Merger Integration Team, met regularly and engaged with various departments at both companies in connection with developing The Integration Plan. The Integration Plan was intended to provide a roadmap for combining the two companies into a unified structure, including strategic objectives, synergy capture initiatives, critical responsibilities, leadership appointments, retention strategies, key performance indicators ("KPIs"), and financial targets.

- 21 -

46.    In fact, after the Merger closed, Rietbroek acknowledged the companies' Merger integration planning efforts during Primo Water's third quarter of 2024 ("3Q24") earnings call on November 7, 2024.  He stated, "[a]fter the transaction was announced [on June 17, 2024], we created working teams from both organizations that were tasked with identifying opportunities and planning to create an optimized structure to capture value across the organization once we close [the Merger]."  More specifically, Rietbroek stated that the IMO "identified 12 work streams and over 65 value capture initiatives" and went through "three stages of planning that identified, in the first stage at the conceptual level, where we would be able to capture synergies."  "We then worked *out very specific plans* and we're now at the pre-execution stage to be able to hit the ground running from day one, *we'll be executing synergies starting this quarter and the remainder of Q4*.  So really organized through IMO, work streams, and multistage from conceptualization to execution with the help of the best consulting firms in the world."

47.    Through this process, the Merger Integration Team analyzed the various compatibility issues between the legacy companies, which were known from the due diligence process.

48.    For example, the legacy companies' databases were on two separate ERP systems – *i.e.*, business management software that helps automate, manage, and connect core processes across the organization.  BlueTriton had invested in

- 22 -

upgrading to a relatively new SAP system while Primo Water relied on a much older Oracle system. In order for the Company to operate efficiently and effectively, both legacy companies need to be on the same operating system. It was determined, before the Merger closed, that Primo Water's legacy Oracle system would be migrated to BlueTriton's newer SAP system. This was a complicated, time-consuming process that was frequently discussed by the Merger Integration Team in the months leading up to the November 2024 Merger. The Merger Integration Team identified, in August, 2024 that unless the two ERP systems were integrated, there would be significant challenges regarding the closure of plants and the pace at which they would be closed.

49. The Merger Integration Team also raised concerns regarding the closing and merging of branches, including questions regarding the retention plan to keep drivers and employees, and the capacity to store, park, and fuel the trucks.

50. It was also learned during the due diligence process and discussed by the Merger Integration Team prior to close of the Merger, that BlueTriton and Primo Water had other incompatibilities that would disrupt the integration process. For example, there were incompatibilities with the bottles and modular racks used to store and transport bottles. Primo Water used only one type of rack, whereas BlueTriton utilized another, with different models included within those. The lack

- 23 -

of consistency in the number and types of bottles and racks would cause the system to break down.

51.    In fact, in August 2024, the Merger Integration Team discussed the purchase of new racks that would accommodate both companies' product lines. But, as the cost to do this was approximately $16 million, the executive management team refused, as they did not want this expense to offset the Merger synergies.

52.    The legacy companies' manufacturing facilities were also designed for their own products and not each other's. And, in addition to having overlapping delivery routes that would need to be realigned, merged, and reduced, there were also incompatibilities related to the different transportation management systems each legacy company used. Transportation management systems were responsible for taking all the orders, bringing them in, and assigning them to the different factories and drivers. Primo Water used a program through Mercury Gate, while BlueTriton used an Uber program. The incompatibility of the two systems created significant challenges.

53.    There were also integration issues identified related to the different system utilized by the "last mile" delivery teams. The legacy Primo Water drivers used a system called CFLI, known internally as iDeliver. It was a sophisticated and intuitive system that optimized driver routes. BlueTriton used a system called "RMF" that was integrated with the SAP system; that, contrary to iDeliver, was

antiquated and difficult to use.  Despite being aware, prior to the Merger, of the disruptions that integrating everyone to the RMF system would cause, that was the decision made by the executive team, which ultimately led to a significant drag on the business, driver frustration, and driver quits.

54.    Exchange Act Defendants participated in the due diligence and Merger integration processes and were intimately aware of these incompatibilities.  Indeed, as the Company ultimately admitted to investors on January 7, 2026, Primo Water and BlueTriton "were run and operated very differently."

55.    Indeed, prior to the Merger closing, the Merger Integration Team had created a comprehensive Integration Plan which laid out these issues and a plan for synergizing the Company's distinct operations.  It also laid out warnings and red flags if these operational differences were not remedied.  However, despite being made aware of these red flags before the Merger closed, executive management decided not to pursue certain of the Merger Integration Team's suggestions because of the costs associated that would offset the Merger synergies they had promised Wall Street.

56.    While Exchange Act Defendants spent months hyping the Merger, the "complementary" nature of the two legacy companies, the "operational efficiencies" the Merger would achieve, and their confidence in achieving $200 million in synergies for a one-time cost of $115 million to the market, they failed to disclose

- 25 -

the known significant dichotomies in the Company's businesses that would be time-consuming and costly to align.

### 4. The Merger Closes and Rushed Integration Efforts Exacerbate Known Incompatibilities Causing Major Operational Issues

57. The Merger closed on Friday, November 8, 2024, resulting in the formation of Primo Brands. At the closing of the Merger, Primo Water and BlueTriton shareholders exchanged their shares of those companies for shares of the newly issued Class A common stock of Primo Brands.

58. Primo Brands' Class A common stock began trading on the NYSE under the ticker symbol "PRMB" on Monday, November 11, 2024. The PRMB ticker effectively replaced the PRMW ticker under which Primo Water traded on the NYSE prior to the Merger.

59. Notably, Hass and Metropoulos were paid hefty one time bonuses for their roles in the Merger. Hass was given a $300,000 bonus for his "efforts during the pendency of the" Merger, while Metropoulos' affiliate company Fairmont, was paid a whopping $2,320,303 as "consideration for the provision of advice and strategic planning to the Company in connection" with the Merger.

60. As detailed above, Exchange Act Defendants' extensive due-diligence and integration processes made them aware of the Company's distinct operational systems, and the problems that would develop in trying to integrate them. Bridging

these operational gaps was critical to the Company's ability to operate effectively. Rather than take the necessary steps to address these known operational differences effectively, however, and contrary to positive statements about the integration process and the Merger, the integration was rushed, poorly executed, and fraught with several serious problems. This flowed from the desire to achieve promised cost synergies from the Merger as quickly as possible, despite the warnings and red flags set forth in the Merger Integration Plan, which Defendants ignored.

61. From the outset of the Merger, the integration of BlueTriton and Primo Brands' ERP systems was slow. While the migration process dragged on, the Company was forced to operate on separate systems that did not communicate with each other, resulting in operational inefficiencies and disruptions. For example, because the Company's systems did not talk to each other, a BlueTriton product could not be filled in a Primo Water plant without manual entry of orders. The Company's failure to sufficiently merge the legacy companies' two different ERP systems resulted in duplication, conflicting data structures, inconsistent reporting, and operational inefficiencies, which affected the Company's vital operations such as sales, inventory control, delivery routes, human resources, billing, and financial reporting. Training and field support for the ERP systems was inadequate. And, in conjunction with this switch, the Company also undertook a complicated process of upgrading all employee handheld technology to the iPhone.

- 27 -

62.     In addition, the Company grappled with the compatibility issues involving bottles and racks that had been identified in the summer during the integration planning process but left unresolved due to the cost to fix them. The Company needed thousands of additional racks to accommodate its newly expanded bottle offerings and the Company's production lines were incompatible with many of the existing racks, necessitating a costly engineering fix.

63.     Further, the Merger compounded the problems at the facilities with Primo Water's Mountain Valley brand, which was sold exclusively in glass bottles. For example, drivers returning empty bottles did not sort them properly, creating chaos on the plant floor. Bottles ended up in the wrong racks, leading to frequent breakage. Further, manufacturing robots that were a part of the manufacturing facilities assembly lines from BlueTriton and Primo Water, which were not appropriately calibrated to grab glass bottles, gripped them too tightly, causing further breakage. These disruptions, which had been anticipated and known about before the Merger, ultimately forced assembly lines to shut down for hours while thorough cleanups were conducted. This led to shortages and production delays.

64.     As a result of bottle and rack shortages, delivery drivers were instructed to travel numerous miles to retrieve racks and bottles from distant customers. Consequently, Primo Brands incurred considerable additional freight costs. These various incompatibility issues caused major problems at the Company.

- 28 -

65.     In addition, to bottle and rack shortages, Primo Brands' trucks were not all equipped to carry the varying brands that Primo Brands now offered.

### 5.     Exchange Act Defendants Accelerate the Integration Plan Despite Known Problems and Build the Plane as They Fly It

66.     To make matters worse, during the first week of January 2025, the Company's executive management, including Rietbroek and Hass, decided to further accelerate the timeline in the Integration Plan formulated by the Merger Integration Team. The plan developed prior to Merger completion, which laid out the timelines and strategic implementation plans, was not the plan that was rolled out. Despite warnings and red flags presented in the Integration Plan, executive management stated they wanted the Merger integration to move *even faster* and implemented a more accelerated timeline in order to meet commitments to Wall Street and to achieve cost synergies from the Merger. This approach lacked operational logic and risked creating instability rather than progress. When concerns were raised over accelerating the timeline on the Integration Plan, executive management responded that we will build the plane while we are flying it.

67.     However, the integration simply was not doable in the timeline that the executives pushed. Rather than take a measured and deliberate approach to merging systems and closing branches that would allow for real time evaluation of failures and lessons learned, as had been suggested by the Merger Integration Team,

executives ignored the known, potential problems, and flipped the switch as soon as the Merger was announced. These problems identified through the in-depth integration planning process and known, but left unaddressed, now plagued the newly-merged Company.

68.     The rapid cost-cutting and restructuring measures pushed by executive management compounded the incompatibility issues discussed above, causing operations to deteriorate rapidly.

69.     They closed numerous manufacturing plants and branch locations and dramatically reduced headcount, including delivery drivers. Indeed, from the close of the Merger in November 2024 through May 2025, the Company shuttered 48 facilities (15% of its total network) and slashed headcount by more than 1,600 (11% of its total headcount).

70.     The Company also took drastic measures to realign, merge, and reduce its delivery routes, including factory-to-branch routes, "middle mile" routes from factories to warehouses, and "last mile" customer delivery routes. Because of the significantly reduced network, distances between factories and branches were elevated, and Primo Brands needed far more bottles and racks on hand in order to meet customer demand.

71.     These rushed initiatives disrupted the Company's crucial direct delivery business, preventing it from effectively serving its customers. Customers

frequently received late deliveries – which the Company referred to as "drags" (delayed one day) and "multi-drags" (delayed more than one day) – incorrect deliveries (*e.g.*, substituted products), or no deliveries at all.

72.     Defendants closely tracked these "self-inflicted" delivery disruptions through metrics such as delivery service rates, which dropped substantially during the Merger integration process from the high 90% range to below 80%.  Indeed, Rietbroek said that he tracked the delivery drags "every day."

73.     As a result of the delivery disruptions, the Company was inundated with a deluge of customer complaints.  Customer call volume exploded while customer satisfaction scores plunged.  Company representatives were forced to shut down the Company's chat platform.  To make matters worse, the Company had laid off too many customer service representatives, significantly lengthening response times and overall service quality.  Customers were often placed on hold as long as two hours when they called the customer service department to resolve delivery issues, only to be disconnected before reaching a customer service representative.

74.     Frustrated customers began reducing their purchases and cancelling their accounts altogether.  This was evident from customer metrics that Exchange Act Defendants tracked and spoke about on public conference calls, including customer "quits" and retention rates, which showed the amounts of customers lost

over particular time periods. This slowed customer sales, particularly in the Company's critical direct delivery business.

75. At the same time, costs exploded due to operational inefficiencies and the Company's massive expenditures to address integration problems (*e.g.*, the extra freight and labor costs to address to address supply and delivery issues). This made it more difficult for the Company to realize cost synergies from the Merger and ultimately had a major negative impact on the Company's financial results, slowing net sales growth, and compressing earnings (earnings before interest, taxes, depreciation, and amortization ("EBITDA")).

**6.      Exchange Act Defendants Conceal Massive Operational Issues and Resulting Costs While Touting "Flawless Integration"**

76. Despite these known issues, and the acceleration of the timeline of the Merger integration, Defendants continued to publicly mislead investors that the Merger integration was progressing well, achieving synergies, and positively impacting the Company's operations and financial results. Indeed, on February 20, 2025, the Company reported its fourth quarter 2024 ("4Q24") and fiscal year 2024 ("FY24") financial results, highlighting strong organic combined net sales growth, reporting that the "integration [was] ahead of schedule" and that Exchange Act Defendants had, in fact, "*accelerated* the size and speed of cost synergy capture." The Company also issued full year 2025 net sales, adjusted EBITDA, and adjusted

free cash flow guidance. Rietbroek stated, "We believe all aspects of our business are aligning for flawless integration execution" and that the Company was "one go to market system now."

77. Hass explained the raised the synergy estimate, stating, "[w]ith more time and focus on our integration activities, we are pleased to announce that our previously estimated 200 million cost [synergy] opportunity is expected to be captured within 2025" and that "[t]otal cost synergy opportunities are now estimated to be $300 million by the year 2026," "$100 million higher and 1 year sooner than previous forecasts provided at the time of the deal announcement." Hass further highlighted that the anticipated costs to achieve synergies had now gone down, stating, "[w]e are decreasing our estimate of anticipated costs necessary to achieve these synergies to approximately $100 million. This figure was previously $115 million at the time of our merger announcement."

78. On March 11, 2025, in conjunction with the SPO, Defendants touted the purported benefits from the combined infrastructure such as "efficient delivery, strong service levels, and high overall customer satisfaction" and affirmed the new higher $300 million synergy capture and lower anticipated costs ($100 million) for their achievement.

79. But, by the end of April 2025, the supply chain began collapsing, causing operations to deteriorate quickly. The Company's systems were

- 33 -

incompatible (could not talk to one another), and the Company was facing delivery disruptions because route deliveries were a mess, inventory was disorganized with racks and bottles in a state of disarray, and there was insufficient staff to handle ongoing or upcoming issues.

80. But, Rietbroek and Metropoulos decided to continue the accelerated integration plan, including closing Primo Water's largest newly renovated plant in Los Angeles, California, and shifting operations to BlueTriton's plant located in the same city.

81. Despite being intimately aware of the Company's Merger integration problems that had been exacerbated by their acceleration of synergy capture, on May 8, 2025, the Company announced its first quarter 2025 results ("1Q25") and reaffirmed its full year guidance, which was linked to the Company's synergy capture.  Rietbroek stated that "***We are on track to realize our $200 million cost synergies opportunity by 2025***, supporting our full-year outlook for Net Sales, Adjusted EBITDA, and Adjusted Free Cash Flow."  He also said, "***We believe the successful execution and delivery of these key initiatives will position us to achieve our 2025 financial guidance***, which includes ***capturing $200 million in cost synergies*** opportunity as we ramp up through the balance of the year."

82. And, while Rietbroek touted the Company's measures to achieve "synergy capture," including headcount reductions, "new distribution and resets,"

and "optimizing our SG&A structure," Exchange Act Defendants failed to disclose the Company's mounting problems (*i.e.*, distribution issues, delivery issues, mounting costs, customer quits) caused by the Company's haphazard Merger execution driven by prioritizing speed and cost reductions over effective integration. Rather, than disclose these material problems to investors, Rietbroek stated, "*[w]e believe all aspects of our business are aligning for flawless integration execution*." And, despite the known "lags," massive customer complaints, and quits, when asked about customer churn, Hass misleadingly told investors "we remain in a good position," "*[w]e've really not seen any sort of slippage*," even reporting "an increase slightly in retention."

83. On May 14, 2025, Rietbroek doubled down on the misleading portrayal of the Merger's execution in response to an analyst question as to how the integration process has gone, stating, "we're driving synergies," and assuring investors "[w]e've *not* had major hiccups."

### 7. Defendants Formed a War Room and Crisis Response Team to Address the Merger Integration Problems

84. Unbeknownst to investors, despite Exchange Act Defendants' Class Period assurances that the Merger "integration [was] ahead of schedule," that their integration execution was "flawless" and that there had been "no major hiccups," the Company's integration problems had become so dire that, in approximately May or June 2025, the Company's executive management, including Rietbroek, Hass,

- 35 -

and Johnson, formed a "War Room" at the Company's headquarters in Stamford, Connecticut. The War Room involved a team of approximately 25 employees from various sectors of the Company (including manufacturing, inventory supply chain, transportation, and IT), as well as consultants from McKinsey. During the first few days of the War Room, Johnson addressed the team to outline its mission and provide initial direction.

85.    The War Room team's mandate was to address escalating freight costs, plant inefficiencies, and other operational issues from the Merger integration that were impacting the Company's performance. Indeed, at this time, customer complaints had increased significantly, and the daily "drag," representing missed delivery numbers had risen to between 65,000 and 80,000 units per day. The War Room team – later renamed the CRT – managed significant operational failures that arose during the integration, including failures relating to logistics, technology systems, customer service functions, and challenges at the manufacturing plants. Specifically, the CRT would meet with Johnson and review the daily flash report containing the data from the night before (*e.g.*, drag, service level, on time in full (OTIF) rates) and devise an action plan that Johnson would then relay to the executive team.

86.    To extend its effectiveness, the CRT established smaller, specialized groups known as "Tiger Teams." These Tiger Teams were cross-functional units

- 36 -

composed of subject matter experts deployed to plants and offices experiencing major operational challenges. Their mandate was to rapidly diagnose and resolve high-stakes issues or execute specialized, high-impact initiatives. Once their specific objectives were achieved, Tiger Team members returned to home base to await their next deployment.

87. For example, around late July 2025, a Tiger Team was deployed to the site to stabilize operations at a troubled Company plant in New Jersey that had essentially imploded. The team performed hands-on operational tasks, including unloading and packing trucks, adjusting machinery settings, yard management, and addressing other production issues. The team remained at the New Jersey plant for approximately one week before returning to their home base for their next deployment. The Tiger Team cycled in and out of New Jersey for the next two months to stabilize and correct ongoing concerns.

88. Exchange Act Defendants' formation of the CRT to address massive execution problems that arose approximately six to seven months after the Merger's close demonstrates the severity of the operational issues the Company was experiencing and Exchange Act Defendants' knowledge of it.

**8.    The Merger Integration Problems Became so Pervasive that Exchange Act Defendants Could No Longer Conceal Them from the Public**

89.    Ultimately, Exchange Act Defendants were forced to reveal serious operational and financial problems resulting from the Merger integration and its impact on the Company's financial results, as more fully discussed below.

90.    First, on August 7, 2025, Exchange Act Defendants shocked the market by announcing a 2.5% year-over-year sales decline in the second quarter of 2025 ("2Q25"), and reducing full year 2025 net sales growth guidance to a range of 0% to 1% (down from 3% to 5%), full year 2025 adjusted EBITDA guidance to a range of $1.485 to $1.515 billion (down from $1.6 to $1.628 billion), and adjusted free cash flow guidance to a range of $740 million to $760 million (down from $790 million to $810 million) due, in part, to "***integration disruptions** during the later part of Q2[25], and our **reinvestment** to correct the issues.*"  Hass admitted that the poor results and lowered guidance were due to the Exchange Act Defendants' actions stating, "***We prioritized speed and cost reductions, resulting in some customers experiencing rescheduled or canceled deliveries on a recurring basis, product substitutions and extended customer service wait times.*"    Rietbroek further admitted that "***[t]he speed by which we closed facilities and reduced headcount led to disruptions in product supply, delivery and service.*"  On this news, Primo Brands

- 38 -

stock fell **9%**, from a closing price of $26.41 per share on August 6, 2025, to a closing price of $24.00 per share on August 7, 2025.

91.    However, Exchange Act Defendants continued to keep the price of Primo Brands securities artificially inflated by concealing the full extent of the integration problems and their ongoing negative impact on the Company's operations and financial results.  For example, they partly blamed the lackluster results on tornado damage to a plant in Hawkins, Texas.  This was misleading because, in reality, the plant sustained minimal damage and was fully operational within a few days of the tornado.  Moreover, they stated that "we have largely resolved these delays across the network, and we've learned a lot" and "[w]e're now battle tested and well positioned to restore growth, improve margins and generate free cash flow in the second half."  Rietbroek also confirmed the Company would be "past most of those challenges come September."

92.    Exchange Act Defendants made additional misleading statements assuring investors that the Merger integration problems were mostly resolved and were appropriately accounted for in the Company's lowered guidance.  For example on August 11, 2025, they claimed that they had "resolved the majority of issues" and that the disruptions occurred in a "one rip the band-aid off quarter."  And, on September 4, 2025, they stated, "we believe that we're largely through what would be the peak sort of period of frustration."  Analysts understood these statements to

- 39 -

mean the Company had adequately accounted for any further disruptions in the third quarter of 2025 ("3Q25"), with Barclays Capital, Inc. ("Barclays") noting, "[w]e sensed some initial skepticism following PRMB's guidance cut in early August (i.e., what is the risk of the timeline to integration recovery being pushed out further?), but we were inclined to think of the revised outlook as having sufficiently de-risked FY25."

93.     Just a few weeks later, on November 6, 2025, the market was shocked again when, despite assurances that the Company's problems were behind it, Exchange Act Defendants revealed another year-over-year sales decline (1.6%) 3Q25 and again reduced full year 2025 net sales growth guidance to a "net sales decline in the low single digits" (down from a prior rage of 0% to 1%) and full year 2025 adjusted EBITDA guidance of "approximately $1.45 billion" (down from a prior range of $1.485 to $1.515 billion).  The Company further surprised the market with the abrupt announcement that Rietbroek was being "transitioned" from his CEO role and resigning as a member of the Board to be replaced by Foss.  The Company also announced that Metropoulos had stepped down as the Company's Chairman of the Board.   These announcements, in conjunction with resulting analyst commentary, caused additional stock price declines of approximately 21% on November 6, 2025 and an additional 18% on November 7, 2026.

94.     In his first public call as CEO, Rietbroek's replacement, Foss, stated on behalf of the Company that "I think most of the direct delivery disruption has been *self-inflicted*. . . . we probably moved too far too fast on some of the various integration work streams." Foss also stated there was "no doubt" that the speed of the integration efforts impacted "product supply" and "our ability to get through a lot of the warehouse closures and route realignment without disruption," resulting in the "customer service issues that we've highlighted." Further, Foss acknowledged "integration issues related to the technology move over."

## C.     Post-Class Period Developments

95.     After the Class Period, Foss and Haas continued to reveal the incompatibilities between BlueTriton and Primo Water, which were known to them in their extensive due diligence process.

96.     For example, on January 7, 2026, Foss and Hass hosted a "fireside" chat, which Foss began by acknowledging, "to be perfectly honest, [Primo Water and BlueTriton] they were run and operated very differently." Later in the call, Foss reiterated, "[a]nd the reality is, the two companies, as I mentioned earlier, they were run somewhat differently across several dimensions."

97.     Moreover, Foss acknowledged that the Company's integration issues were still ongoing. In the Company's February 26, 2026 press release announcing fourth quarter 2025 ("4Q25") and fiscal year 2025 ("FY25") financial results Foss

- 41 -

declared that the Company's "challenges are within our control."   And, in a conference call hosted that same day, Foss discussed the Company's investment in various "initiatives underway" as of February 2026, to counteract the Company's operational issues and win-back customers, including: (a) "a new warehouse management system for superior supply chain execution"; (b) technology integration "to continue to harmonize our systems to create better management tools, data analytics and insights, as well as improve our digital and app experience for our customers;" (c) the "Solve-by-sundown" customer service program to "address and resolve customer service issues faster" and "connect[] our customers more closely with our call center, as well as our operational teams reducing friction that could lead to customer loss"; (d) "a new approach to our call center to elevate satisfaction throughout the customer experience [to] include[] improved digital opportunities and leveraging AI to more quickly serve and solve customer issues"; and (e) "a more strategic and holistic revenue management approach across price points, package types, and channels [to] allow us to zero in on SKUs that matter most to the consumer, focusing on the most profitable packages and channels, and simplify our production and route to market."

98.    In the presentation that accompanied the conference call that day, with respect to the integration process, the Company identified that ERP consolidation remained.  Specifically, the presentation called out that, for 2026, "[r]emaining

- 42 -

integration entails branch consolidation and technology conversion to a unified ERP system."

    **D.    Exchange Act Defendants' Scienter**

        **1.    Exchange Act Defendants' Admitted Involvement in Merger Due Diligence and the Merger Integration Process Confirms Their Knowledge**

99.    Exchange Act Defendants admitted they participated in the Merger's extensive due diligence process, in which Exchange Act Defendants would have learned of the serious incompatibilities between both Primo Water and BlueTriton, as well as the extensive time and costs needed to appropriately integrate the companies.

100.    Specifically, Primo Water detailed in its Proxy Statement filed with the SEC on October 7, 2024 that, as part of the Merger due diligence process, between December 2023 and June 2024, executives from BlueTriton and Primo Water shared information on the two businesses, meeting numerous times, and conducting in-person visits across various operating locations. For example:

- From December 18, 2023 to February 20, 2024, BlueTriton and Primo Water engaged in informal discussions and communications, including establishing a process to evaluate synergies with each party's prospective advisors in an initial phase before moving into a fulsome due diligence review. Throughout that time, Metropoulos was Chairman of the Board of Directors of BlueTriton and Hass was CFO of Primo Water. And, on January 1, 2024, Rietbroek became CEO of Primo Water.

- On February 20, 2024, the Primo Water Board of Directors, joined by

senior management of Primo Water and other representatives including BofA Securities, Inc. ("BofA Securities"), met virtually.  At the meeting, BofA Securities provided an update on the cost synergy opportunities associated with the proposed transaction based on the work conducted advisors, as well as an updated preliminary combination analysis and preliminary illustrative value creation analysis using a range of potential *pro forma* equity ownership levels, synergy levels and *pro forma* trading multiples.

- From March 2024 to June 2024, representatives of Primo Water and BlueTriton participated in various business and legal due diligence sessions, along with numerous in-person site visits across both companies' various operating locations.

- From March 4, 2024 to May 22, 2024, the Board of Directors of Primo Water and a Special Committee of the Board of Directors ("Special Committee"), met on multiple occasions, often joined by senior management of Primo Water and representatives from Primo Water's legal and financial advisors, to receive updates on and discuss the proposed transaction. In addition to formal meetings, the Special Committee members had additional informal discussions among themselves, as well as with Primo Water's management and legal and financial advisors.

- On May 7, 2024, the Primo Water Board of Directors met and received an update from BofA Securities, which presented BlueTriton's first quarter 2024 financial results and indicative valuations of the two businesses on a standalone and combined basis.

- On May 31, 2024, Primo Water's Special Committee met and received an update from BofA Securities on the due diligence process, Ernst & Young's preliminary quality of earnings findings, term sheet negotiations, transaction timeline, an updated preliminary combination analysis and preliminary and illustrative value creation analysis.

101.   Rietbroek, Hass, and Metropoulos played a pivotal role in the events leading up to the Merger, and emphasized their involvement in the due diligence process and its comprehensiveness.  On June 17, 2024, Rietbroek stated that he had

- 44 -

been "[n]egotiating this transaction over the last several months. Metropoulos echoed that "we completed the proper due diligence necessary for a deal of this magnitude." Hass reiterated that "a wealth of information . . . has enabled us to bring these two great companies together." With respect to questions concerning the strategic benefits of the merger, Metropoulos explained, "[w]e spent a fair amount of time looking . . . at the two businesses." Hass stated that "[w]e have an analysis of what we both do in the market. And we believe that as we have – as we are allowed to sort of look a little bit closer at each other's businesses and address both the cost of goods cost pools and how we produce water, as well as the SG&A and other activities within our systems and processes, that we could revise and have different views of that."

102. In addition, as detailed above, executives from Primo Water (including Rietbroek, Hass, and Johnson) and BlueTriton were part of a Merger Integration Team that was formed after the Merger was announced in June 2024 and tasked with developing and formulating a comprehensive Merger Integration Plan.

103. The Merger Integration Team was led by Johnson and Lord and included working groups consisting of the CEOs from both companies (including Rietbroek), the CFOs from both companies (including Hass), and the Merger Integration Team, met regularly and engaged with various departments at both companies in connection with developing the Integration Plan. The plan was

intended to provide a roadmap for combining the two companies into a unified structure, including strategic objectives, synergy capture initiatives, critical responsibilities, leadership appointments, retention strategies, key performance indicators ("KPIs"), and financial targets.

104.   Indeed, on November 7, 2024, the day before the Merger was expected to close, Exchange Act Defendants highlighted their integration planning efforts to investors, further indicating their knowledge of the Company's Merger integration efforts and plans.   As detailed above, Rietbroek stated, "Our teams have been intensely focused on ensuring we '*hit the ground running*' *post-close*."

105.   More specifically, Rietbroek stated that the IMO went through "three stages of planning that identified, in the first stage at the conceptual level, where we would be able to capture synergies."   "We then worked *out very specific plans* and we're now at the pre-execution stage to be able to hit the ground running from day one, *we'll be executing synergies starting this quarter and the remainder of Q4*. So really organized through IMO, work streams, and multistage from conceptualization to execution with the help of the best consulting firms in the world."

106.   Through their involvement in this process, Exchange Act Defendants knew of the various incompatibilities in the legacy businesses and the serious

- 46 -

potential problems that would occur in the integration process if these operational

differences were not remedied.

> **2.      The Exchange Act Defendants' Knowledge of Merger
> Integration and Operational Problems Is Further
> Established by Their Admitted Tracking of the
> Company's Key Performance Metrics**

107.  In addition, as detailed below, in Section IV.E, Exchange Act

Defendants frequently spoke about the Merger's progress and its achievement of

synergies to investors, assuring investors they were informed on these matters.  For

example, Rietbroek repeatedly told investors that "[we] believe ***all aspects of our***

***business are aligning for flawless integration execution***."  And, in raising the

Company's synergy estimate, Hass emphasized that "***[w]ith more time and focus on***

***our integration activities***, we are pleased to announce that our previously estimated

***[$]200 million cost [synergy] opportunity is expected to be captured within 2025***."

Johnson appeared at the Company's inaugural Investor Day conference and

specifically addressed "the considerable progress we have made towards integration

and delivering on our increased expected synergy opportunity."  Other examples

include:

- Metropoulos, June 17, 2024 conference call:  Prior to the Merger, BlueTriton and Primo Water "spent a fair amount of time looking out to look at the two businesses, both of us sharing each other's views of the wonderful strategic opportunities.  And we saw tremendous strategic operational and financial synergies that would take this company to the next level going forward."

- 47 -

- Rietbroek, November 14, 2024 conference call: Discussing bringing Primo Brands into Primo Water's IT "platform" set up to give "a lot more visibility into the business to be able to make decisions on which of the markets, which of the routes are most efficient, how do we make them even more efficient?"

- Rietbroek, February 20, 2025 conference call: In response to a question regarding "opportunities to leverage best practices across legacy businesses," Rietbroek stated, "that's a question we spend a lot of time on as a company." He expounded: "[W]e are absolutely looking at best practices as we integrate the two distribution models get more density in our routes, get more proximity to the finished to the final customer. And so we are absolutely working through that right now."

- Metropoulos, February 27, 2025 Investor Day conference: After the Merger closed, "Our management teams interacted incredibly with tremendous enthusiasm. They shared the vision, they shared the culture. They began to identify significant synergies, not only financial synergies, but strategic synergies, how do we become a better company? How do we penetrate the marketplace even deeper and those synergies, by the way, were well identified. We've been working as a team together for a year, by November ninth, the day after the FTC approval, we were ready to execute."

- Johnson, February 27, 2025 Investor Day conference: "We are following a detailed, organized process to ensure that we maximize synergies across each of these categories. In fact, we have already made meaningful progress. For example, in operations, we have started and implemented route engineering in our non-consolidated depot locations. We have taken steps to align our brand portfolio to simplify our supply chain and our operations. We have also begun our IT ERP conversion and have optimized multiple processes across key functional areas, including our call centre."

108.	Defendants also admitted to monitoring key performance indicators and having access to and actively tracking scheduling, delivery, and customer retention metrics among others:

- Rietbroek, November 7, 2024: Emphasizing his commitment to "stay[ing] focused on key metrics like service, retention, organic sales growth, ensuring our customer touch points are great."

- 48 -

- Hass, January 7, 2025: "[O]bviously, we'll be very attentive to customer call center metrics. But all of those customer retention across the supply chain, obviously, adds, quits and nets are critical operational metrics."

- Rietbroek, February 20, 2025 conference call: "We're looking at, the operations, we're looking at procurement, we're looking at IT and enterprise software. Our call center is a big driver of savings . . . ."

- Rietbroek, May 8, 2025: "We continuously monitor our performance through key metrics such as Net Promoter Score, Trustpilot, Google ratings, and app ratings, which provide valuable insights that enable us to make timely improvements."

- Hass, May 8, 2025: In response to a question regarding customer satisfaction, Hass stated, "we've spent time as businesses looking at factors like on-time and full, in-stock rates, our NPS scores, our customer satisfaction. We've actually built out a pretty extensive KPI dashboard for internal discussion that over the next coming quarters, like we did at legacy Primo Water, we'll start to reveal some of those when it's best on the backside of conversion or consolidation." He noted performance statistics for the Company's "last mile," "refill uptime," and "[c]ustomer retention."

### 3. Exchange Act Defendants' Knowledge of the Company's Operational Issues Is Evidenced by Their Creation and Involvement in the War Room/Crisis Response Team

109. As detailed above, Rietbroek, Hass, and Johnson, formed a War Room, later to be known as the CRT, which was run by Johnson, who reported directly to Hass, Rietbroek, and Metropoulos, to address escalating freight costs, plant inefficiencies, and other operational issues from the Merger integration that were impacting the Company's performance. To extend its effectiveness, the CRT even deployed Tiger Teams, to rapidly diagnose and resolve high-stakes issues or execute specialized, high-impact initiatives. Notably, the CRT would meet with Johnson

- 49 -

and review the daily flash report containing the data from the night before (*e.g.*, drag, service level, on time in full (OTIF) rates) and devise an action plan that Johnson would then relay to the executive team.

110. The need to establish a CRT to address significant operational issues approximately six to seven months after the Merger closed demonstrates the massive failures of the Merger integration process and Exchange Act Defendants' knowledge of those problems which they concealed from investors.

### 4. Exchange Act Defendants' Admissions Affirm Their Contemporaneous Knowledge of Information Undermining Their Public Statements

111. Exchange Act Defendants' scienter is also supported by their admissions at the end of the Class Period, which establish that the problems were "self-inflicted" and caused by Exchange Act Defendants' intentional efforts.

112. For example, on August 7, 2025, Rietbroek admitted that "[w]e prioritized speed and cost reductions" which "result[ed] in some customers experiencing rescheduled or canceled deliveries on a recurring basis, product substitutions and extended customer service wait times." He admitted, "we had extensive integration planning, but due to the speed of integration, we clearly prioritized speed. We did temporarily experience supply shortages." Hass also made a series of admissions on that day. Specifically, Hass admitted, "we experienced some disruptions as the first wave of integration impacts caused product

- 50 -

supply and delivery service . . ., and we're unable to fulfill strong demand from our customers." Hass admitted further, "[t]he pursuit of our factory closures across production and branches in addition to routing as part of the integration resulted in short-term disruption to the supply and service of our products to our direct delivery customers. . . ." Finally, Hass also admitted to "recovery initiatives to address [the Company's] operational disruptions" that "slowed our growth trajectory versus our original guidance."

113.  Rietbroek again admitted that speed negatively affected the Merger's success, saying, on September 4, 2025, "we put together the companies probably a little faster than we should have."

114.  Finally, on November 6, 2025, after Rietbroek had been replaced as CEO, the new CEO, Foss, elaborated on Rietbroek's earlier admissions, admitting on behalf of the Company, "I think most of the direct delivery disruption has been ***self-inflicted***." Foss went on to add that Primo Brands "probably moved too far too fast on some of the various integration work streams." Foss also admitted, "[t]here's no doubt that, that speed impacted product supply" and the "ability to get through a lot of the warehouse closures and route realignment without disruption" and "the ultimate output of that was the customer service issues that we've highlighted." Additionally, in the Company's February 26, 2026 press release, Foss admitted that the Company's "challenges are within our control."

- 51 -

### 5. Exchange Act Defendants' Substantial Merger-Related Payments and Compensation Tied to Financial and Stock Price Performance

115. Exchange Act Defendants' substantial executive compensation motivated them to complete the Merger and mislead the market about the Company's Merger integration and post-Merger financial and operational performance.

116. Notably, the Company's March 20, 2025 and March 20, 2026 Proxy Statements acknowledged Exchange Act Defendants' unique 2024 and 2025 compensation stating, "compensation for [Rietbroek, Hass, and Metropoulos] *may differ from the peer group* and may vary according to factors such as experience, position, tenure, individual and organizational factors, retention needs, and extraordinary events, *like the consummation of the Transaction*, among others."

117. Indeed, Rietbroek was paid significantly when onboarding with legacy Primo Water at the start of 2024, including a one-time cash sign-on bonus of $882,500 on January 19, 2024, and a one-time inducement equity award of $3,500,000. In total, Riebroek was awarded $11.6 million in 2024 for "one-time-on-hire Legacy Primo Water compensation." Given this significant "on-hire" compensation, Rietbroek was motivated to show his worth and make a name for himself at the Company by successfully closing the Merger and portraying it in a

positive light, rather than cancelling or delaying the Merger and revealing problems apparent from due diligence and integration planning.

118. Also in 2024, Metropoulos and Hass received huge cash payments directly tied to their work on the Merger. Through one of his affiliates, Fairmont, Metropoulos received a lump sum of $2,320,303 in "consideration for the provision of advice and strategic planning to the Company in connection" with the Merger. Additionally, Hass was paid a one-time cash bonus of $300,000 for his "efforts during the pendency of the" Merger. Thus, not only were they both closely involved with the strategic planning of the Merger (supporting knowledge of the problems alleged herein), they were also motivated to ensure it was approved and completed (and, in turn, to portray it in the best possible light) in order to secure a substantial Merger-related payment.

119. This motivated them to quickly close the Merger and portray it in a positive light, rather than reveal problems apparent from due diligence and integration planning.

120. Rietbroek's large sign-on bonus and Metropoulos' and Hass' cash payments motivated them to successfully and quickly close the Merger and portray it in a positive light in 2024, rather than cancel or delay the Merger and reveal problems apparent from due diligence and integration planning.

- 53 -

121. Exchange Act Defendants were also positioned to extract massive personal gains from executive compensation tied to the Company's financial and stock price performance. In essence, the better the Company and its stock price performed, the more compensation they received. As such, they were highly motivated to portray the Merger and associated financial results in a positive light, while concealing problems related to the Merger integration. This supports their knowledge of and/or severe reckless disregard of such problems.

122. *Rietbroek*. In 2024, Rietbroek received over $25.9 million total compensation, including over $22.8 million in stock awards (88% of his total compensation). Rietbroek's stock awards included long-term equity incentive awards (*i.e.*, performance-based restricted share units ("PSUs")) described by the Company as "[e]quity compensation that reinforces the link between incentives and long-term performance of Primo Brands (or its applicable predecessor), incentivizes our named executive officers [("NEOs")], aligns the interests of our [NEOs] with those of stockholders, and encourages executive retention."

123. The 2024 PSUs issued to Rietbroek vested based on the: (a) average annual return on invested capital ("ROIC") and total shareholder return ("TSR") relative to the Russell 2000 index over a three-year period beginning on the first day of Primo Water's 2024 fiscal year and ending on the last day of Primo Water's 2026 fiscal year (weighted 50% and 50%, respectively); and (b) TSR relative to the S&P

- 54 -

400 index over a three-year period beginning on the first day of the Company's 2025 fiscal year and ending on the last day of the Company's 2027 fiscal year.

124. In 2024, Rietbroek also received $1.3 million in non-equity incentive plan compensation based on achievement of a specified level of Bonus-Adjusted EBITDA, Bonus-Adjusted operating free cash flow and Bonus-Adjusted revenue, weighted 50%, 25%, and 25%, respectively.

125. Rietbroek's total compensation ($25.9 million) in 2024 was 763.3% greater than the 2023 total compensation paid to Rietbroek's predecessor as CEO of Primo Water, Thomas J. Harrington ("Harrington") ($3.0 million) and 339.0% greater than the 2022 total compensation paid to Harrington ($5.9 million).

126. In 2025, Rietbroek started the year with a salary of over $1.0 million (an increase of 46% from his 2024 salary). In addition, although Rietbroek eventually left Primo Brands, his 2025 Target Bonus Opportunity was $1,650,000, an 83.3% increase from the prior year. And, the "Company performance" aspect of his annual performance bonus, was yet again based on a specified level of Bonus-Adjusted EBITDA, Bonus-Adjusted operating free cash flow, and Bonus-Adjusted revenue, weighted 60%, 20%, and 20%, respectively - the same three 2025 guidance metrics that Exchange Act Defendants had inflated and were ultimately forced to lower beginning on August 7, 2025, (and again in November as to EBITDA and

- 55 -

revenue).   Notably, any "outperform" rating was "inclusive of targeted synergy amounts."

127.   *Hass*.   In 2024, Hass received over $7.1 million total compensation, including over $5.6 million in stock awards (79.3% of his total compensation). Hass' stock awards included long-term equity incentive awards (*i.e.*, PSUs), which vested based on the: (a) average annual ROIC and TSR relative to the Russell 2000 index over a three-year period beginning on the first day of Primo Water's 2024 fiscal year and ending on the last day of Primo Water's 2026 fiscal year (weighted 50% and 50%, respectively); and (b) TSR relative to the S&P 400 index over a three-year period beginning on the first day of the Company's 2025 fiscal year and ending on the last day of the Company's 2027 fiscal year.

128.   Hass also received $608,850 in 2024 non-equity incentive plan compensation based on achievement of a specified level of Bonus-Adjusted EBITDA, Bonus-Adjusted operating free cash flow and Bonus-Adjusted revenue, weighted 50%, 25%, and 25%, respectively.

129.   Hass' total compensation in 2024 ($7.1 million) was 136.6% greater than the 2023 total compensation Hass received at Primo Water ($3.0 million) and 610.0% greater than the 2022 total compensation paid to Hass' predecessor as CFO of Primo Water, Jay Wells ($1.0 million).

130.  In 2025, Hass received over $2.5 million in total compensation, including over $1.9 million in stock awards (74.9% of his total compensation). Hass' stock awards included long-term equity incentive awards (*i.e.*, PSUs), which vested based on the amount of TSR relative to a Performance Peer Group over a three-year period beginning on the first day of Primo Brands' 2026 fiscal year and ending on the last day of Primo Brands' 2028 fiscal year.  Like Rietbroek, Hass' 2025 $1,200,000 Target Bonus Opportunity was based on a specified level of Bonus-Adjusted EBITDA, Bonus-Adjusted operating free cash flow, and Bonus-Adjusted revenue, weighted 60%, 20%, and 20%, respectively, and any "outperform" rating was "inclusive of targeted synergy amounts."

131.  *Metropoulos*.  In 2024, Metropoulos made over $10.5 million in total compensation, far greater than the 2024 total compensation of the Company's nine other non-employee directors, which ranged from $99,568 to $428,401.  In addition, as described above, Metropoulos' affiliate, Fairmont, received a $2.3 million cash payment in connection with the Merger.

132.  Metropoulos' total compensation ($10.5 million) in 2024 was 2,627.3% greater than the total compensation of Primo Water's non-executive Chairman of the Board of Directors, Jerry Fowden ("Fowden"), in both 2022 and 2023 ($385,000 each year).

133. In 2025, Metropoulos received $460,000 in total compensation, which was higher than the compensation received by the seven other non-executive directors (ranging from $219,068 and $421,603).

### 6. Suspiciously-Timed Executive Departures Support Scienter

134. The spate of executive departures that occurred as the Company's severe operational problems were disclosed to the market also supports Exchange Act Defendants' scienter. For example, on August 6, 2025, just prior to the August 2025 disclosure, it was announced that Marni Poe ("Poe") was terminated as the Company's General Counsel, effective that same day. Poe began working with Primo Water in 2008, and was intimately involved in the Merger, receiving "a one-time discretionary cash bonus" in connection with her "efforts during the pendency of the" Merger of $300,000 (or 58% of her annual salary). Poe was also signatory to the Arrangement Agreement and Plan of Merger on behalf of Primo Water.

135. In addition, on November 6, 2025, in conjunction with disclosing the Company's continued operational issues and their financial impact, and a few weeks after appointing Rietbroek interim COO, the Company disclosed that he was now being "transitioned" from his CEO and interim COO roles and resigning as a member of the Board. Notably, at the time of the announcement, Rietbroek had yet to sign his severance agreement with the Company.

- 58 -

136.    Also on November 6, 2025, the Company announced that Metropoulos was stepping down from his role as Chairman of the Board, while remaining as a member of the Board.

137.    Rietbroek's sudden departure from the Company and Metropoulos' step down from the Chairman of the Board position, which came on the heels of the Company's second lowering of guidance and admission of the ongoing integration and operational problems at the Company, is additional circumstantial evidence of their knowledge and responsibility for the Company's self-inflicted Merger integration issues and resulting operational problems and poor financial performance.

### E.    Exchange Act Defendants' Materially Misleading Statements and Omissions[1]

#### 1.    June 17, 2024 Merger Announcement

138.    The Class Period begins on June 17, 2024, when before the market opened, BlueTriton and Primo Water issued a press release announcing that they had reached a definitive agreement to combine the two companies to create Primo Brands, setting forth the terms of the Merger and touting its benefits.

139.    The press release stated that "[t]he Transaction will bring together Primo Water and BlueTriton's complementary strengths, creating a leader in North

---

[1]    Bold and italics are for emphasis.

American pure-play healthy hydration with combined Net Revenue and Adjusted EBITDA, including ***$200 million in estimated cost synergies***[,] of $6.5 billion and $1.5 billion, respectively, for the twelve month period ended March 31, 2024. ***One-time costs associated in the capture of the $200 million synergies opportunity are estimated to be approximately $115 million***."

140. That same morning, in a conference call with investors, hosted by Metropoulos, Rietbroek, and Hass, Metropoulos claimed, "[b]y combining BlueTriton and Primo Waters, we will create a leading North American platform, which ***combines complementary businesses*** across various channels, formats, geographies, and usage occasions."

141. Rietbroek emphasized the Company's Merger synergies to investors, highlighting, among other things, its "target of $200 million of run rate cost synergies, which we will achieve over the next three years following closing [of the Merger]."

142. Hass also discussed the Company's plan to "implement business optimization initiatives," positioning it to "realize an estimated $200 million of cost synergies and value-creation opportunities on a run-rate basis."

143. In particular, Hass touted planned optimizations from the Company's Information Technology and Enterprise Resource Planning systems, stating:

> In IT and ERP, ***we plan to optimize our functional software and expand the use of successful systems implementation further into the organization***.

We also plan to benefit from a recently implemented ERP by Blue Triton, which we expect to accelerate the modernization of our combined financial systems.

144.    In response to several analyst questions, Defendants also reiterated their focus on, and confidence in, the $200 million synergies target, with Hass stating, "*we are very confident in the $200 million*."  Echoing Rietbroek, Hass further remarked that "[w]ith regard to the synergies . . . . we'll be fully through those $200 million by the end of year three."

145.    As a follow up, in response a question from a J.P. Morgan Securities LLC ("J.P. Morgan") analyst regarding the "cost" of achieving the $200 million in synergies, Hass repeated that "we have an *estimated cost of approximately $115 million to bring those synergies to life*, and that will follow the similar phasing pattern as discussed on how we outline the synergy generation."

146.    Analysts reacted positively to Defendants' statements, noting how complementary the two companies are to each other and the scale of the resulting cost synergies.  For example, a June 17, 2024 J.P. Morgan report stated, "we believe investors should grow more positive with this combination given the benefits to scaling route-based businesses and upside to synergy capture," and "if deal is approved, there could be more synergies than the $200M cost synergies management indicated."

- 61 -

147. Defendants' statements in the June 17, 2024 press release and conference call, as set forth above in ¶¶138-145 were materially false or misleading and/or omitted material information necessary to make them not misleading when made. Specifically:

(a)    Defendants' positive statements regarding the Merger's $200 million in cost synergies and the $115 million cost "to bring those synergies to life," and their expression of "confiden[ce]" in these metrics, gave the market a misleading impression of the financial prospects of the Merger, and omitted to disclose the true nature of the costs and efforts associated with capturing those synergies, which would ultimately cause expenses to skyrocket, result in customer losses, and lead to slower net sales growth, reduced free cash flow, and compressed earnings (EBITDA). At the time these statements were made, Exchange Act Defendants had conducted months of thorough due diligence showing that Primo Water and BlueTriton "were run and operated very differently," and that the changes needed to effectively integrate the two legacy companies would be expensive and time consuming, and if left unresolved would result in severe operational challenges, including significant delivery, supply, manufacturing, and customer service disruptions requiring massive expenditures to stabilize, far higher than $115 million.

(b)    Defendants' positive statements that the legacy companies were "complementary," and the Merger "combined complementary businesses," gave a

- 62 -

misleading impression as to the ease with which BlueTriton and Primo Water could be integrated, failing to disclose that at the time these statements were made, Exchange Act Defendants had conducted months of due diligence showing that, as later admitted, the legacy companies "were run and operated very differently." They had different and incompatible ERP systems, transportation management systems, systems used by "last mile" delivery teams, and their manufacturing facilities could not accommodate each other's products. Efforts to integrate and align these incongruous systems would be time-consuming and costly.

(c)    Defendants' statements regarding the Company's IT and ERP optimizations and BlueTriton's ERP would "accelerate the modernization of our combined financial systems," in conjunction with Defendants' positive statements regarding Merger synergies, were misleading and gave investors a false impression that integrating the legacy companies' IT and ERP systems would generate significant cost savings without causing significant operational disruptions, when in truth, at the time these statements were made, Exchange Act Defendants had conducted months of due diligence showing that legacy companies ran on two separate IT and ERP systems, that would be slow, costly, and difficult to integrate. After the Class Period, over a year and a half after the Merger was announced, the Company admitted it still had not fully integrated these systems, acknowledging

"tech transfer challenges" stemming from the Merger and the need to "harmonize [those] systems to create better management tools, data analytics and insights."

### 2. November 7, 2024 Primo Water Press Release (3Q24 Results)

148. On November 7, 2024, Primo Water issued a press release before the market opened announcing its financial results for 3Q24. That same morning, it held a conference call with analysts, hosted by Rietbroek and Hass, to discuss its 3Q24 financial and operational results.

149. On the conference call, Rietbroek touted the benefits of the Merger, telling investors "[t]he combination of these companies creates a leading branded beverage company that is well positioned to drive growth with a highly competitive portfolio of brands and *unique vertically-integrated manufacturing and distribution network to deliver superior customer service*."

150. Rietbroek also continued to emphasize the Merger's $200 million in synergies to investors, stating:

> Additionally, we plan to implement several optimization initiatives across various business functions, positioning us to *realize an estimated minimum $200 million of cost synergies on a run rate basis* within three years of closing or earlier.

151. Defendants' prepared remarks were followed by questions from analysts regarding the Company's strategic initiatives, synergies, and potential integration issues. A CJS Securities analyst asked about the "strategic initiatives" Defendants were planning for the next 12 months, to which Rietbroek directed

- 64 -

investors to the Company's Merger synergies and operational efficiencies, responding, "when it comes to strategic initiatives, our goal would be to drive sustainable long-term shareholder value creation, ***as we capture these transformative operational efficiencies and achieve those synergy goals that you refer to whilst delivering strong financial results***."

152.   Rietbroek highlighted the Company's "first year" goals including:

***We'll work on routes, fleets and production optimization.  These are the key components of the synergy and value capture.  And as I said, we're going to leverage the portfolio of brands to drive revenue synergies and grow market share*** . . . .

153.   Rietbroek reiterated the Company's "committing to $200 million in the first three years."

154.   Defendants' statements on November 7, 2024, as set forth above in ¶¶148-153, were materially false or misleading and/or omitted material information necessary to make them not misleading when made.

155.   Specifically, Defendants' positive statements regarding the Merger's purported $200 million in cost synergies and the associated $115 million cost to achieve them gave the market a misleading impression of the financial prospects of the Merger, and omitted to disclose the true nature of the costs and efforts associated with capturing those synergies, which would ultimately cause expenses to sky rocket, result in customer losses, and lead to slower net sales growth, reduced free cash flow, and compressed earnings (EBITDA).  At the time these statements were

- 65 -

made, Exchange Act Defendants had conducted months of thorough due diligence and Merger integration planning, establishing that, as later admitted, Primo Water and BlueTriton "were run and operated very differently," and that the changes needed to effectively integrate the two legacy companies would be expensive and time consuming, and if left unresolved would, result in severe operational challenges, including significant delivery, supply, manufacturing, and customer service disruptions requiring massive expenditures to stabilize, far higher than $115 million.

156. Defendants' statement that the Company would have "unique vertically-integrated manufacturing and distribution network to deliver superior customer service" and its statement that its "routes, fleets and production optimization" "are the key components of the synergy and value capture," were materially misleading because there were significant incompatibilities in the manufacturing and distribution systems of the two legacy companies. For example, there were incompatibilities with the bottles and modular racks used to store and transport bottles (previously flagged during the integration planning process), the legacy companies' manufacturing facilities were also designed for their own products and not each other's, and, Primo Brands' trucks were not equipped to carry the varying brands that Primo Brands now offered. And, in addition to having overlapping delivery routes that would need to be realigned, merged, and reduced,

- 66 -

there were also incompatibilities related to the different transportation management systems each legacy company used.  There were also integration issues related to the different systems utilized by the legacy companies' "last mile" delivery teams.

157.  Rietbroek's statement, in response to an analyst question about what Defendants had planned over the next 12 months, that "when it comes to strategic initiatives, our goal would be to drive sustainable long-term shareholder value creation, as we capture these transformative operational efficiencies and achieve those synergy goals that you refer to whilst delivering strong financial results," was materially false and misleading when made because achieving "transformative operational efficiencies" and the Company's "synergy goals" would require bridging extensive operational gaps that could not effectively be completed in 12 months (*e.g.*, ERP system migration) and would require significant expenditures, impacting the Company's ability to deliver strong financial results, as Exchange Act Defendants admitted in twice lowering guidance and reporting substantially increased expenses across several categories.

### 3. November 8, 2024 Primo Brands Press Release Announcing the Closing of the Merger

158.  The next day, on November 8, 2024, after the market closed, Primo Brands announced the closing of the Merger in a press release.  In the press release published on its website, Rietbroek stated, "we believe Primo Brands is ***strategically positioned to accelerate growth***, deliver superior products and services for our

- 67 -

customers and consumers." The press release also repeated the same quote Rietbroek made to analysts the day before: "Our goal is to drive sustainable, long-term shareholder value creation as *we capture transformative operational efficiencies, achieve our synergy goals and deliver strong financial results*."

159. Defendants' statements on November 8, 2024, as set forth above in ¶158, were materially false or misleading and/or omitted material information necessary to make them not misleading when made because Primo Brands was not, "strategically positioned to accelerate growth, deliver superior products and services for our customers and consumers." Rather, as Defendants later admitted, the legacy companies "were run and operated very differently." They had two separate ERP systems, different transportation management systems, different systems used by "last mile" delivery teams, and different types of bottles and racks which could cause the existing manufacturing systems to break down. Efforts to integrate and align these incongruous systems would be time-consuming and costly. Indeed, given these significant operational differences, growth would not be "accelerated," and any attempt to do so would result in severe operational challenges, including significant delivery, supply, manufacturing, and customer service disruptions

160. Likewise, Rietbroek's statement that "our goal would be to drive sustainable long-term shareholder value creation, as we capture these transformative operational efficiencies and achieve those synergy goals that you refer to whilst

delivering strong financial results," was materially false and misleading when made because it failed to disclose that achieving "transformative operational efficiencies" and the Company's "synergy goals" would require bridging extensive operational gaps that could not effectively be completed in 12 months (*e.g.*, the ERP system migration) and would require significant expenditures impacting the Company's ability to deliver strong financial results, as Exchange Act Defendants admitted in twice lowering guidance and reporting substantially increased expenses across several categories, as detailed above.

### 4.    November 14, 2024 JPMorgan Equity Opportunities Forum

161.    On November 14, 2024, Metropoulos, Hass, and Rietbroek participated in the JPMorgan Equity Opportunities Forum on behalf of Primo Brands, and answered questions regarding the Merger.

162.    An analyst from JPMorgan asked about the "backbone of all integration," and Metropoulos stated:

> And by the way, in the next few months, and we're starting integration as we speak, *we're already got a lot of moves in place to integrate these companies, to create efficiency, to create more strategic penetration*, *and there's no question about combining SG&A accounting and call centers. And we're going to reduce the number of manufacturing facilities significantly, the various depots across the country. We're going to make our routes much more efficient and consolidate a lot of them with AI and very, very effectively design. So we are in very good shape as we move into this year. And we think these trends are going to continue for years to come*.

- 69 -

163.    The questions next turned to the cost synergies and "how the $200 million came about." Hass responded by discussing, among other things, the status of the combined companies' Automatic Route Optimization ("ARO"), a key metric, stating:

> *[t]oday, we can take customer lists and streamline routes to make sure that that density is not only providing a better delivery opportunity, a better effective relationship with that customer, but also reducing the miles, and that's very important. So not only are we more environmentally friendly with the fleet, but we're also cutting gross mileage by the density and the routing through this synergy process*.

164.    Defendants' statements on November 14, 2024, including those about the $200 million in Merger synergies and their integration activities "to create efficiency," including reducing manufacturing facilities, and that they were "streamlin[ing]" and making their routes more "efficient," "reducing the miles," "providing a better delivery opportunity" and a "better effective relationship with that customer," and "we are in very good shape as we move into this year," as set forth fully above in ¶¶162-163, were materially false or misleading and/or omitted material information necessary to make them not misleading because Exchange Act Defendants' extensive due diligence and Merger integration processes revealed what they later admitted that the legacy companies "were run and operated very differently." They had two separate ERP systems, different transportation management systems, different systems used by "last mile" delivery teams, and different types of bottles and racks which could cause the existing manufacturing

- 70 -

systems to break down.  Moreover, efforts to merge, cut, and realign routes would be fraught as they would create longer distances between stops causing delivery delays and increased expenditures.  Defendants failed to disclose that efforts to integrate and align these incongruous systems would be time-consuming and costly.

### 5. February 20, 2025: Fourth Quarter and Fiscal Year 2024 Financial Results

165. On February 20, 2025, Primo Brands issued a press release before the market opened, attached to Form 8-K, announcing the Company's financial results for 4Q24 and FY24.  The press release highlighted strong organic combined net sales growth, among other things, including that the "[i]ntegration [w]as *ahead of schedule; increases estimated cost synergy opportunity to $300 million, with $200 million expected to be captured in 2025; balance expected to be captured in 2026*."

166. The press release quoted Rietbroek, who stated:

*We have accelerated the size and speed of cost synergy capture. It is now forecasted to be $100 million higher and one year sooner, with $300 million in total expected by year end 2026. First-year 2025 synergies are estimated to be $200 million, with the balance occurring in 2026. The synergy capture is reflected in our 2025 outlook.*

167. The press release issued full year 2025 net sales, adjusted EBITDA, capex, and adjusted free cash flow guidance.  As for full-year 2025 guidance, inclusive of the estimated $200 million cost synergies opportunities anticipated for 2025, the Company projected:

| Comparable Results[1] | | 2025 Range | |
|---|---|---|---|
| ($ in millions) | | Low | High |
| Net Sales Growth | | 3% | 5% |
| Adj. EBITDA | | $1,600 | $1,628 |
| CAPEX | | 4% of Net Sales | |
| Adj. Free Cash Flow | | $790 | $810 |

[1]Comparison period includes 2024 Combined Financials, less results of exited Eastern Canadian operations. For Net Sales reconciliation please see exhibit 9

168. Also on the morning of February 20, 2025, Primo Brands held a conference call with analysts to discuss the 4Q24 and FY24 results, which was hosted by Rietbroek and Hass.

169. Rietbroek assured investors that "*[w]e believe all aspects of our business are aligning for flawless integration execution* where we build the foundation for long-term growth by unifying the people, processes, policies, and platforms to maximize timely cost synergy capture, as well as to capture, revenue synergies" and that "*our integration planning is on track*."

170. Hass highlighted the Company's acceleration of synergies from the Merger stating, "[w]ith more time and focus on our integration activities, we are pleased to announce that our previously estimated *200 million cost [synergy] opportunity is expected to be captured within 2025*."  Hass further stated that the anticipated costs to achieve synergies had now gone down stating, "[w]e are decreasing our estimate of *anticipated costs necessary to achieve these synergies to approximately $100 million*.  This figure was previously $115 million at the time of our merger announcement."

- 72 -

171. Hass later discussed other synergy opportunities, including "reengineer[ing] our route network," stating:

> [A]s you recall, Legacy Prim[o] Water had had and built an extensive private fleet network where we were unsure if that could have been used with all of the distribution points or through the product volume. And **we've been able to find ways to optimize that and reduce and replace high cost and create shorter leg movements between the business**.

172. A TD Cowen analyst asked about the Company's "route optimization" and "how much overlap do you think you could eliminate over time [and] any color on . . . additional efficiencies there[?]" Hass responded:

> **The . . . large synergy capture we have. And one of the reasons we were able to elevate that dollar value today, as I mentioned earlier, was just getting into more of the route engineering more of the branch consolidation . . . .**
>
> \*    \*    \*
>
> **It's running less routes. It's putting more bottles and velocity through the production system and then between branch and inter-branch transfer, as I mentioned, we were able to extract benefit from our private fleet investments**.

173. Analysts reacted positively to the news. For example, in a report issued that day, J.P. Morgan called the upsized synergy target a year ahead of schedule a "positive surprise," while an analyst at RBC Capital Markets, LLC ("RBC") wrote that the "higher synergy targets instill further confidence in our thesis."

174. In discussing the news that the "[i]ntegration [was] ahead of schedule," TD Cowen's report on that day said, "[w]e believe that the market will react positively to this." And in commenting on the "3[%]-5% top line growth"

- 73 -

expectation, it wrote "[w]e think that higher end is very achievable given numerous opportunities including brand cross-fertilization, expansion into new markets and channels, and more."

175. RBC issued a report the next day, on February 21, 2025, writing, "the largest source of upside (while largely expected) came from upward revisions to the size and speed of synergy realization, which yields material upside to our profitability/cash flow estimates."

176. Defendants' statements on February 20, 2025, as set forth above in ¶¶165-172, were materially false or misleading and/or omitted material information necessary to make them not when made. Specifically:

(a) Rietbroek's statements that "*our integration planning is on track*" and that "*[w]e believe all aspects of our business are aligning for flawless integration execution*," were false and misleading when made because the Company was already facing serious operational issues from the rushed and poorly executed integration and significant incompatibilities in the two legacy businesses, which were making integration slow, difficult, and costly. In particular, the Company's failure to sufficiently merge the legacy companies' two different ERP systems resulted in duplication, conflicting data structures, inconsistent reporting, and operational inefficiencies, which affected the Company's vital operations such as

- 74 -

sales, inventory control, delivery routes, human resources, billing, and financial reporting.

(b)     Defendants' statements above touting the acceleration of the size and speed of the synergy capture ($100 million higher and one year sooner) and lowering the anticipated costs to achieve it from ($115 to $100 million) were false and misleading when made because, as detailed above, at the time the acceleration was announced, the Company was already facing serious operational issues from the integration.  The decision made by the executive team in January 2025 to further accelerate the timeline for synergy achievement was a departure from the Integration Plan formulated by the Merger Integration Team and ignored potential problems and red flags that had been identified.  To achieve this accelerated plan, the Company would have to undertake rapid cost-cutting and restructuring measures, which were compounding the incompatibility issues Defendants were facing and driving up costs.  As the Company later admitted, the resulting problems from this decision were "self-inflicted . . .  we probably moved too far too fast" and "we put together the companies probably a little faster than we should have."

(c)     Exchange Act Defendants' statements regarding its route capture and route optimization as a "large synergy capture," were materially misleading because they failed to disclose that Defendants' efforts to realign, merge, and reduce delivery routes would significantly reduce the network, increasing distances between

- 75 -

factories and branches, disrupting the Company's critical direct delivery business, causing late deliveries and inability to meet customer demand.  Additionally, due to incompatibilities in manufacturing facilities and on delivery vehicles, the Company was not positioned to "putting more bottles and velocity through the production system."  These issues drove up costs and slowed customer sales.

(d)     The full year 2025 net sales growth, adjusted EBITDA, and adjusted free cash flow guidance issued on February 20, 2025 was unrealistic and unattainable and would require full year 2025 net sales growth, adjusted EBITDA and adjusted free cash flow guidance to be reduced because as detailed above, at the time the acceleration was announced, the Company was already facing serious operational issues from the rushed and poorly executed integration and the incompatibilities in the two legacy businesses, which were making integration slow, difficult, and costly.  The guidance announcement was made one month after the executive decision in January 2025 to further accelerate the timeline for synergy achievement, which was a departure from plan formulated by the Merger Integration Team and ignored potential problems and red flags that had been identified.  To achieve this accelerated plan, the Company would have to undertake rapid cost-cutting and restructuring measures, which were compounding the incompatibility issues the Company was already facing and significantly driving up costs.  This resulted in massive expenditures to address integration problems and customer

- 76 -

losses, ultimately having a major negative impact on the Company's financial results, slowing net sales growth, and compressing earnings (EBITDA). Indeed, as Hass later admitted, "recovery initiatives to address [the Company's] operational disruptions . . . slowed our growth trajectory versus our original guidance."

### 6. February 27, 2025 – Primo Brands Inaugural Investor Day

177. On the afternoon of February 27, 2025, Primo Brands held its inaugural Primo Brands Corporation Investor Day, hosted by Metropoulos, Rietbroek, Hass, and Johnson. Metropoulos reiterated the accelerated cost synergies and assured investors "we feel very comfortable about the $200 million [in synergies this year] and an additional $100 million next year," which he referred to as a "big jump." Metropoulos also touted "[w]e're well invested as a company," describing the Company's investments in "manufacturing," and building its "IT system," stating:

> We've ***done a lot of investing in the manufacturing, and we're going to continue to do that this year, and built our IT system to the latest technology we've introduced AI in our manufacturing***.

178. Rietbroek told investors, that the Company was "***making great progress towards realizing the compelling financial and operation benefits of the merger***." He then reiterated, "***we expect to deliver 3% to 5%, Net sales growth and approximately 500 basis points of adjusted EBITDA margin expansion from full year '24 to full year 2027***."

- 77 -

179.    Johnson, the Company's Chief Transformation Officer (and leader of the Merger Integration Team) spoke to investors about the "considerable progress we have made towards integration and delivering our increased expected synergy opportunity."  He falsely described that the Company was taking "*a strategic and efficient approach to our synergy capture, finding smarter ways to maximize value and drive better outcomes*."  Johnson also reported positive updates on the cost synergies to date, reiterating the $100 million increase.

180.    He then went on to tell investors about the opportunities and progress to date, in particular regarding route and network consolidation, stating:

> *We are driving cost synergies that are larger and faster than anticipated. We have already made considerable progress . . .*
>
>           \*         \*         \*
>
> When we closed the transaction, we communicated that we expected to realize an estimated $200 million of cost synergies within three years of closing by the end of 2027.
>
> Given our highly disciplined process, we aim to deliver 50% more efficiencies even faster.  We now expect to deliver $300 million in cost synergies by the end of 2026, and we are on track to generate $200 million of synergies in 2025.
>
>           \*         \*         \*
>
> We are following a detailed, organized process to ensure that we maximize synergies across each of these categories.  In fact, we have already made meaningful progress.
>
>           \*         \*         \*
>
> We have also begun our IT ERP conversion and have optimized multiple processes across key functional areas, including our call centre.

- 78 -

\*     \*     \*

*Additionally, we are making significant progress towards optimizing our operating network and have clear targets.*

*We are actively evaluating our footprint and supply chain to minimize or enhance efficiency and minimize excess inventory and optimize our transportation network.*

*We are optimizing our fleet and our routes while also consolidating factories and depots. By sustaining production levels with fewer facilities, we are better leveraging fixed costs as we drive increased volume.*

181. Analysts reacted favorably to Defendants' statements. For example, a February 28, 2025 J.P. Morgan report summarized, "Building Blocks Seem to Suggest Upper End of the +3% to +5% Annual Revenue Guidance Is Readily Achievable, in Our View."

182. A February 28, 2025 TD Cowen report stated, "3-5% long-term revenue growth guidance seems very conservative."

183. Defendants' statements on February 27, 2025, as set forth above in ¶¶177-180, were materially false or misleading and/or omitted material information necessary to make them not misleading when made. Specifically:

(a) Defendants' statements touting the acceleration of the size and speed of the synergy capture ($100 million higher and one year sooner), that "[w]e are driving cost synergies that are larger and faster than anticipated," were false and misleading when made because the Company was already facing serious operational issues from the integration. The decision made by the executive team in January

2025 to further accelerate the timeline for synergy achievement was a departure from plan formulated by the Merger Integration Team and ignored potential problems and red flags that had been identified. To achieve this accelerated plan, the Company would have to rapid cost-cutting and restructuring measures, compounding the incompatibility issues the Company was facing and driving up costs. As the Company later admitted, the resulting problems from this decision were "self-inflicted . . . we probably moved too far too fast" and "we put together the companies probably a little faster than we should have."

(b)    Defendants' statements concerning the Company's "strategic and efficient approach to synergy capture," including that they were "following a detailed, organized process to ensure that we maximize synergies across each of these categories," were false and misleading because in truth, the Company's integration efforts were rushed and poorly executed and Exchange Act Defendants had intentionally departed from the timelines established in the strategic plan formulated by the Merger Integration Team to accelerate synergies, despite red flags and problems identified.

(c)    Defendants' statements about the Company's IT/ERP conversion, including that it "built our IT system to the latest technology," that "[w]e are making significant progress towards optimizing our operating network" were false and misleading because the efforts to integrate the Company's ERP systems

- 80 -

were slow and poorly executed, resulting in duplication, conflicting data structures, inconsistent reporting, and operational inefficiencies, which affected the Company's vital operations such as sales, inventory control, delivery routes, human resources, billing, and financial reporting.

(d)     Defendants' statements about the optimizations achieved by the Merger, including in manufacturing and with the Company's fleet and routes, enabling it to "sustain[] production levels with fewer facilities," and "leverag[e] fixed costs as we drive increased volume," were false and misleading because the Company was suffering from serious problems at its manufacturing facilities due to incompatibilities in its legacy businesses, which were exacerbated by rapid factory closures.  Rather than sustain production levels or increase volume, these problems caused assembly lines to shut down, leading to production delays and shortages. Likewise, Defendants' efforts to realign, merge, and reduce delivery routes significantly reduced the Company's network, increasing distances between factories and branches and disrupting the Company's critical direct delivery business, causing late deliveries and an inability to meet customer demand.  These issues drove up costs, decreased volumes, and slowed customer sales.

(e)     Rietbroek's reiteration of FY25 net sales growth guidance ("we expect to deliver 3% to 5%, Net sales growth") was unrealistic and unattainable because, as detailed above, at the time the guidance was affirmed, the Company was

- 81 -

already facing serious operational issues from the rushed and poorly executed integration and the incompatibilities in the two legacy businesses, which were making integration slow, difficult, and costly (*i.e.*, ERP system migration issues, rack and bottle compatibility issues, disruptions at manufacturing facilities). The guidance announcement was made one month after the executive decision in January 2025 to accelerate the timeline for synergy, achievement which was a departure from plan formulated by the Merger Integration Team and ignored potential problems and red flags that had been identified. To achieve this accelerated plan, the Company would have to undertake rapid cost-cutting and restructuring measures, compounding the incompatibility issues the Company was already facing. This resulted in massive expenditures to address integration problems and customer losses, which ultimately had a major negative impact on the Company's financial results, slowing net sales growth, and compressing earnings (EBITDA), requiring full year 2025 net sales growth guidance to be reduced. As Hass later admitted, "recovery initiatives to address [the Company's] operational disruptions . . . slowed our growth trajectory versus our original guidance."

### 7.    February 27, 2025 – Issuance of the Form 10-K for FY24

184.    Also, on February 27, 2025, Primo Brands filed their FY24 Form 10-K, which was signed by Rietbroek, Hass, and Metropoulos, among others. The FY24 Form 10-K included additional information regarding the Merger, including

key features and initiatives to optimize efficiencies and drive growth and sales.  In its discussion regarding suppliers and distribution, the FY24 Form 10-K described the Company's distribution strengths and touted the improvements, capabilities, and "highly efficient and thoughtfully designed distribution network," as a result of the Merger.  With regard to improvements and capabilities, for example, the FY24 Form 10-K stated:

> As a result of the Transaction, **we expect more improvements to our distribution capabilities as we look to capture an estimated $300 million cost synergy opportunity that includes optimization of our combined manufacturing locations, routes, branches, and inventory management**.

185.  This statement was materially false or misleading and/or omitted material information necessary to make them not misleading when made because Defendants' distribution capabilities were getting worse not better as a result of its attempt to capture $300 million in synergies.  Its attempt to optimize combined manufacturing locations and routes, involved the rapid closure of manufacturing facilities which exacerbated the serious problems it was already facing due to incompatibilities from its legacy businesses.  Defendants' efforts to realign, merge, and reduce delivery routes also significantly reduced its network, increasing distances between factories and branches, disrupting the Company's critical direct delivery business, causing late deliveries and inability to meet customer demand.  These issues drove up costs, decreased volumes, and slowed customer sales.

186. The FY24 Form 10-K also outlined a series of purported "Risk Factors," but those statements were themselves misleading because the risks that they warned of had already materialized.

187. The Company warned that "future results *may* suffer if we do not effectively manage our expanded operations following the Transaction," stating:

> If integration is not managed successfully, we *may* experience interruptions in our business activities, deterioration in our associate and customer relationships, increased costs of integration, and harm to our reputation, all of which *could* have a material adverse effect on our business, financial condition, and results of operations.

188. These purported risks concerning the Merger integration, as set forth above in ¶¶184-187, were materially false or misleading and/or omitted material information necessary to make them not misleading because, unbeknownst to investors, Defendants knew that these risks had already come to pass and were already negatively impacting Primo Brands' operations. Specifically, the Company's rushed and poorly executed efforts to integrate the legacy companies, which had significant incompatibilities, were causing serious operational issues. These issues were exacerbated by Defendants' decision in January 2025 to accelerate the timeline for achieving synergies (despite known red flags and problems) through rapid cost-cutting and restructuring measures, which caused disruptions in manufacturing, supply chains, and deliveries. This resulted in massive expenditures to address integration problems and customer losses, ultimately having

a material negative impact on the Company's financial results, slowing net sales growth, and compressing earnings (EBITDA).

189. Indeed, Defendants later admitted that, the actions they had taken, including prioritizing speed, had caused operational disruptions, damaged customer relationships, and increased costs. These problems *were having* (not "could have") a material adverse effect on the Company's business, financial condition, and results of operations. As Rietbroek stated, "[t]he speed by which we closed facilities and reduced headcount led to disruptions in product supply, delivery and service." Consistent with this statement, Foss, who replaced Rietbroek as CEO, later acknowledged that "[d]irect delivery disruption has been *self-inflicted* . . . . we probably moved too far too fast on some of the various integration work streams." Foss added, "There's no doubt that, that speed impacted product supply" and impacted the "ability to get through a lot of the warehouse closures and route realignment without disruption," causing an "ultimate output" of "the customer service issues that we've highlighted."

### 8.    March 2025 – SPO Offering Materials

190. In March 2025, Primo Brands filed a shelf registration statement with the SEC on Form S-1/A, registering the resale of up to approximately 218.6 million shares of Class A common stock by existing stockholders, which may be sold publicly from time to time with no fixed schedule ("Registration Statement"). The

- 85 -

SEC declared the Registration Statement effective on March 7, 2025. The Registration Statement incorporated a Prospectus, dated March 7, 2025, and subsequent Prospectus supplements ("Prospectus Supplements") filed under Rule 424(b)(3) including a Prospectus Supplement filed on March 11, 2025 in connection with the SPO (collectively, "Prospectus" and, together with the Registration Statement, "Offering Materials"). The Registration Statement was signed by Rietbroek, Hass, and Metropoulos, among others.

191. In the Prospectus Supplement, Defendants stated, "We believe our carefully curated footprint . . . allows for efficient delivery, strong service levels and high overall customer satisfaction . . ."

192. The Prospectus Supplement also stated, "We have also identified an estimated $300 million run-rate cost synergies opportunity, exclusive of an estimated $100 million in associated one-time costs, that we intend to implement over the next two years." Further, "We intend to capture cost synergies through network optimization (including branch and last mile, manufacturing and integrating IT systems), route optimization, vertical integration of bottle sourcing and PET case pack production, as well as streamlining vendor/supplier engagements."

193. Additionally, the Prospectus Supplement stated that the Company was committed to "drive net sales growth and sustainable profitability."

194.    Defendants' statements in the Prospectus Supplement, as set forth above in ¶¶191-193, were materially false or misleading and/or omitted material information necessary to make them not misleading when made.  Specifically:

(a)    Defendants' statement that the Company's "carefully curated footprint" allowed for "efficient delivery, strong service levels and high overall customer satisfaction" was false and misleading because, as Defendants would later admit, the Company prioritized speed and cost reductions, such as facility closures, that reduced the Company's inventory levels, causing the Company to experience supply shortages leading to rescheduled or canceled deliveries, customer service issues, and customer cancellations.  Moreover, Defendants' efforts to realign, merge, and reduce delivery routes significantly reduced its network and increased distances between factories and branches.  Thus, contrary to Defendants' statement, the Company's integration efforts made deliveries far less efficient, deteriorated service levels, and substantially lowered customer satisfaction.

(b)    Defendants' statements regarding a "$300 million run-rate cost synergies opportunity, exclusive of an estimated $100 million in associated one-time costs, that we intend to implement over the next two years" gave investors the false impression that the Company was on track to rapidly and successfully achieve such synergies.  In reality, the Company's rushed efforts to achieve synergies were causing severe problems.  The two legacy companies (Primo Water and BlueTriton)

- 87 -

had different and incompatible systems and products, which were difficult and time-consuming to merge. And, as Defendants would eventually admit, the accelerated integration plan "to make sure we achieve the run rate synergies" caused self-inflicted disruptions to product supply, product deliveries, and customer service. As a result, the Company incurred massive costs, suffered reduced margins, experienced declining sales growth, and suffered from compressed earnings (EBITDA).

(c)    Defendants' statements regarding net sales growth and sustainable profitability were false and misleading because, as Defendants would later admit, the Company's accelerated Merger integration created supply, delivery, and customer service issues that resulted in customer cancellations and sales growth declines. Moreover, the Company was forced to make massive expenditures to fix the problems, which further damaged profitability, including offering customer discounts and implementing win-back campaigns in an attempt to slow customer departures.

195.    The Offering Materials incorporated by reference the Company's press release announcing 4Q24 and FY24 results, which was filed with the SEC on Form 8-K on February 20, 2025. The press release contained additional false and misleading statements and omissions related to the Merger integration, as set forth in §IV.E.5 above.

- 88 -

196.  The Offering Materials also incorporated by reference the Company's FY24 Form 10-K filed with the SEC on February 27, 2025.  The FY24 Form 10-K contained additional false and misleading statements and omissions related to the Merger integration, as set forth in §IV.E.7 above.

### 9.  May 8, 2025 – First Quarter 2025 Financial Results

197.  On May 8, 2025, before the market opened, Primo Brands issued a press release announcing the Company's financial results for 1Q25.  The 1Q25 press release reaffirmed the Company's full year 2025 net sales growth and adjusted EBITDA guidance.

198.  In the press release, Rietbroek assured investors that the Company was "***on track to realize our $200 million cost synergies opportunity by 2025***, and that such synergies "support[ed]" the Company's FY25 net sales growth and adjusted EBITDA guidance.

199.  That same morning, on May 8, 2025, Primo Brands held a conference call with analysts to discuss its 1Q25 financial and operational results, which was hosted by Rietbroek and Hass.

200.  Rietbroek discussed the Company's operational excellence.  Later on the call, Rietbroek again reiterated that "***[w]e believe all aspects of our business are aligning for flawless integration execution***, where we build the foundation for long-

term growth by unifying the people, processes, policies and platforms to maximize timely cost synergy capture, as well as to capture revenue synergies."

201.    Rietbroek also said, "***We believe the successful execution and delivery of these key initiatives will position us to achieve our 2025 financial guidance***, which includes ***capturing $200 million in cost synergies*** opportunity as we ramp up through the balance of the year."

202.    Rietbroek provided further detail about the Company's $300 million in synergies and the Company's expected net sales:

> We have already begun the initial stages of the synergy capture. ***In the first quarter, we focused on reducing redundant corporate headcount and driving efficiencies in the business and optimizing our SG&A structure. At the end of the first quarter, we executed the closure of eight facilities and continued the process of streamlining our workforce***. Total cost synergy opportunities are still projected to reach $300 million by the end of 2026, as a reminder, this is $100 million higher and one year sooner than the estimate provided at the time of the deal announcement, with $200 million in 2025 and an incremental $100 million in 2026. ***From an overall perspective, we expect 2025 net sales to ramp through the year as new distribution and resets are implemented***, as well as benefiting from the immediate implementation of product availability across the company's branch network.

203.    Hass reaffirmed the Company's net sales guidance in light of the integration, stating:

> ***We are reaffirming our net sales guidance of between 3% to 5% growth on a comparable basis***. . . .  And ***we continue to see 2025 building into the 3% to 5% comparable net sales guidance largely balanced between volume and price or mix***.

- 90 -

204.   In speaking about the Merger integration process to date, Hass told investors:

> *Primo Brands remains in a strong position to quickly extract and leverage the benefits of our merger.  We began to immediately deploy our integration playbook at the time of our merger, to remove duplicative costs and seek a leaner cost structure.  This also allows us to review all aspects of the businesses we are combining without a lot of risks to our offerings, as we're largely driving efficiencies and streamlining into a single company operating structure*.

205.   Hass continued by reiterating the Company's in-year and total synergy capture and reiterating its EBITDA outlook:

> *We continue to anticipate our full-year 2025 adjusted EBITDA range to be between $1.6 billion and $1.628 billion with an implied adjusted EBITDA margin of approximately 23.1% at the midpoint*.  Our adjusted EBITDA guidance includes the cap of $200 million in cost synergy opportunity in 2025. As previously mentioned, the first quarter synergy capture represented a strong start to our in-year estimated opportunity.

206.   In response to a question from BMO Capital Markets Corp. ("BMO") regarding customer retention and churn, Hass told investors "*we remain in a good position*," "*[w]e've really not seen any sort of slippage*," and even reported "*an increase slightly in retention*."

207.   When asked by a Deutsche Bank Securities Inc. ("Deutsche Bank") analyst about "[w]hat you're hearing in terms of what we're seeing, in terms of customer satisfaction, just the level of, you know, marketplace disruption or lack thereof from the integration," Hass responded:

> *[I]n the quarter, you know, our last mile, which would be our direct delivery business, had o rates grow by several basis points.  Our refill*

- 91 -

*uptime, which really isn't impacted by the consolidation, remains at sort of its all-time levels.  Customer retention, as I mentioned, was up a few basis points on a year-over-year basis.*

And as can be expected, when you go through consolidation, we are experiencing some call volume.  Of which our call center prepares for, and that's why we do these branch consolidations in waves.  And we're looking to address concerns or questions about hey, why is this product available now or why did my date potentially change from my original very regular schedule?  But those are sort of growing pains as we will experience going through the consolidation.  But please look for us to release more of those KPIs in coming quarters.  *But from a perspective of how we deliver, how we make product, all those are trending in a positive direction as we look to consolidate production and last-mile delivery.*

208.   Analysts reacted positively to Exchange Act Defendants' statements.  For example, a May 8, 2025 RBC report noted, "Strong start to the year for PRMB across key metrics; synergy realization and guidance on track as planned," and the analyst wrote, "[a]ll in, we view this as a solid result that should appease investors and set the company up well to deliver through the balance of 2025."

209.   That same day, a TD Cowen Report stated, "We think that these strong Q1 results . . . and margin outperformance, should begin to persuade those investors on the sidelines about the power of the business model and the ability of this management team to execute and deliver on its guide."

210.   Defendants' statements on May 8, 2025, as set forth above in ¶¶197-207, were materially false or misleading and/or omitted material information necessary to make them not misleading when made.  Specifically:

- 92 -

(a)    Defendants' statements that the Company was "on track to realize our $200 million cost synergies opportunity by 2025" and that such "synergies" supported the Company's FY25 net sales growth and adjusted EBITDA guidance and that the Company "remains in a strong position to quickly extract and leverage the benefits of our merger," and that "[w]e believe all aspects of our business are aligning for flawless integration execution," were materially misleading because they omitted to disclose the true operational problems and rising costs caused by Defendants' acceleration of and pursuit of these synergies. The rushed closure of manufacturing plants, branch locations, reduced headcount, and route realignments disrupted the Company's critical direct delivery business preventing it from effectively serving its customers and resulting in drags or no deliveries at all. The Company's delivery service rates dropped substantially and it was inundated with customer complaints. Customers began reducing their purchases and cancelling their accounts altogether. The Company was forced to undertake massive expenditures to address these issues (*i.e.*, freight and labor costs), slowing net sales growth, and compressing earnings (EBITDA). By the end of April 2025, the supply chain began collapsing, causing operations to deteriorate quickly. The Company's systems were incompatible (could not talk to one another), and the Company was facing delivery disruptions because route deliveries were a mess, inventory was disorganized, and there was insufficient staff to handle ongoing or upcoming issues.

(b)     Indeed, as Rietbroek later admitted, when the Company lowered EBITDA and net sales growth guidance the following quarter, "The speed by which we closed facilities and reduced headcount led to disruptions in product supply, delivery and service."  And, as Foss later admitted on behalf of the Company, "I think most of the direct delivery disruption has been self-inflicted."  Foss went on to add that Primo Brands "probably moved too far too fast on some of the various integration work streams."  Foss also admitted, "[t]here's no doubt that, that speed impacted product supply" and the "ability to get through a lot of the warehouse closures and route realignment without disruption" and "the ultimate output of that was the customer service issues that we've highlighted."  Moreover, as Hass admitted, "recovery initiatives to address [the Company's] operational disruptions" "slowed our growth trajectory versus our original guidance."

(c)     Defendants' statements in response to a question about customer retention and churn, "we remain in a good position," "[w]e've not seen any sort of slippage," and reporting an "increase slightly in retention" and their downplaying of customer dissatisfaction as "growing pains," were also misleading because the Company failed to disclose the massive problems it was experiencing with its customers.  The Company was inundated with a deluge of customer complaints, which it was unable to effectively address as it had laid off too many customer service representatives, significantly lengthening response times and overall service

quality. Frustrated customers began reducing their purchases and cancelling their accounts altogether. This slowed customer sales, particularly in the Company's critical direct delivery business.

(d)   The Company's reaffirmed FY25 "3% to 5% comparable net sales guidance," and adjusted EBITDA guidance "between $1.6 billion and $1.628 billion" was unrealistic and unattainable because, as detailed above, at the time the guidance was reaffirmed, in attempting to achieve the accelerated integration plan, the Company was undertaking rapid cost-cutting and restructuring measures, which were compounding the incompatibility issues the Company was already facing. This resulted in massive expenditures to address integration problems and customer losses, which ultimately had a major negative impact on the Company's financial results, slowing net sales growth and compressing earnings (EBITDA), and would require 2025 net sales growth, adjusted EBITDA, and adjusted free cash flow guidance to be reduced. As Hass later admitted, "recovery initiatives to address [the Company's] operational disruptions" "slowed our growth trajectory versus our original guidance."

### 10.   May 14, 2025 BMO Farm to Markets Chemicals Conference

211.   On May 14, 2025, Primo Brands presented at the 2025 BMO Farm to Market Chemicals Conference. During the presentation, a BMO analyst asked, "It's been six months now, I think, as a combined company. Can you reflect on how that

- 95 -

process has gone with the integration, and any surprises or kind of anything that you've learned as you've gone through that process?"

212.   In response, Rietbroek touted the Company's success in driving synergies, explaining, "Then you have the reduction of manufacturing.  So we have to set up new logistical networks, we are building a stronger fleet and we're driving synergies.  So we've committed to $200 million of synergies within 2025, $300 million of synergies by the end of 2026.  *And we feel very confident that we will deliver that*."  He also stated that:

> [T]he focus for this year is truly primarily the integration and getting to a *flawless integration* so that by the time we get into 2026, you all see a true picture of this business.  It's far from perfect, but *it is working well*.
>
> *We've not had major hiccups*.  But think about things like data integrity when you're transferring a database from one system to another.  Enterprise software, so migrating our facilities into SAP, those are all single individual projects that go side by side that need entire multifunctional teams to execute with excellence.

213.   Defendants' statements on May 14, 2025, as set forth above in ¶¶211-212, were materially false or misleading and/or omitted material information necessary to make them not misleading when made.  Specifically, Defendants' statements touting the Company's synergy achievements, including that they were "very confident that we will deliver" the "$200 million of synergies within 2025, $300 million of synergies by the end of 2026," and "[w]e've not had major hiccups," were materially misleading because Defendants failed to disclose the true operational problems and rising costs caused by Defendants' pursuit and

acceleration of these synergies.  By the end of April 2025, the supply chain began collapsing, causing operations to deteriorate quickly.  The Company's systems were incompatible (could not talk to one another), and the Company was facing delivery disruptions because route deliveries were a mess, inventory was disorganized, and there was insufficient staff to handle ongoing or upcoming issues.  Indeed, contrary to Defendants' statements that the integration "***is working well***" and "***[w]e've not had major hiccups***," conditions at the Company were so dire that Defendants would form a War Room/CRT to address escalating freight costs, plant inefficiencies, and other operational issues from the integration that were impacting the Company's performance, while deploying Tiger Teams to deal with plants and offices experiencing major operational challenges.  And, as Rietbroek later admitted, "The speed by which we closed facilities and reduced headcount led to disruptions in product supply, delivery and service."  Consistent with these statements, Foss, who replaced Rietbroek as CEO, later acknowledged that "[d]irect delivery disruption has been ***self-inflicted*** . . . . we probably moved too far too fast on some of the various integration work streams."  Foss added, "There's no doubt that, that speed impacted product supply" and impacted the "ability to get through a lot of the warehouse closures and route realignment without disruption," causing an "ultimate output" of "the customer service issues that we've highlighted."

- 97 -

**11.    August 7, 2025 – Second Quarter 2025 Financial Results**

214.    On August 7, 2025, before the market opened, Primo Brands issued a press release announcing its financial results for 2Q25.  As detailed more fully below, the 2Q25 press release and conference call that day disclosed disappointing financial results and certain reductions in full year 2025 guidance, due in part to "service issues during the accelerated [Merger] integration process."

215.    The Company reduced full year 2025 net sales growth guidance to 0% to 1% (from 3% to 5%), full year 2025 adjusted EBITDA guidance to $1.485 billion to $1.515 billion (from $1.6 billion to $1.628), and its adjusted free cash flow guidance to $740 million to $760 million (from $790 million to $810 million).

216.    Rietbroek sought to temper any news stemming from operational failures of the Merger, by falsely blaming the Company's lackluster results on factors such as "previously reported ***tornado damage to our Hawkins, Texas facility***."

217.    Moreover, despite the poor results attributed (falsely) to the tornado, Rietbroek reassured investors by speaking about the Company's promising future prospects, stating, in pertinent part:

> Despite these Q2 challenges, we continue to see strong consumer demand for healthy hydration, and are encouraged by our retail share growth in July.  ***We believe we are taking the right steps to resolve the service issues, which we expect to be back to normal by the end of September.  Our business model is resilient and is well positioned to deliver growth, improve margins, and***

*generate strong cash flow going forward*, which will enable us to opportunistically return value to shareholders with the new $250 million share repurchase program[.]

218.    That same day the Company also held a conference call with analysts to discuss the Company's financial and operational results for 2Q25, hosted by Rietbroek and Hass.  During that call, Rietbroek explained that the integration process contributed to the Company's poor 2Q25 results, telling investors it was one of "the two key disruptions that impacted our top line in the second quarter," but claiming "both of which are largely resolved[.]"

219.    Despite calling it out as a disruptor of 2Q25 results, Hass downplayed the issues arising from the Merger integration, specifically with respect to the direct delivery business, stating in relevant part:

> *These friction points in our integration were not anticipated, but we believe that as our product supply stabilizes, this business will resume accretive performance to our long-term algorithm*.

> *We believe this portion of business will stabilize in late Q3, . . .* Integrations can be challenging, particularly when merging two established leaders, *but we have moved quickly to address the product supply issues and expect to return to growth as we exit the year*.

220.    Hass continued, "*We believe our shortfall was largely driven by correctable product supply issues*."  And Hass reassured investors, "*[w]e believe this portion of [the] business will stabilize in late Q3*."

221.   Further, Hass gave investors the false impression that the integration efforts were successful and that the Company was still on track to meets its $300 million synergy target ($200 million in 2025 and $100 million in 2026), stating:

> We continued reducing long-term costs in the quarter by delivering another wave of integration activities. ***We actioned another $20 million of synergies within the quarter.   We believe this puts us on pace to achieve approximately $200 million of in-year synergy capture***, with the remaining $100 million coming in 2026.

222.   Despite reducing guidance, Rietbroek assured, "we are confident in our post-2025 long-term growth algorithm of 3% to 5% organic net sales."

223.   During the question and answer portion of the call, an RBC analyst asked about the "integration pathway going forward," to which Rietbroek responded that "***we have largely resolved these delays across the network, and we've learned a lot***."   He stated further, "We entered the third quarter far more cohesively as a company, more resilient.   ***We're now battle tested and well positioned to restore growth, improve margins and generate free cash flow in the second half***." Rietbroek confirmed the Company would be "past most of those challenges come September."

224.   In response to a question from a Bank of America analyst, Hass spoke about the Company's "recovery plans," specifically telling investors he was seeing "units per route per day increase[s]" and that they "***remain very positive*** in the way we're approaching the recovery plans."

- 100 -

*Where we really feel confident is when we get to Q4, having largely the direct delivery disruptions behind us*, being able to start to exit 2025 with a nice exit velocity that provides more linear confidence in how we start 2026.

225. When the analyst followed up regarding synergy captures, Hass responded that the Company was on pace to "sort of" achieve its in-year and 2026 goals, but revealed that, based on the smaller captures to date, "when you extrapolate those decisions out, it puts you on pace for the about $140 million of annualized targeted actions."

226. Without prompting, Rietbroek jumped in and redirected the response to provide a further assurances regarding the Company's health and changed the subject to the increased level of demand they were experiencing saying, "fundamentally, the underlying business health is strong. And what it really was is *there so much demand out there, we couldn't fulfill because of internal disruption that led to service issues*."

227. In response to a question from a Mizuho Securities USA LLC ("Mizuho") analyst regarding customer cancellation rates, Hass stated service levels "started to decline in April and May," leading to customer quits in June and July, but falsely assuring investors that the Company had seen the level of customer departures had "stabilize[d]" and the delivery success rate improve. In pertinent part, he explained:

> *We have seen some elevation in quits largely in the June and July period.* But that is always a lagging indicator of service. *And so as service started*

- 101 -

***to decline in April and May,*** that was June departures and then add service persisted in June that led to some of the July departures.

\*       \*       \*

. . .we remain very confident that as service stabilizes that customer departure rate, the digital adds plus our in-field and other programs through club will allow us to sort of resume our net organic additions that we've been very proud of and believe is obviously a very big beneficiary of the two direct delivery business is coming together.

So again, temporarily, we see that as an elevated level of departure. You can see that whether it be in Google or Trustpilot reviews. But ***we have seen those things stabilize***. We have seen negative sentiment, stable in the market. And I think that is a completely correlated impact of what Robbert's mentioned, where our operating teams are doing an amazing job of stabilizing service and improving that delivery success rate to our customers.

228. Specifically, in response to a Morgan Stanley & Co. LLC ("Morgan Stanley") analyst's question asking for "more visibility" into the "tech transitions" the Company was undertaking, Rietbroek described various components to the transition: management, hardware, and software, and stated the Company felt "***very confident that we've identified the challenges and already address[ed] them***."

229. An analyst from Deutsche Bank, however, sought additional confirmation that the disruption issues were really contained. Specifically, he asked for confirmation that "the direct delivery disruptions that we've seen so far that we'll see through September are really going to be contained to the 3Q, 4Q period," and "[t]he value per customer, recruitment and retention costs will all kind of revert back the trend that we were seeing kind of exiting last year without any real additional kind of run rate cost."

- 102 -

230. In response, Hass, again, falsely assured a "snapback" in the direct delivery business, from the previously experienced service and supply issues the Company had experienced, stating:

> And since then, *as we've harmonized our digital properties, we've actually seen an acceleration of our ability to acquire customers through digital. So again, a lot of that confidence remains that the demand is there, the customer acquisition profile is continuing.  It's a matter of fulfilling the product on time and in full as they've requested it.  And that's really where we feel that the snapback is there*.

231. Defendants' statements on August 7, 2025, as set forth above in ¶¶214-230, were materially false or misleading and/or omitted material information necessary to make them not misleading when made.  Specifically:

(a)    Defendants' positive statements that that majority of the disruptions and negative financial impact caused by the accelerated integration occurred in 2Q25, and the problems would stabilize by the end of 3Q25 including that "service issues" would be "back to normal by end of September," that "we have largely resolved these delays across the network," and will be "past most of those challenges come September" that "we have seen those things stabilize" and that the "snapback is there" and that the Company was "positioned to restore growth" were false and misleading because, unbeknownst to investors, the integration-related disruptions remained ongoing and would continue to have a negative impact on 3Q25 financial results, with Defendants reporting a decline in net sales and forcing Defendants again to lower 2025 net sales and EBITDA guidance.  Defendants'

statements downplayed the depth of the Company's ongoing problems, which were so dire that a War Room/CRT had been formed to address them and the Company had still not fully or effectively merged its ERP systems, which continued to be a problem through the end of the Class Period. As Defendants later acknowledged, the resulting problems from their decision to accelerate the Merger integration were "self-inflicted" and in 3Q25, Defendants admitted that the "recovery in our direct delivery business" is still "ongoing," resulting in a negative impact on 3Q25 financial performance and FY25 guidance.

(b)     Defendants' suggestion that "friction points in our integration were not anticipated," was materially misleading because Defendants knew from the due diligence and the Merger integration process over at least a year prior of various operational disparities between the legacy companies that would need to be bridged for the Company to effectively function. Defendants ignored red flags and in January of 2025 intentionally accelerated the timelines laid out by the Merger Integration Team. In attempting to achieve the accelerated integration plan, the Company was undertaking rapid cost-cutting and restructuring measures, which were compounding the incompatibility issues the Company was already facing and significantly driving up costs.

(c)     Defendants' attempts to blame poor 2Q25 financial results on factors such as "significant" tornado damage at the Hawkins Texas plant were

- 104 -

misleading because, in reality, the plant sustained minimal damage, and was fully operational within a few days and was not the true cause of its problems, which the Company later admitted were "self-inflicted," "[t]here's no doubt that, that speed impacted product supply," and the "ability to get through a lot of the warehouse closures and route realignment without disruption" and "the ultimate output of that was the customer service issues." Additionally, as Foss later admitted in the Company's February 26, 2026 press release, the Company's "challenges are within our control."

(d)    The Company's lowered full year 2025 net sales growth, and adjusted EBITDA guidance was still unrealistic and unattainable because, as detailed above, Defendants knew that in attempting to achieve the accelerated integration plan, the Company was undertaking rapid cost-cutting and restructuring measures, which were compounding the incompatibility issues the Company was already facing. This resulted in massive expenditures to address integration problems and customer losses, which ultimately had a material negative impact on the Company's financial results, slowing net sales growth, and compressing earnings (EBITDA), requiring 2025 net sales growth, and adjusted EBITDA to be reduced again.

(e)    At the time these statements were made, the Company's integration problems and operational issues were so dire that a War Room/CRT had

- 105 -

already been formed to address them. And, as the Company later admitted in 3Q25, when again lowering EBITDA and net sales guidance, the "recovery in our direct delivery business" is still "ongoing," and "the recovery path is not at the right magnitude to deliver the midpoint of our previous guidance" and "we now expect a net sales decline in the low single digits versus the prior year." As Defendants later acknowledged, the resulting problems from their decision to accelerate the Merger integration were "self-inflicted . . . we probably moved too far too fast."

### 12.  August 11, 2025 – Fireside Chat Hosted by RBC Capital Markets

232. On the morning of August 11, 2025, RBC hosted a "Fireside Chat" for investors with Primo Brands, at which both Rietbroek and Hass spoke. Rietbroek falsely assured investors "***We've largely restored service levels***."

233. In response to a question as to "what part of the planning around the integration went wrong to result in [the direct delivery business] service issues and how can investors feel confident that this can be resolved as we move forward?" Rietbroek responded providing additional detail on the previously known incompatibilities, giving investors the false impression that these issues were first discovered in "May":

> So what happened is that once we start closing factories, which happened in the month of May, primarily. ***In the second half of May***, we ran into supply issues. And those supply issues were driven by equipment compatibility issues for the bottles and racks and general shortages of the racks that carry the 5-gallon bottles. Those are usually 4-wide, they carry about 40 bottles

- 106 -

per rack. And we've since infused about 70,000 of those racks and a couple of million of additional bottles to overcome these shortages. We've made significant progress.

From a technical standpoint, we basically backed the Primo Water company into the legacy BlueTriton or Nestlé systems, SAP, the handheld, the geo-routing system. And we experienced some initial change management challenges. And we also needed to update the IT technology to accommodate the more complex business model which now includes frequent retail deliveries in exchange. So those are the racks that you see at Walmart or Kroger.

234. In response to an RBC analyst question about "speed" of the integration and "why go so fast"? Rietbroek falsely reassured investors, "***I'm glad to report that we have resolved the majority of issues . . . . And the benefit of this approach is that we don't have multiple quarters of compounding smaller issues, but we've just got through it in one rip the band-aid off quarter***."

235. The Fireside Chat concluded with final comments from Rietbroek, who reiterated that the Company was continuing "to implement corrections to restore performance."

236. RBC published a report the next day following the Fireside Chat. In it, RBC reported:

Our questions focused on the service disruptions in the delivery business, which the team provided helpful clarity on. We walked away with a better understanding of what caused the issues, their magnitude, and what work is left to resolve them. We are now more confident that this is a hurdle they can overcome in the assumed time frame. We maintain our $37 price target and Outperform rating.

237. Defendants' statements at the August 11, 2025 RBC Fireside Chat, as set forth above in ¶¶232-236, were materially false or misleading and/or omitted

- 107 -

material information necessary to make them not misleading when made. Specifically:

(a)    Defendants' statements that they "ran into supply issues" in the "second half of May" that were "driven by equipment compatibility issues for the bottles and racks and general shortages of the racks" were false and misleading because, they gave investors the false impression that the bottle and rack incompatibility and service issues the Company was experiencing were new in that quarter or unknowable. In reality, unbeknownst to investors, Defendants already knew from through the due diligence and the Merger integration process of the bottle compatibility issues. During the Merger Integration Process, they even rejected a proposed fix to this issue, failing to resolve it because it would offset synergies, despite being warned that this issue would cause operational and logistical disruptions, which it ultimately did, forcing assembly lines to shut down for hours and leading to shortages and production delays. Likewise, the Company's "technical" issues were "not initial change management challenges" experienced for the first time in that quarter but, rather Exchange Act Defendants knew from the due diligence and Merger integration planning process that migrating Primo Water's data and ERP system to BlueTriton's would be slow, costly, and disruptive. And, the merging of the Company's two ERP systems had been an ongoing issue for the Company since the Merger's close. These compatiblity issues (ERP systems and

- 108 -

bottles and racks) were exacerbated by Defendants' decision to accelerate the timelines laid out by the Merger Integration Team and the undertaking of rapid cost-cutting and restructuring measures, created service issues, and significantly drove up costs. And, at the time these statements were made, these issues were so dire that a War Room/CRT had already been formed to address them.

(b)    Defendants' positive statements that majority of the disruptions and negative financial impact caused by the accelerated integration were mostly fixed, including that they had "resolved the majority of issues," that it was a "one rip the band-aid off quarter" rather than "multiple quarters of compounding smaller issues" were false and misleading because, unbeknownst to investors, these issues had been compounding and were exacerbated by the acceleration, the integration-related disruptions remained ongoing and would continue to have a negative impact on 3Q25 financial results, with Defendants reporting a decline in net sales and forcing Defendants to again lower 2025 net sales and EBITDA guidance. Defendants' statements downplayed the depth of the Company's problems, which were so dire that a War Room/CRT had been formed to address them and the Company had still not fully or effectively merged its ERP systems, which continued to be a problem through the end of the Class Period. As Defendants later admitted in 3Q25, the "recovery in our direct delivery business" is still "ongoing," resulting in a negative impact on 3Q25 financial performance and FY25 guidance.

### 13.  September 4, 2025 – Barclays Global Consumer Staples Conference

238.  On the morning of September 4, 2025, Primo Brands participated in the Barclays Global Consumer Staples Conference.  Rietbroek and Hass attended on behalf of the Company.  Nearly a month after the 2Q25 earnings release and call, Rietbroek reported seeing early successes in 3Q25 with respect to retail, distribution, and increased market share in response to early questions from a Barclays analyst.

239.  The analyst asked about the impact of the direct delivery business on the 40% downward revision to the year's sales outlook, asking specifically about "key learnings from the challenges that [the Company] encountered."

240.  Rietbroek falsely stated that the Company recently "learned" about modular risk issues, stating:

> *And so in doing that, we actually learned that we needed more modular racks, more bottles in the system to be able to meet supply*.  *So we temporarily saw some service issues*.

241.  He concluded his response by assuring investors, however, "*we see week-on-week improved performance right now in terms of deliveries and service. We're optimistic that we're going to get it back*."

242.  In response to a Barclays analyst asking about delivery churn, Hass again noted that the Company was "largely through" the "period of frustration" inferring that the Company first became aware of customer service issues in July due to "lag effect of the quits":

- 110 -

And so when we saw, obviously, the lag effect of the quits that ***occurred in July***, and we're still waiting to understand sort of the August feedback, ***we were pleased . . . it wasn't to the degree that maybe we had previously expected or could have – it could have been***.

***But when you start to look at either public data or call center volumes based on that service resumption and service improvement, a lot of those leading indicators are starting to decline and improve.***

***And in that case, we believe that we're largely through what would be the peak sort of period of frustration.***

So when you look at all of that in summary, we believe that, again, ***we'll be able to get back to normal levels of retention. And it was probably a two to three-month period here that we've experienced the biggest factors of that lagging indicator***.

243. Barclays published a report following the conference that day, on September 4, 2025, expressing its re-found confidence in the Company's financial status. Specifically, the analyst wrote:

We sensed some initial skepticism following PRMB's guidance cut in early August (i.e. what is the risk of the timeline to integration recovery being pushed out further?), but we were inclined to think of the revised outlook as having sufficiently de-risked FY25. The tone from management today struck us as generally comfortable with the continued progress made on integration and the momentum inherent in retail. And looking past the several discrete items that are weighing on FY25 results (some in the company's control and some that were not), we continue to like the setup for an on-algorithm year in 2026 that better reflects the attractive medium-term story presented by PRMB.

244. Defendants' statements at the September 4, 2025 Barclays Global Consumer Staples Conference, as set forth above in ¶¶238-243, were materially false or misleading and/or omitted material information necessary to make them not misleading when made. Specifically:

- 111 -

(a)    Defendants' statements that they "actually learned that we needed more modular racks" and that the Company first became aware of customer service issues in "July" were false and misleading because, they gave investors the false impression that the need for modular racks and the service issues the Company was experiencing were new or previously unknowable.  In reality, unbeknownst to investors, Defendants already knew from the due diligence and the Merger integration process of the need for additional modular racks at the legacy companies' facilities to accommodate each other's brands but left this issue unresolved.  The operational problems created by this were exacerbated by Defendants' decision to accelerate the timelines laid out by the Merger Integration Team and the undertaking of rapid cost-cutting and restructuring measures, which created service issues, and significantly drove up costs.  And, at the time these statements were made, these issues which were so dire that a War Room/CRT had already been formed to address them.

(b)    Defendants' positive statements that the bulk of the accelerated Merger integration disruptions were mostly fixed, including that "it was probably a two to three-month period here that we've experienced the biggest factors of that lagging indicator" that "that we're largely through what would be the peak sort of period of frustration" and "we see week-on-week improved performance right now in terms of deliveries and service" were false and misleading because, unbeknownst

- 112 -

to investors, the integration-related disruptions remained ongoing and would continue to have a negative impact on 3Q25 financial results, with Defendants reporting a decline in net sales and forcing Defendants to again lower 2025 net sales and EBITDA guidance. Defendants' statements downplayed the depth of the Company's ongoing problems, which were so dire that a War Room/CRT had been formed to address them and the Company had still not fully or effectively merged its ERP systems, which continued to be a problem through the end of the Class Period. As Defendants later admitted in 3Q25 the "recovery in our direct delivery business" is still "ongoing," resulting in a negative impact on 3Q25 financial performance and FY25 guidance.

## F.    Loss Causation and Economic Loss – Exchange Act Claims Only

245.    During the Class Period, Exchange Act Defendants engaged in a scheme to defraud and made materially untrue, false, and misleading statements and/or omitted material information concerning Primo Water's and/or Primo Brands' Merger Integration, operational and financial performance, and growth. Exchange Act Defendants' fraudulent conduct had the effect of artificially inflating, maintaining, and manipulating the price of Primo Brands'[2], and its predecessor-in-

---

[2]    As detailed above, upon the consummation of the Merger on November 8, 2024, Primo Brands became the surviving corporation, and Primo Water and BlueTriton became wholly-owned subsidiaries of Primo Brands. As a result, on November 11, 2024, the Company's Class A common stock began regular-way trading on the NYSE under the ticker symbol "PRMB" and no longer as "PRMW." For purposes of this section, and for ease of reference, references to Primo

- 113 -

interest, Primo Water's common stock and deceived Lead Plaintiffs and the Class, causing purchasers of Primo Brands common stock to suffer economic harm as the truth reached the market.  Exchange Act Defendants' false and misleading statements and omissions throughout the Class Period had the intended effect and caused, or were a substantial contributing cause of, artificially inflating, maintaining, and manipulating the price of Primo Brands common stock, reaching as high as $35.63 on April 3, 2025 (during the Class Period), causing purchasers of Primo Brands common stock to suffer economic harm as the truth reached the market. When the circumstances concealed by Exchange Act Defendants began to come out, it caused the price of Primo Brands common stock to fall as the prior artificial inflation came out of the stock price.  As a result of their purchase or acquisition of Primo Brands common stock at inflated prices during the Class Period, and the decline in the price of Primo Brands common stock when the relevant truth began to be revealed, Lead Plaintiffs and other members of the Exchange Act Class (as defined herein) suffered economic loss, *i.e.*, damages, under the federal securities laws.

---

Brands common stock includes legacy Primo Water common stock that traded on the NYSE under the ticker symbol "PRMW" during the Class Period prior to the Merger and up until November 8, 2024.

246.    The decline in the price of Primo Brands common stock was the direct result of the nature and extent of Exchange Act Defendants' fraud being revealed to investors as the truth began to emerge, and the risk caused by Exchange Act Defendants' fraud materialized through partial revelations on August 7, 2025 and November 6, 2025 that cast doubt on the veracity of Exchange Act Defendants' Class Period statements.

### 1.    August 7, 2025

247.    On August 7, 2025, before the market opened, Primo Brands issued the 2Q25 press release reporting poor financial results and lowered guidance. Specifically, in the 2Q25 press release, the Company reported revenue of $1.730 billion and adjusted diluted EPS of $0.36 for 2Q25, both of which missed analysts' estimates of $1.806 billion and $0.41 per share, respectively.  The Company also reported that "SG&A expenses increased 47.7% to $378.6 million compared to $256.3 million, primarily as a result of the merger transaction," and from 19.5% of net sales to 21.9% of net sales.

248.    Primo Brands also reduced its full year 2025 net sales growth guidance significantly to 0% to 1% (from 3% to 5%), full year 2025 adjusted EBITDA guidance to $1.485 billion to $1.515 billion (from $1.6 billion to $1.628), and its adjusted free cash flow guidance to $740 million to $760 million (from $790 million

to $810 million) due, in part, to "integration disruptions during the later part of Q2, and our reinvestment to correct the issues."

249. During the 2Q25 conference call that day, Rietbroek elaborated on the integration issues, admitting that the Company "*prioritized speed and cost reductions*" stating:

> *In the second quarter, we have significant disruptions in our direct delivery business, resulting from the combining, upgrading and rationalizing of our operations*. During the quarter, we closed 40 facilities, bringing the total number of facilities closed since the merger to 48 facilities or 15% of our total network, and we reduced headcount by 1,100 full-time equivalent roles in the quarter. In total, since the merger, we have reduced headcount by more than 1,600 roles, representing an 11% reduction across our organization.
>
> Additionally, in the past few months, we have been integrating facilities, merging routes and rationalizing technology, which included transitioning our legacy Primo Brands to SAP and introducing new handheld devices to a large portion of our workforce.
>
> While the vast majority of our customers continued to receive the great service they expect from us, *in some markets, the high demand, standardization initiatives and challenges from an accelerated integration collectively affected our inventory levels and fill rates.*
>
> *We prioritized speed and cost reductions, resulting in some customers experiencing rescheduled or canceled deliveries on a recurring basis, product substitutions and extended customer service wait times . . . we have been working tirelessly to address the underlying operational issues, stabilizing service levels and optimizing our factory-to-branch transport and delivery routes.*

250. During the same call, Hass also stated, in relevant part:

> Shifting to the direct delivery business. As Robbert mentioned, *we experienced some disruptions as the first wave of integration impacts caused product supply and delivery service . .* , and we're unable to fulfill strong demand from our customers.

- 116 -

251. In providing additional details surrounding the disruption, he explained:

> *The pursuit of our factory closures across production and branches in addition to routing as part of the integration resulted in short-term disruption to the supply and service of our products to our direct delivery customers. . . .*
>
> *Part of our revised guidance factors in the activities required to stabilize the direct delivery business, including temporary product discounts and win-back campaigns for those customers who might have quit as a result of these integration-related disruptions.*
>
> *   *   *
>
> *While we are pleased with the process of executing our integration plan, it has led to some disruptions in our business that is preventing us from fully realizing the benefits of the integration within the P&L.  This has also resulted in adjusting our financial guidance for the year . . . .*

252. Hass further discussed modest synergy capture the Company had experienced in 2Q25, and revealed that "[o]ffsetting some of the gains were actions taken to stabilize the business across product supply, product distribution and extra costs related to delivery and service to support customer activities, including retention."

253. Hass also spoke about how the anticipated "recovery initiatives to address [the Company's] operational disruptions" that took place "in the second quarter of 2025 as well as recovery actions in the back half of 2025," "*slowed our growth trajectory versus our original guidance*," and resulted in the Company "revising our full year comparable net sales growth expectations to between flat and 1%," a "350-basis-point reduction from the midpoint" of the original guidance, the

- 117 -

majority of which (140 basis points) was attributable to the "disruptions in our direct delivery business."

254. In response to a question from an RBC analyst about the "integration pathway going forward," Rietbroek revealed that the Company's prioritization of speed resulted in disruptions, stating, "*[W]e had extensive integration planning, but due to the speed of integration, we clearly prioritized speed. We did temporarily experience supply shortages*."

255. A TD Cowen analyst asked about the issues pertaining to service levels. In response, Rietbroek provided further detail and stated:

> When we started the conversion of the branches, rolled out new handhelds, consolidated branches, *we saw a significant disruption there* for a short period. We then started adding modular racks and bottles. *We had a compatibility issue*.

> We were running the legacy Primo bottles through the ReadyRefresh network and discovered that we had an issue of decapping and capping the bottles.

> We also learned about a *compatibility issue with the racks*, where we put in optical eyes to be able to identify the racks.

256. In response to a question about the Company's confidence in its EBITDA margins, Hass acknowledged increased costs of the integration and its negative impact on the Company's 2Q25 results, stating, that "[a]gain, sort of the basis point departure here is just largely a function of revenue decline. And then some of the cost support we've had to put into the market to sort of stabilize the business."

257.   The Company's 2Q25 Form 10-Q further reported on increased costs, stating, that Cost of Sales also increased 34.4% year-over-year to $1.19 billion and total acquisition, integration & restructuring expenses further increased 276.5% year-over-year to $49.7 million.

258.   On this news, Primo Brands stock fell $2.41 per share, or about **9%**, from a closing price of $26.41 per share on August 6, 2025, to a closing price of $24.00 per share on August 7, 2025 on unusually high trading volume of 21.4 million shares.  However, as detailed above, Exchange Act Defendants continued to conceal the full truth of their Merger Integration Plan, its ongoing operational problems, and the negative impact such issues would have on the Company's financial position from investors, propping up the Company's stock price, which would have declined further had the full truth been known.

259.   Analysts were surprised by the news and reacted negatively to the Company's announced guidance revision.

(a)   RBC called the news "[n]ot a great outcome," and called the cut "steeper than we assumed."

(b)   Truist Securities, Inc. ("Truist") similarly called the guide down "disappointing" "less than a year after the merger and less than 6 months after the secondary offering."

(c)     Deutsche Bank downgraded PRMB's shares, noting "a series of operational and financial setbacks" that "call into question our prior thesis and undermine our conviction in both near- and medium-term revenue growth and margin development expectations." Specifically, Deutsche wrote:

> Clearly, our timing is not ideal – fully recognizing that PRMB's shares have meaningfully underperformed not only on Thursday (-9% vs. S&P flat) but since reporting 1Q (-26% vs. S&P +12%). However, (i) continued deterioration in revenue growth expectations into and through this year, (ii) executional missteps in the accelerated integration/rationalization of facilities and related headcount reductions (resulting in disruptions to product supply, delivery, and service in 2Q), and (iii) incremental investments now needed to win back lost/lapsed customers in the attractive HOD business have both materially reduced our FY25 revenue and EBITDA generation forecasts, and eroded confidence in PRMB's ability to cleanly return to on-algorithm +3%-5% growth in FY26. Moreover, further potential downstream investments to mitigate repeated disruptions and/or preserve customer retention through remaining integration activity could lead to less robust FY26/27 margin expansion, and ultimately put the company's 25% FY27 EBITDA margin target (if not its $1 billion FCF target) at risk.
>
> *      *      *
>
> As noted above, we materially lower our FY25 revenue and EBITDA estimates to reflect the weaker 2Q results, as well as reduced expectations over the balance of the year.

260.    The decline in the price of Primo Brands common stock after the August 7, 2025 corrective disclosure came to light was a direct result of the nature and extent of Exchange Act Defendants' fraudulent misrepresentations and omissions being revealed to investors and the market.

261.    The timing and magnitude of the price decline in Primo Brands common stock negate any inference that the loss suffered by Lead Plaintiffs and

- 120 -

other members of the Exchange Act Class was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Exchange Act Defendants' fraudulent conduct.

262. This is evidenced by the chart below, which demonstrates the clear divergence of the Company's common stock price from the Company's benchmark index and peer company stock prices[3] as the revelations of the truth became known to the market on August 7, 2025:

---

[3] Primo Brands has identified the S&P 400 Index and the peer group (identified below) comparison as benchmarks for its common stock performance in its annual report, filed with the SEC on February 27, 2026 ("FY25 Form 10-K"). The peer comparison is based on the stock prices of the following publicly traded companies in the beverage, other consumer packaged goods, and route-based service industries identified in the Company's FY25 Form 10-K: The Boston Beer Company, Inc., Campbell Soup Company, Clean Harbors, Inc., Coca-Cola Consolidated, Inc., Flowers Foods, Inc., General Mills, Inc., The Hershey Company, the J.M. Smucker Company, Keurig Dr. Pepper Inc., Lamb Weston Holdings, Inc., Molson Coors Beverage Company, Monster Beverage Corporation, Post Holdings, Inc., Waste Connections, Inc., WK Kellogg Co, and XPO, Inc.



### 2.    November 6, 2025

263.    Next, the truth more fully emerged before markets opened on November 6, 2025 when Primo Brands issued a press release shocking the market and announcing poor financial results for 3Q25 and lowering 2025 guidance again.

264.    Despite the Company's ongoing reassurances that the majority of the issues were behind them, and touting their confidence in restoring the experienced disruptions, the 3Q25 press release and accompanying presentation disclosed another year-over-year sales decline of 1.6% and a comparable net sales of direct delivery included a decline of 6.5%.  The Company further reported that "SG&A

expenses increased 43.1% to $343.0 million compared to $239.7 million, primarily as a result of the merger transaction, partially offset by nonrecurring management fees incurred in the prior year period."

265. The Company further disclosed a second revision to "2025 Net Sales and Adjusted EBITDA guidance," reducing 2025 net sales growth guidance to "net sales decline in the low single digits" (down from a prior rage of 0% to 1%) and full year 2025 adjusted EBITDA guidance to $1.440 billion to $1.460 billion (down from a prior range of $1.485 to $1.515 billion).

266. This same morning, after quoting Rietbroek in the 3Q25 press release, Exchange Act Defendants issued a subsequent press release on Form 8-K unexpectedly announcing that Rietbroek had been "transitioned" and replaced as CEO by Foss, and that Rietbroek resigned from the Board. The Company also announced that Metropoulos "stepped down" as non-executive Chairman of the Board, while remaining a member of the Board.

267. During the conference call that morning, Hass revealed that "credits provided to customers in the direct delivery business increased by $3.7 million year-over-year in the quarter. We believe this increase is temporary as we prioritized retention during the integration disruptions and will return to normalized levels as we exit 2025."

268.   And, despite previously giving investors the false impression that the integration issues were behind them and already accounted for in the updated 2025 guidance that was lowered the prior quarter, the Company stated that the "recovery in our direct delivery business" is "***ongoing***," "***but the recovery path is not at the right magnitude to deliver the midpoint of our previous guidance***."  As a result, "we now expect a net sales decline in the low single digits versus the prior year," and that Primo Brands was lowering its full year 2025 adjusted EBITDA guidance to "approximately $1.45 billion" at the midpoint.  Hass further stated that "[t]he remaining gap between our operational and financial recovery and our original guidance expectation continues to be unit volumes at the customer level.  Our product supply was . . . disrupted . . . ."

269.   During the question-and-answer portion of that same call, in response to a CJS Securities analyst asking about challenges relating to the integration, Foss doubled down on earlier admissions and said, "I think most of the direct delivery disruption has ***been self-inflicted***."  He went on to add that Primo Brands "probably moved too far too fast on some of the various integration work streams."  Foss also admitted, "[t]here's no doubt that, that speed impacted product supply" and the "ability to get through a lot of the warehouse closures and route realignment without disruption" and "the ultimate output of that was the customer service issues that we've highlighted."

- 124 -

270.    In responding further to that same question, Foss acknowledged that integration issues related to technology were still not resolved:

> There are also where, I believe, *some just integration issues related to the technology move over* . . . .  But we still have work to do at the moment of truth around making sure our deliveries are on time with the right product . . . . But again, there is *more work to do on this front* to completely get the issues solved and corrected.

271.    Later in the call, a CJS Securities analyst asked specifically about increased 3Q25 costs due to the Company's customer service disruptions asking, "if we sort of look at Q3 as a baseline, is there more cost investments that will need to be made in terms of routes, drivers, customer service, marketing, et cetera, kind of more permanent costs that may need to incur relative to our initial expectations to maintain that customer service."  Hass confirmed, "*Obviously, we've had some, what I'll call, middle mile or interbranch transfer cost to sort of keep product supply stable*."

272.    The Company's 3Q25 Form 10-Q further detailed increasing costs, including that Cost of Sales also increased 39.3% year-over-year to $1.24 billion and total acquisition, integration & restructuring expenses further increased 342.0% year-over-year to $44.2 million.

273.    On this news, Primo Brands stock fell $4.96, or more than *21%*, from a closing price of $22.66 per share on November 5, 2025, to a closing price of $17.70 per share on November 6, 2025, on unusually high trading volume of 21.5 million

- 125 -

shares.  The stock price declined even further the next day, on November 7, 2025, dropping an additional *18%*, to a closing price of $14.46, with over 52.4 million shares trading on that day.

274.  Analysts reacted to the Company's disappointing news, issuing the following reports on November 7, 2025:

(a)    Barclays analyst slashed their price target and issued a report, highlighting, "PRMB cut its comparable net sales growth guidance by ~200 bps at the midpoint and lowered its adj. EBITDA range an incremental ~3%[,] and the market (ourselves included) struggled to wrap its head around the sequential deceleration that is required to bridge to this updated outlook."

(b)    Deutsche Bank acknowledged PRMB shares declined -22% following the Company's 3Q25 report, CEO change announcement, and again-reduced full-year 2025 guidance;

(c)    J.P. Morgan also issued a report, in which they wrote:

> The 3Q25 print was another in a series of disappointments since the merger between Primo Water and BlueTriton with another significant guidance cut and now CEO change.  The stock reaction post-print (PRMB -21.9% vs. XLP -0.5%) was severe and reflects the confounding 4Q25 guide, potential implications for 2026 top line/earnings power, and overall lack of investor confidence in the company.  We think part of the significant de-risking of the guide is for new CEO Foss to clear the decks and begin to rebuild following this period of volatility/disappointment.

275.  The decline in the price of Primo Brands common stock after the corrective disclosures came to light were a direct result of the nature and extent of

- 126 -

Exchange Act Defendants' fraudulent misrepresentations and omissions being revealed to investors and the market.

276. The timing and magnitude of the price declines on November 6, 2025 and November 7, 2025 in Primo Brands common stock following the November 6, 2025 disclosure negates any inference that the loss suffered by Lead Plaintiffs and other members of the Exchange Act Class was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Exchange Act Defendants' fraudulent conduct.

277. This is evidenced by the chart below, which demonstrates the clear divergence of the Company's common stock prices from the Company's benchmark index and peer company stock prices as the revelations of the truth became known to the market:



278.  In sum, the rapid declines in Primo Brands common stock price on

August 7, 2025, and November 6-7, 2025, were the direct and foreseeable

consequence of the revelations of the falsity of Exchange Act Defendants' Class

Period misrepresentations and omissions to the market.  Thus, the revelation of truth,

as well as the resulting clear market reaction, support a reasonable inference that the

market understood that Exchange Act Defendants' prior statements were false and

misleading.  In short, when the truth about Exchange Act Defendants' prior

misrepresentations and omissions and other fraudulent conduct were revealed, Primo

Brands common stock price quickly sank as the artificial inflation was removed, and Lead Plaintiffs were damaged, suffering true economic losses.

279. Accordingly, the economic losses, *i.e.*, damages, suffered by Lead Plaintiffs and other members of the Exchange Act Class on August 7, 2025, and November 6-7, 2025, were a direct and proximate result of Exchange Act Defendants' fraudulent scheme to artificially inflated the prices of Primo Brands common stock and the subsequent significant declines in the value of Primo Brands common stock when Exchange Act Defendants' prior misrepresentations and omissions and fraudulent conduct were revealed.

## G.    Presumption of Reliance

280. A class-wide presumption of reliance is also appropriate with respect to the Exchange Act claims in this action under the fraud-on-the-market doctrine. The market for the Company's common stock was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this complaint, the Company's common stock traded at artificially inflated and/or maintained prices during the Class Period. Lead Plaintiffs and other members of the Class purchased the Company's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to the Company and have been damaged thereby.

281.    At all times relevant, the market for the Company's common stock was an efficient market for the following reasons, among others:

(a)    the Company's common stock listed and actively traded on NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, the Company filed periodic public reports with the SEC and/or NYSE;

(c)    the Company regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    the Company was followed by securities analysts employed by brokerage firms, such as RBC, J.P. Morgan, TD Cowen, Morgan Stanley, Truist, Barclays, and Deutsche Bank, who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

282.    As a result of the foregoing, the market for the Company's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the Company's stock

- 130 -

price. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

## H.    No Safe Harbor

283. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

284. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

285. These or other materially identical risk disclosures were disseminated throughout the Class Period and did not serve to adequately inform the market of the true risks and actual operational experience of Primo Water and/or the Company. Indeed, that these stated warnings were inadequate and provided no new, meaningful information, is evident from the market's reaction to the revelation of Exchange Act Defendants' untrue and/or misleading statements.

- 131 -

286.   Alternatively, to the extent the statutory safe harbor is determined to apply to any forward-looking statements alleged, Exchange Act Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Primo Water and/or Primo Brands who knew that the statement was false when made. Moreover, to the extent Exchange Act Defendants issued any disclosures designed to warn or caution investors of certain purported risks, those disclosures were also false and misleading since they did not disclose that Exchange Act Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material, adverse facts undermining such disclosures.

## I.   Class Action Allegations for Exchange Act Claims

287.   Lead Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure alleging violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC, on behalf of all persons or entities that purchased or acquired publicly traded common stock of Primo Water and/or Primo Brands during the Class Period, and who were damaged thereby ("Exchange Act Class").  Excluded from the Exchange Act Class are Exchange Act Defendants, the officers and directors Primo Water

- 132 -

and/or the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Exchange Act Defendants have or had a controlling interest, or any affiliate of any Defendants.

288.   Members of the Exchange Act Class are so numerous that joinder of all members is impracticable.  While the exact number of Exchange Act Class members can only be determined by appropriate discovery, Lead Plaintiffs believe that Exchange Act Class members number at least in the hundreds, if not the thousands, and that they are geographically dispersed.  During the Class Period, millions of shares of common stock of Primo Water and Primo Brands actively traded on the NYSE (an open and efficient market) under the ticker symbols "PRMW" and "PRMB," respectively.  As of May 6, 2024, Primo Water had more than 159 million shares of Class A common stock outstanding.  As of November 3, 2025, Primo Brands had more than 370 million shares of Class A common stock outstanding.

289.   Lead Plaintiffs' claims are typical of the claims of the members of the Exchange Act Class because Lead Plaintiffs and all of the Exchange Act Class members sustained damages arising out of Exchange Act Defendants' wrongful conduct complained of herein.

290.   Lead Plaintiffs will fairly and adequately protect the interests of the Exchange Act Class members and have retained counsel experienced and competent

in class actions and securities litigation.  Lead Plaintiffs have no interests that are contrary to, or in conflict with, the members of the Exchange Act Class that Lead Plaintiffs seek to represent.

291.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Exchange Act Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Exchange Act Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

292.  Questions of law and fact common to the members of the Exchange Act Class predominate over any questions that may affect only individual members in that Exchange Act Defendants have acted on grounds generally applicable to the entire Exchange Act Class.  Among the questions of law and fact common to the Exchange Act Class are:

(a)    whether Exchange Act Defendants violated the federal securities laws as alleged herein;

(b)    whether Exchange Act Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)     whether Exchange Act Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)     whether Exchange Act Defendants participated in and pursued the fraudulent scheme or course of business complained of herein in violation of the Exchange Act;

(e)     whether Exchange Act Defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts in violation of the Exchange Act;

(f)     whether the market prices of Primo Water and/or the Company's common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)     whether the members of the Exchange Act Class have sustained damages as a result of the decline in value of the Company's common stock when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

### COUNT I:
### For Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against Exchange Act Defendants

293.   Lead Plaintiffs repeat and reallege each and every allegation in §IV above as if fully set forth herein.

- 135 -

294.   During the Class Period, Exchange Act Defendants disseminated or approved one or more of statements as specified above in §IV.E, which they knew, or disregarded with severe recklessness, contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

295.   Exchange Act Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10-b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Primo Brands and Primo Water common stock during the Class Period.

296.   In addition to the duties of full disclosure imposed on Exchange Act Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X, 17 C.F.R. §210.01, *et seq.*, and SEC Regulation S-K, 17 C.F.R. §229.10, *et seq.*, and other SEC regulations, including

accurate and truthful information with respect to the Company's operations, sales, financial condition, and operational performance, so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.

297.    Exchange Act Defendants, individually and together, directly and indirectly, by the use, means, and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the Primo Water and/or Primo Brands' business, operations, and financial condition as specified herein.

298.    Exchange Act Individual Defendants' primary liability and controlling person liability arise from the following facts, among others: (a) they were high-level executives at Primo Water and/or the Company during the Class Period; (b) Exchange Act Individual Defendants, by virtue of their responsibilities and activities as executives were privy to, and participated in, the creation, development, and reporting of Primo Water and/or the Company's projections and financial condition; (c) they enjoyed significant personal contact and familiarity with, was advised of, and had access to other members of Primo Water and/or Company's management team, internal reports, and other data and information about Primo Water and/or the Company's financial and operational results and prospects at all relevant times; and (d) they were aware of Primo Water and/or the Company's dissemination of

- 137 -

information to the investing public which they knew, or recklessly disregarded, was materially false and misleading.

299. Exchange Act Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or disregarded with severe recklessness the true facts that were available to them. As such, Exchange Act Defendants' material misrepresentations and/or omissions were done knowingly or with severe recklessness and for the purpose and effect of concealing information regarding Primo Water and/or the Company's true financial and operational results and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Exchange Act Defendants' misstatements and omissions throughout the Class Period regarding Primo Water and/or the Company's true financial and operational results and prospects, Exchange Act Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

300. As a result of the conduct, dissemination of the materially false and misleading information, and/or failure to disclose material facts, as set forth above, the market prices of Primo Water and/or the Company's common stock were artificially inflated during the Class Period. In ignorance of the fact that market price

- 138 -

of Primo Water and/or Company's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which Primo Water and Primo Brands common stock traded, and/or on the absence of material adverse information that was known to, or disregarded with severe recklessness by Exchange Act Defendants (but not disclosed in public statements by Exchange Act Defendants during the Class Period), Lead Plaintiffs and other members of the Exchange Act Class purchased or otherwise acquired Primo Water and/or the Company's common stock during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the common stock price declines above.

301.   Lead Plaintiffs and the Exchange Act Class, in reliance on the integrity of the market, paid artificially inflated prices for Primo Water and/or Primo Brands common stock, and suffered losses when the relevant truth was revealed.  Lead Plaintiffs and the Exchange Act Class would not have purchased Primo Water and/or Primo Brands common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Exchange Act Defendants' misleading statements.

302.   As a direct and proximate result of Exchange Act Defendants' wrongful conduct, Lead Plaintiffs and other members of the Exchange Act Class suffered

damages in connection with their purchases of Primo Water and/or the Company's common stock.

303. By reason of the foregoing, Exchange Act Defendants named in this Count have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

304. This claim is brought within the applicable statute of limitations.

## COUNT II:
### For Violations of Section 20(a) of the Exchange Act
### Against Exchange Act Individual Defendants

305. Lead Plaintiffs repeat and reallege each and every allegation in §IV above as if fully set forth herein.

306. Exchange Act Individual Defendants acted as controlling persons of Primo Water and/or Primo Brands within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions within Primo Water and/or the Company, participation in, and/or awareness of Primo Water and/or Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, Exchange Act Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Primo Water and/or the Company, including the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading.

307. In particular, Exchange Act Individual Defendants had direct and supervisory involvement in the day-to-day operations of Primo Water and/or the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

308. As set forth above, Primo Brands and Exchange Act Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in Count I. By virtue of their control, Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

309. As a direct and proximate result of Exchange Act Individual Defendants' wrongful conduct, Lead Plaintiffs and other members of the Exchange Act Class suffered damages in connection with their purchases and acquisitions Primo Water and/or of Primo Brands' common stock when the truth was revealed, as evidenced by, among others, the securities price declines discussed above, when the artificial inflation was released from Primo Water and/or Company's securities.

310. By reason of the foregoing, Exchange Act Individual Defendants named in this Count violated Section 20(a) of the Exchange Act.

311. This claim is brought within the applicable statute of limitations.

## V. STRICT LIABILITY SECURITIES ACT CLAIMS (NON-FRAUD)

312. The strict liability claims addressed in this section (Counts III, IV, and V, below) are brought by Lead Plaintiff Providence Employees Retirement System ("Providence") pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, respectively.

313. These claims are, in effect, a separate complaint. Providence asserts these claims pursuant to the Securities Act on behalf of itself and the Securities Act Class (defined herein). Providence's Securities Act claims are not based on any allegations of intentional, knowing, or reckless misconduct by any of the Securities Act Defendants (defined herein). Providence's Securities Act claims do not, and are not intended to, allege fraud or sound in fraud, and Providence specifically disclaims any allegations of fraud, scienter, or recklessness in connection with these non-fraud claims.

314. During the Class Period, Primo Brands completed the SPO, wherein Triton Water Parent Holdings, LP ("Triton") sold 51,750,000 shares of its Primo Brands Class A common stock (including a base offering of 45,000,000 shares and an additional offering of 6,750,000 shares) at a price of $29.50 per share for gross proceeds of $1,522,692,060. As alleged herein, the relevant offering materials and documents incorporated therein contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the

- 142 -

statements not misleading at the time they were made.

### A.    Parties to Strict Liability Securities Act Claims

#### 1.    Securities Act Plaintiff

315.    Providence was appointed to serve as a Lead Plaintiff in this action by Order of this Court dated February 4, 2026 [ECF 48].  As shown in its certification filed in this action [ECF 17-3], which is incorporated herein, Providence purchased or otherwise acquired Primo Brands Class A common stock directly in the SPO issued pursuant to the Company's Registration Statement (defined herein). Providence suffered economic losses when true facts about the Company's operating and financial condition were disclosed and the artificial inflation was removed from the price of Primo Brands Class A common stock.

#### 2.    The Securities Act Defendants

316.    Defendant Primo Brands is incorporated under the laws of Delaware, with its principal executive offices located in Tampa, Florida and Stamford, Connecticut.  During the Class Period, the common stock of Primo Brands and its predecessor-in-interest, Primo Water, traded on the NYSE under the ticker symbols "PRMB" and "PRMW," respectively.

##### a.    The Individual Securities Act Defendants

317.    Defendant Rietbroek served as CEO of Primo Brands at the time of the SPO.  Prior to the Merger, Rietbroek served as the CEO of Primo Water from January 1, 2024 until the Merger closed on November 8, 2024.  At the close of the

Merger, Rietbroek became CEO of Primo Brands and occupied that position through November 6, 2025, when he was abruptly replaced by Foss.  At the time the Merger was announced, Rietbroek's background included more than 25 years of leadership experience at Fortune 200 consumer goods companies, including PepsiCo, Kimberly-Clark, and Procter & Gamble, among other leadership roles.

318.   Defendant Hass served as CFO of Primo Brands at the time of the SPO. Prior to the Merger, Hass served as CFO of Primo Water from January 23, 2023 until the Merger closed on November 8, 2024.  Prior to that role, Hass served in various other roles at Primo Water from 2011 to 2023, including Chief Strategy Officer; Vice President of Strategy; Vice President of FP&A; and General Manager of the Canadian Business Unit and the Water Direct Business Unit.

319.   Defendant Ausher served as Chief Accounting Officer ("CAO") of Primo Brands at the time of the SPO.  Prior to the Merger, Ausher served as CAO of Primo Water from May 2015 until the Merger closed on November 8, 2024.  Prior to that role, Ausher served in various other roles at Primo Water from 2010 to 2015, including Vice President Treasurer, Corporate Development; Corporate Controller; and Controller for the U.S. Business Unit.

320.   Defendants identified in ¶¶317-319 above are collectively referred to herein as "Individual Securities Act Defendants."  Each of the Individual Securities Act Defendants signed the Registration Statement for the March 2025 SPO, ensuring

- 144 -

the truth and accuracy of the various statements contained and incorporated therein, and that the Registration Statement and materials incorporated therein were free from misstatements or omissions of material fact. Each of the Individual Securities Act Defendants also reviewed and helped prepare the Registration Statement and, as directors and/or executive officers of the Company, participated in the drafting, preparation, and/or approval of various untrue and misleading statements contained or incorporated in the Offering Materials.

### b.     The Director Defendants

321.  Defendant Metropoulos served as non-executive Chairman of the Board at the time of the SPO.  Metropoulos held that role from the close of the Merger on November 8, 2024 until November 6, 2025, and thereafter has continued to serve as member of Primo Brands' Board through the present.  Prior to the Merger, Metropoulos served as Chairman of the Board of Directors of BlueTriton from March 31, 2021 until the close of the Merger.

322.  Defendant Kurtis Barker ("Barker") served as a member of the Board at the time of the SPO.  Barker held that role from the close of the Merger on November 8, 2024 until his resignation effective May 21, 2025.  Prior to the Merger, Barker served as a member of BlueTriton's Board of Directors from March 2021 to the close of the Merger.  Additionally, Barker has been an Operating Partner in the Business and Environmental Services vertical for One Rock Capital since 2011.

- 145 -

323.  Defendant Britta Bomhard ("Bomhard") served as a member of the Board at the time of the SPO.  Bomhard held that role from the close of the Merger on November 8, 2024 through present.  Prior to the Merger, Bomhard served as a member of the Board of Directors of Primo Water from November 2018 to the close of the Merger, and as the Lead Independent Director of Primo Water from May 2023 to the close of the Merger.

324.  Defendant Susan E. Cates ("Cates") served as a member of the Board at the time of the SPO.  Cates held that role from the close of the Merger on November 8, 2024 through the present.

325.  Defendant Michael J. Cramer ("Cramer") served as a member of the Board at the time of the SPO.  Cramer held that role from the close of the Merger on November 8, 2024 through the present.  Prior to the Merger, Cramer served as a member of the Board of Directors of BlueTriton from March 2021 to the close of the Merger.

326.  Defendant Foss served as a member of the Board at the time of the SPO.  Foss held that role from the close of the Merger on November 8, 2024 through the present.  Foss was also appointed CEO and Chairman of the Board effective November 6, 2025, and continues to serve in those roles through the present.

327.  Defendant Jerry Fowden ("Fowden") served as a member of the Board at the time of the SPO.  Fowden held that role from the close of the Merger on

- 146 -

November 8, 2024 through the present.  Prior to the Merger, Fowden served as a member of the Board of Directors of Primo Water from 2009 to the close of the Merger, and as Chairman of the Board of Directors of Primo Water from 2020 to the close of the Merger.

328.   Defendant Tony W. Lee ("Lee") served as a member of the Board at the time of the SPO.  Lee held that role from the close of the Merger on November 8, 2024 through the present.  Prior to the Merger, Lee served as a member of the Board of Directors of BlueTriton from March 2021 to the close of the Merger.  Lee is also a co-founder and Managing Partner of One Rock Capital.

329.   Defendant Billy D. Prim ("Prim") served as a member of the Board at the time of the SPO.  Prim held that role from the close of the Merger on November 8, 2024 through the present.  Prior to the Merger, Prim served as a member of the Board of Directors of Primo Water from 2020 to the close of the Merger.  Prim also founded Primo Water in 2004, and served as Executive Chairman of the Board of Directors of Primo Water from 2017 to 2020.

330.   Defendant Kimberly Reed ("Reed") served as a member of the Board at the time of the SPO.  Reed held that role from the close of the Merger on November 8, 2024 through the present.  Prior to the Merger, Reed served as a member of BlueTriton's Board of Directors from March 2021 to the close of the Merger.  Reed also serves as a partner of One Rock Capital since 2010.

- 147 -

331. Defendant Joseph Rosenberg ("Rosenberg") served as a member of the Board at the time of the SPO. Rosenberg held that role from the close of the Merger on November 8, 2024 until his resignation on March 20, 2025. Prior to the Merger, Rosenberg served as a member of BlueTriton's Board of Directors from March 2021 to the close of the Merger. Rosenberg has also served as a partner of One Rock Capital from 2022 through present.

332. Defendant Allison Spector ("Spector") served as a member of the Board at the time of the SPO. Spector held that role from the close of the Merger on November 8, 2024 until her resignation effective May 21, 2025. Spector has also served as the Head of Environmental, Social, and Governance of One Rock Capital since 2021.

333. Defendant Steven P. Stanbrook ("Stanbrook") served as a member of the Board at the time of the SPO. Stanbrook held that role from the close of the Merger on November 8, 2024 Merger through present.

334. Defendants named in ¶¶321-333 above are collectively referred to herein as the "Director Defendants."

335. Director Defendants participated in the drafting, preparation, and/or approval of various untrue and misleading statements contained or incorporated in the Offering Materials. Each Director Defendant signed the Registration Statement, attesting to the truth and accuracy of the various statements contained and

- 148 -

incorporated therein, and that the Registration Statement and materials incorporated therein were free from misstatements or omissions of material fact.

### c.  The Underwriter Defendants

336.  Defendant Morgan Stanley & Co. LLC served as an underwriter for the SPO.

337.  Defendant BofA Securities, Inc. served as an underwriter for the SPO.

338.  Defendant J.P. Morgan Securities LLC served as an underwriter for the SPO.

339.  Defendant RBC Capital Markets, LLC served as an underwriter for the SPO.

340.  Defendant Barclays Capital Inc. served as an underwriter for the SPO.

341.  Defendant BMO Capital Markets Corp. served as an underwriter for the SPO.

342.  Defendant Deutsche Bank Securities Inc. served as an underwriter for the SPO.

343.  Defendant Jefferies LLC served as an underwriter for the SPO.

344.  Defendant Goldman Sachs & Co. LLC served as an underwriter for the SPO.

345.  Defendant Mizuho Securities USA LLC served as an underwriter for the SPO.

346. Defendant TD Securities (USA) LLC served as an underwriter for the SPO.

347. Defendant Truist Securities, Inc. served as an underwriter for the SPO.

348. Defendant William Blair & Company, L.L.C. served as an underwriter for the SPO.

349. Defendant Drexel Hamilton, LLC served as an underwriter for the SPO.

350. Defendant Loop Capital Markets LLC served as an underwriter for the SPO.

351. Defendants listed above are referred to herein as "Underwriter Defendants."

352. Underwriter Defendants are all investment banking houses with operations in the United States. Each of the Underwriter Defendants served as underwriters for the SPO and participated in the offer and sale of Primo Brands' common stock to the investing public. Because of their roles as underwriters of the SPO, Underwriter Defendants are responsible under the Securities Act for the untrue and misleading statements contained or incorporated in the Offering Materials.

353. Underwriter Defendants purported to conduct a due diligence investigation in connection with the SPO and gained access to information regarding the Company, its business, operations, financial results, and prospects. Underwriter Defendants solicited investors and participated in the sale and offering of Primo

Brands common stock in the SPO and otherwise participated in the SPO for their own financial benefit.

354. In connection with the SPO, Underwriter Defendants agreed to purchase, and Triton agreed to sell them, the number of shares of Class A common stock of Primo Brands listed below:

| Underwriter Defendant | Number of Shares |
|---|---|
| Morgan Stanley | 10,753,825 |
| BofA Securities | 10,753,825 |
| J.P. Morgan | 3,240,323 |
| RBC | 3,240,323 |
| Barclays Capital | 3,240,323 |
| BMO | 2,430,242 |
| Deutsche Bank | 2,430,242 |
| Jefferies | 2,430,242 |
| Goldman Sachs | 1,215,123 |
| Mizuho | 1,215,123 |
| TD Securities | 1,215,123 |

| Truist | 1,215,123 |
|--------|-----------|
| William Blair | 1,215,123 |
| Drexel | 202,520 |
| Loop Capital | 202,520 |
| **TOTAL** | 45,000,000 |

355. Underwriter Defendants sold a total of 51,750,000 shares of Primo Brands Class A common stock in the SPO at $29.50 per share, including Underwriter Defendants' firm commitment to purchase from Triton and offer to the investing public 45,000,000 shares of Primo Brands common stock, and the full exercise of Underwriters Defendants' option to purchase from Triton and offer to the investing public up to 6,750,000 additional shares of Primo Brands common stock. In connection with the sale, Underwriter Defendants shared $46,949,471 in underwriting discounts and commissions.

356. Underwriter Defendants participated in the drafting and dissemination of the Offering Materials. Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Offering Materials were prepared properly, accurately, and free from misstatements or omissions of material fact. Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

### d.  The Selling Stockholder Defendant

357.  Defendant Triton, an affiliate of One Rock Capital, owned 160,618,368 shares of Primo Brands common stock prior to the SPO.  In the SPO, Triton sold 51,750,000 shares of its Primo Brands Class A common stock (including a base offering of 45,000,000 shares and an additional offering of 6,750,000 shares) at a price of $29.50 per share for gross proceeds of $1,522,692,060.

358.  Triton is referred to herein as the "Selling Stockholder Defendant."

359.  For purposes of the Securities Act claims alleged herein, Defendant Primo Brands, Individual Securities Act Defendants, Director Defendants, Underwriter Defendants, and the Selling Stockholder Defendant, are collectively referred to herein as "Securities Act Defendants."

360.  Providence does not allege that Securities Act Defendants acted fraudulently (*i.e.*, knowingly or recklessly) with respect to the Securities Act claims set forth herein.  Instead, Providence's Securities Act claims against these specific Securities Act Defendants, which are based solely on strict liability and sound in negligence, allege that they acted negligently in connection with the SPO based on their failure to conduct adequate due diligence in connection with the preparation, execution, and/or dissemination of the SPO Offering Materials.

- 153 -

**B.     Securities Act Defendants File the Offering Materials and Conduct the SPO**

361.   In March 2025, Primo Brands filed a shelf Registration Statement with the SEC on Form S-1/A, registering the resale of up to approximately 218.6 million shares of Class A common stock by existing stockholders, which may be sold publicly from time to time with no fixed schedule.  As noted above, the Registration Statement was signed by each of the Individual Securities Act Defendants and Director Defendants.  The SEC declared the Registration Statement effective on March 7, 2025.

362.   The Registration Statement incorporated a Prospectus, dated March 7, 2025, and subsequent prospectus supplements under Rule 424(b)(3), including the Prospectus Supplement filed on March 11, 2025 in connection with the SPO, which were filed by Primo Brands with the SEC and disseminated to the investing public. Each of the Underwriter Defendants was listed in one and/or both of the Prospectus and Prospectus Supplement filed on March 11, 2025, filed in connection with the SPO Registration Statement.  The Prospectus and March 11, 2025 Prospectus Supplement are collectively hereinafter referred to as the SPO Prospectus.

363.   The Registration Statement, Prospectus and March 11, 2025 Prospectus Supplement make up the Offering Materials.  The Prospectus Supplement informed investors that "this prospectus contains or incorporates by reference information that you should consider when making your investment decision."

364. On March 12, 2025, Securities Act Defendants completed the SPO. The SPO was conducted pursuant to, and the sale of Class A common stock was solicited by, the Offering Materials. In the SPO, Triton sold 51,750,000 shares of its Primo Brands Class A common stock (including a base offering of 45,000,000 shares and an additional offering of 6,750,000 shares) at a price of $29.50 per share for gross proceeds of $1,522,692,060.

365. The SPO involved a firm commitment underwriting by Underwriter Defendants (*i.e.*, they agreed to purchase all the shares offered by Triton before selling them to the public, and assume the risk of any unsold shares). In connection with the SPO, Underwriter Defendants exercised a 30-day option to purchase an additional 6,750,000 shares from Triton (on top of the base offering of 45,000,000 shares), and Primo Brands repurchased 4,000,000 shares from the Underwriter Defendants. Additionally, Underwriter Defendants collectively received $46,949,471 in discounts and commissions in connection with the SPO.

366. The Offering Materials contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading at the time they were made, and were not prepared in accordance with the laws, rules, and regulations governing their preparation.

367. The Offering Materials failed to disclose significant operational and financial problems related to Defendants' integration of the Merger between Primo Water and BlueTriton that closed in November 2024.

368. The integration problems that existed at the time of the SPO included, among other things, difficulties combining the different systems of Primo Water and BlueTriton, incompatible bottles and racks, supply and delivery disruptions, customer service issues, and customer cancellations. These issues were exacerbated by Defendants' decision in January 2025 to accelerate the timeline for achieving synergies through rapid cost-cutting and restructuring measures, including the closure of manufacturing facilities, the reduction of headcount, and the reduction of delivery routes. The problems collectively had a material adverse effect on the Company's financial results and prospects, including lower net sales growth, increased costs, compressed margins, and compressed earnings (EBITDA).

369. When the truth about the Company's problems were revealed publicly after the SPO, the value of Primo Brands Class A common stock shares plummeted. As a result, Securities Act Class members suffered significant losses and damages. On December 4, 2025, the day before this action was filed, the price of Primo Brands Class A common stock was $16.24 per share, a 44.95% decline from the SPO price of $29.50 per share.

### C.   The Registration Statements' False and Misleading Statements and Omissions[4]

370.   The Offering Materials contained, and incorporated by reference, false and misleading statements and omissions of material fact.

371.   The Prospectus Supplement stated, "We believe our carefully curated footprint . . . allows for efficient delivery, strong service levels and high overall customer satisfaction . . ."

372.   The Prospectus Supplement also stated, "We have also identified an estimated $300 million run-rate cost synergies opportunity, exclusive of an estimated $100 million in associated one-time costs, that we intend to implement over the next two years."  Further, "[w]e intend to capture cost synergies through network optimization (including branch and last mile, manufacturing and integrating IT systems), route optimization, vertical integration of bottle sourcing and PET case pack production, as well as streamlining vendor/supplier engagements."

373.   Additionally, the Prospectus Supplement stated that the Company was committed to "drive net sales growth and sustainable profitability."

374.   The statements in the Prospectus Supplement, as set forth above, were materially false or misleading and/or omitted material information necessary to make them not misleading (that was unbeknownst to investors).  Specifically:

---

[4]   Bold and italics are for emphasis.

- 157 -

(a)      The statement that the Company's "carefully curated footprint" allowed for "efficient delivery, strong service levels and high overall customer satisfaction" was false and misleading because, it failed to disclose, as would later be admitted, that the Company prioritized speed and cost reductions, such as facility closures, that reduced the Company's inventory levels, causing the Company to experience supply shortages leading to rescheduled or canceled deliveries, customer service issues, and customer cancellations.  Moreover, the Company's efforts to realign, merge, and reduce delivery routes significantly reduced its network and increased distances between factories and branches.  Thus, contrary to these statements, the Company's integration efforts made deliveries far less efficient, deteriorated service levels, and substantially lowered customer satisfaction.

(b)      The statements regarding a "$300 million run-rate cost synergies opportunity, exclusive of an estimated $100 million in associated one-time costs, that we intend to implement over the next two years" gave investors the false impression that the Company was on track to rapidly and successfully achieve such synergies.  In reality, the statements failed to disclose Company's rushed efforts to achieve synergies were causing severe problems.  The two legacy companies (Primo Water and BlueTriton) had different and incompatible systems and products, which were difficult and time-consuming to merge.  And, as would eventually be admitted,

- 158 -

the accelerated integration plan "to make sure we achieve the run rate synergies" caused self-inflicted disruptions to product supply, product deliveries, and customer service. As a result, the Company incurred massive costs, suffered reduced margins, experienced declining sales growth, and suffered from compressed earnings (EBITDA).

(c)  The statements regarding net sales growth and sustainable profitability were false and misleading because, they failed to disclose, as would later be admitted, the Company's accelerated Merger integration created supply, delivery, and customer service issues that resulted in customer cancellations and sales growth declines. Moreover, the Company was forced to make massive expenditures to fix the problems, which further damaged profitability, including offering customer discounts and implementing win-back campaigns in an attempt to slow customer departures.

375. The Offering Materials incorporated by reference the Company's press release announcing 4Q24 and FY24 results filed with the SEC on Form 8-K on February 20, 2025. By incorporating by reference the Company's press release announcing 4Q24 and FY24 results, the Offering Materials contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made.

376. The press release stated that the "integration [was] ahead of schedule; increases estimated cost synergy opportunity to $300 million, with $200 million expected to be captured in 2025; balance expected to be captured in 2026."

377. Similarly, Rietbroek stated:

We have accelerated the size and speed of cost synergy capture. It is now forecasted to be $100 million higher and one year sooner, with $300 million in total expected by year end 2026. First-year 2025 synergies are estimated to be $200 million, with the balance occurring in 2026. The synergy capture is reflected in our 2025 outlook.

378. The press release also issued FY25 net sales growth of 3-5%, adjusted EBITDA of $1.6 billion to $1.628 billion, and adjusted free cash flow guidance of $790 to $810 million. Inclusive of the estimated $200 million cost synergies opportunities anticipated for 2025, the Company projected:

| Comparable Results[1] | 2025 Range | |
|---|---|---|
| ($ in millions) | Low | High |
| Net Sales Growth | 3% | 5% |
| Adj. EBITDA | $1,600 | $1,628 |
| CAPEX | 4% of Net Sales | |
| Adj. Free Cash Flow | $790 | $810 |

[1]Comparison period includes 2024 Combined Financials, less results of exited Eastern Canadian operations. For Net Sales reconciliation please see exhibit 9

379. The statements in the February 20, 2025 press release, as set forth above, were materially false or misleading and/or omitted material information necessary to make them not when made. Specifically:

(a)    The positive statement that the "integration [was] ahead of schedule" was false and misleading when made because it failed to disclose that the

- 160 -

Company was already facing serious operational issues from the rushed and poorly executed integration and the incompatibilities in the two legacy businesses, which were making integration slow, difficult, and costly (*i.e.*, ERP system migration issues, rack and bottle compatibility issues, disruptions at manufacturing facilities). In particular, the Company's failure to sufficiently merge the legacy companies' two different ERP systems resulted in duplication, conflicting data structures, inconsistent reporting, and operational inefficiencies, which affected the Company's vital operations such as sales, inventory control, delivery routes, human resources, billing, and financial reporting.

(b)     The positive statements announcing the acceleration of the size and speed of the synergy capture ($100 million higher and one year sooner), and lowering the anticipated costs to achieve it from ($115 to $100 million) were false and misleading when made because they failed to disclose that the Company was already facing serious operational issues from the integration, including the slow, difficult, and costly integration of incompatible systems, racks, and bottles of the two legacy companies (Primo Water and BlueTriton).  The decision made by the executive team in January 2025 to further accelerate the timeline for synergy achievement was a departure from the Merger Integration Plan formulated by the Merger Integration Team and ignored potential problems and red flags that had been identified.  To achieve this accelerated plan, the Company would have to undertake

- 161 -

rapid cost-cutting and restructuring measures, which were compounding the incompatibility issues the Company was facing and driving up costs.  As the Company later admitted, the resulting problems from this decision were "self-inflicted . . .  we probably moved too far too fast."

(c)     The Company's FY25 net sales growth, adjusted EBITDA, and adjusted free cash flow guidance was misleading, unrealistic, and unattainable because the Company was already facing serious operational issues from the rushed and poorly executed integration and the incompatibilities in the two legacy businesses, which were making the integration slow, difficult, and costly (*i.e.*, ERP system migration issues, rack and bottle compatibility issues, disruptions at manufacturing facilities).  The statements further failed to disclose that the guidance announcement was made one month after the executive decision in January 2025 to further accelerate the timeline for synergy achievement, which was a departure from plan formulated by the Merger Integration Team and ignored potential problems and red flags that had been identified.  To achieve this accelerated plan, the Company would have to undertake rapid cost-cutting and restructuring measures, compounding the incompatibility issues the Company was already facing and significantly driving up costs. This resulted in massive expenditures to address integration problems and customer losses, ultimately had a major negative impact on the Company's financial results, including reduced net sales growth and

- 162 -

compressed earnings (EBITDA). Indeed, as Hass later admitted, "recovery initiatives to address [the Company's] operational disruptions" "slowed our growth trajectory versus our original guidance."

380. The Offering Materials also incorporated by reference the Company's FY24 Form 10-K filed with the SEC on February 27, 2025. By incorporating by reference the Company's FY24 Form 10-K, the Offering Materials contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made. The FY24 Form 10-K was signed by each of the Individual Securities Act Defendants and each of the Director Defendants.

381. The FY24 Form 10-K touted purported improvements to the Company's "highly efficient and thoughtfully designed distribution network" as a result of the Merger:

> As a result of the Transaction, we expect more improvements to our distribution capabilities as we look to capture an estimated $300 million cost synergy opportunity that includes optimization of our combined manufacturing locations, routes, branches, and inventory management.

382. These statements were materially false or misleading and/or omitted material information necessary to make them not misleading when made because they failed to disclose that the Company's distribution capabilities were not "highly efficient" and were only getting worse, not better, as a result of Defendants' rushed attempt to capture $300 million in synergies. Efforts to "optimiz[e]" delivery routes

- 163 -

by merging and reducing them increased distances between factories and branches, causing late deliveries, significant customer service issues, and customer cancellations. Efforts to "optimiz[e]" manufacturing locations and branches were also problematic because they entailed rapid shutdowns that caused inventory shortages and exacerbated the delivery disruptions. These issues drove up costs, decreased margins, slowed net sales growth, and compressed earnings (EBITDA).

383. The FY24 Form 10-K also outlined a series of purported "risk factors" that the Company stated, "could cause actual results to differ materially from those in the purportedly forward-looking statements," including:

> If integration is not managed successfully, we *may* experience interruptions in our business activities, deterioration in our associate and customer relationships, increased costs of integration, and harm to our reputation, all of which *could* have a material adverse effect on our business, financial condition, and results of operations.

384. These purported risks concerning the Merger integration, were materially false or misleading and/or omitted material information necessary to make them not misleading because, they failed to disclose that these risks had already come to pass and were already negatively impacting Primo Brands' operations. Specifically, the Company's rushed and poorly executed integration efforts were causing serious operational issues, compounded by incompatibilities among the legacy companies' systems and products. These issues were exacerbated by Defendants' decision in January 2025 to accelerate the timeline for achieving

- 164 -

synergies (despite existing problems and red flags) through rapid cost-cutting and restructuring measures, which caused disruptions in manufacturing, supply chains, and deliveries. This necessitated massive expenditures to fix the integration problems and stem customer losses, which had a major negative impact on the Company's financial results, including reduced net sales growth and compressed earnings (EBITDA).

385. Indeed, as would later be admitted, the Company had not managed the integration successfully and it was causing operational disruptions, damaging customer relationships, and increasing costs. These problems *were having* (not "could have") a material adverse effect on the Company's business, financial condition, and results of operations. It was further acknowledged, "The speed by which we closed facilities and reduced headcount led to disruptions in product supply, delivery and service."

386. Additionally, in his first public call after replacing Rietbroek, Foss acknowledged, "I think most of the direct delivery disruption has been *self-inflicted*. . . . we probably moved too far too fast on some of the various integration work streams." Foss further stated there was "no doubt" that the speed of the integration efforts impacted "product supply" and "our ability to get through a lot of the warehouse closures and route realignment without disruption," resulting in the

- 165 -

"customer service issues that we've highlighted." Foss also acknowledged "integration issues related to the technology move over."

### D. Underwriter Defendants Failed to Exercise Due Diligence

387. As the underwriters of the SPO, representatives of Underwriter Defendants assisted Individual Securities Act Defendants, Director Defendants who signed the SPO Registration Statement, and the Selling Stockholder Defendant by planning the SPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Primo Brands, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of Underwriter Defendants in order to participate in the SPO. During the course of their "due diligence," Underwriter Defendants had continual access to confidential corporate information concerning Primo Brands' operations, risks, and financial prospects. Yet, Underwriter Defendants were negligent by failing to conduct a reasonable degree of due diligence that would have detected Primo Brands was already facing serious operational issues from the rushed and poorly executed Merger Integration Plan and the incompatibilities in the two legacy a companies that was well underway and affecting the Company before the SPO.

### E. Class Action Allegations for Securities Act Claims

388. Providence brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure alleging violations of Sections 11,

- 166 -

12(a)(2), and 15 of the Securities Act, and rules promulgated thereunder by the SEC, on behalf of all persons or entities that purchased or acquired Primo Brands Class A common stock issued pursuant and/or traceable to the Registration Statement in connection with Primo Brands' SPO in March 2025 ("Securities Act Class"). Excluded from the Securities Act Class are Securities Act Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Securities Act Defendants have or had a controlling interest.

389. Members of the Securities Act Class are so numerous that joinder of all members is impracticable. While the exact number of Securities Act Class members can only be determined by appropriate discovery, Providence believes that Securities Act Class members number at least in the hundreds, if not the thousands, and that they are geographically dispersed. The SPO involved the sale of 51,750,000 shares of Primo Brands Class A common stock to the public at a price of $29.50 per share for gross proceeds of $1,522,692,060.

390. Providence's claims are typical of the claims of the members of the Securities Act Class because Providence and all of the Securities Act Class members sustained damages arising out of Securities Act Defendants' wrongful conduct complained of herein.

391. Providence will fairly and adequately protect the interests of the Securities Act Class members and has retained counsel experienced and competent in class actions and securities litigation. Providence has no interests that are contrary to, or in conflict with, the members of the Securities Act Class that Providence seeks to represent.

392. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Securities Act Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Securities Act Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

393. Questions of law and fact common to the members of the Securities Act Class predominate over any questions that may affect only individual members in that Securities Act Defendants have acted on grounds generally applicable to the entire Securities Act Class. Among the questions of law and fact common to the Securities Act Class are:

(a) whether Securities Act Defendants violated the federal securities laws as alleged herein;

(b)     whether the Offering Materials contained or incorporated material misrepresentations;

(c)     whether Securities Act Defendants failed to convey material facts in the Offering Materials or to correct material facts previously disseminated;

(d)     whether the prices of Primo Brands Class A common stock were artificially inflated due to the material nondisclosures and/or misrepresentations contained or incorporated in the Offering Materials; and

(e)     whether the members of the Securities Act Class have sustained damages as a result of the decline in value of Primo Brands Class A common stock when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

## COUNT III:
### For Violations of Section 11 of the Securities Act
### Against Securities Act Defendants

394.    Providence repeats and realleges each and every allegation in §V above as if fully set forth herein.

395.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, by Providence on behalf of itself and the Securities Act Class against Securities Act Defendants.

396.   This Count does not sound in fraud.  Providence does not allege that Securities Act Defendants had scienter or fraudulent intent, which are not elements of a Section 11 claim.

397.   The Registration Statement for the SPO was materially inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

398.   None of the inaccurate, misleading, or untrue statements in the Registration Statement alleged herein was a forward-looking statement.  Rather, each such statement concerned existing facts.  Moreover, the Registration Statement did not properly identify such statements as forward-looking statements and did not disclose information that undermined the putative validity of such statements.

399.   Primo Brands is the registrant for the SPO.  As the issuer of the Class A common stock, Primo Brands is strictly liable to Providence and the Securities Act Class for the materially inaccurate statements in the Registration Statement and the failure of the Registration Statement to be complete and disclose the material information required to be disclosed therein pursuant to the regulations governing the Registration Statement's preparation.

400.   Individual Securities Act Defendants and Director Defendants signed or authorized the signing of the Offering Materials either personally or through and

- 170 -

attorney-in-fact and caused its issuance. Each of the Individual Securities Act Defendants and Director Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. Individual Securities Act Defendants and Director Defendants had a duty to ensure that such statements were true and accurate, and that there were no omissions of material facts that would make the statements in the Registration Statement inaccurate. By virtue of Individual Securities Act Defendants' failure to exercise reasonable care, the Registration Statement contained inaccurate misrepresentations and/or omissions of material facts. As such, Individual Securities Act Defendants and Director Defendants are strictly liable to Providence and the Securities Act Class under Section 11 of the Securities Act.

401. Underwriter Defendants served as underwriters for the SPO and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. §77b(a)(11). As such, they participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Registration Statement. Each of the Underwriter Defendants, as an underwriter of the securities offered in the SPO pursuant to the Registration Statement, had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of

- 171 -

material fact that would make the statements misleading. By virtue of each of the Underwriter Defendants' failure to exercise reasonable care, the Registration Statement contained false statements of material facts and omissions of material facts necessary to make the statements made therein not misleading. As such, each of the Underwriter Defendants is liable under Section 11 of the Securities Act to Providence and the Securities Act Class.

402. Securities Act Defendants were responsible for the contents and dissemination of the Registration Statement. None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

403. By reason of the conduct herein alleged, Securities Act Defendants each violated Section 11 of the Securities Act.

404. Providence and other members of the Securities Act Class have sustained damages. The value of Class A common stock of Primo Brands has declined substantially subsequent to and due to the violations of the Securities Act Defendants.

405. At the time of their purchase of Primo Brands Class A common stock in and/or traceable to the SPO, Providence and other members of the Securities Act Class were without knowledge of the facts concerning the wrongful conduct alleged

- 172 -

herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Providence discovered or reasonably could have discovered the facts upon which this complaint is based to the time that the action commenced. Less than three years has elapsed between the time that the securities upon which this Court is brought were offered to the public and the time this action commenced.

## COUNT IV:
### For Violations of Section 12(a)(2) of the Securities Act
### Against Securities Act Defendants

406. Providence repeats and realleges each and every allegation in §V above as if fully set forth herein.

407. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77*l*(a)(2), on behalf of the Securities Act Class against all Securities Act Defendants.

408. This Count does not sound in fraud, nor does it require a showing of scienter or fraudulent intent, and Providence disavows all averments of fraud against Securities Act Defendants for purposes of this Count.

409. By means of a defective SPO Prospectus and other conduct alleged herein, these defendants promoted and sold Primo Brands Class A common stock sold in the SPO to Providence and other members of the Securities Act Class.

410.   The SPO Prospectus contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above.  Defendants named herein owed Providence and other members of the Securities Act Class who purchased Primo Brands Class A common stock pursuant to the SPO Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the SPO Prospectus to ensure that such statements were not true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.   Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the SPO Prospectus as set forth above.

411.   Providence did not know, nor in the exercise of reasonable diligence could the Providence have known, of the untruths and omissions contained in the SPO Prospectus at the time Providence acquired Primo Brands Class A common stock.

412.   By reason of the conduct herein alleged, Securities Act Defendants each violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Providence and other members of the Securities Act Class who purchased Primo Brands Class A common stock pursuant to the SPO Prospectus sustained substantial damages in connection with their purchases of stock.  Accordingly, Providence and other members of the Securities Act Class who hold

- 174 -

Class A common stock issued pursuant to the SPO Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their Primo Brands Class A common stock to Defendants sued herein.  Securities Act Class members who have sold their Primo Brands Class A common stock seek damages to the extent permitted by law.

**COUNT V:**
**For Violations of Section 15 of the Securities Act**
**Against Individual Securities Act Defendants, Director Defendants,**
**and the Selling Stockholder Defendant**

413.    Providence repeats and realleges each and every allegation in §V above as if fully set forth herein.

414.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of Providence and the Securities Act Class against Individual Securities Act Defendants, Director Defendants, and the Selling Stockholder Defendant ("Section 15 Defendants").

415.    Section 15 of the Securities Act does not require a showing of scienter or fraudulent intent, and Providence disavows all averments of fraud against the Section 15 Defendants for purposes of this Count.

416.    Section 15 Defendants acted as controlling persons of Primo Brands within the meaning of Section 15 of the Securities Act.  By reason of their positions with the Company, agreements, and course of dealings with the Company and/or their ownership of Primo Brands stock and/or their status as, or ability to nominate

- 175 -

directors, the Section 15 Defendants had the power and authority to cause Primo Brands to engage in the wrongful conduct complained of herein, including the SPO, and were culpable participants in the violations of law described herein.  Primo Brands controlled Section 15 Defendants who were the Company's employees, directors, and/or shareholders at the time of the SPO.

417.  By reason of the conduct alleged herein, Section 15 Defendants are liable pursuant to Section 15 of the Securities Act.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs, individually and on behalf of the Exchange Act Class and the Securities Act Class, pray for relief and judgment as follows:

A.    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Securities Act Class and Exchange Act Class defined herein;

B.    Awarding Lead Plaintiffs and the members of the Exchange Act Class and Securities Act Class and damages in an amount that may be proven at trial, together with interest thereon;

C.    Awarding Lead Plaintiffs and the members of the Exchange Act Class and Securities Act Class and pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

D.    Awarding such other relief as this Court deems appropriate

**JURY TRIAL DEMANDED**

Lead Plaintiffs hereby demand a trial by jury.

DATED:  April 6, 2026

ROBBINS GELLER RUDMAN
  & DOWD LLP
KATHLEEN B. DOUGLAS
Florida Bar No. 043240
SABRINA E. TIRABASSI
Florida Bar No. 0025521
ANDREW T. REES
Florida Bar No. 062247


_s/ Kathleen B. Douglas_
KATHLEEN B. DOUGLAS

225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
kdouglas@rgrdlaw.com
stirabassi@rgrdlaw.com
arees@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

ZAZZALI, P.C.
ANDREW F. ZAZZALI, JR.
570 Broad Street, Suite 1402
Newark, NJ  07102
Telephone:  973/623-1822
azazzali@zazzali-law.com

SUSANIN, WIDMAN & BRENNAN, P.C.
DANIEL J. BRENNAN
1001 Old Cassatt Road, Suite 306
Berwyn, PA  19312
Telephone:  610/710-4510
dbrennan@swb.law

Counsel for Heavy & General Laborers'
Locals 472 & 172 Pension & Annuity Funds